IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RICHARD MCMANUS, EDNA AVAKIAN, CHARLES CARDILLO, BEN CAPPS, DEBORAH DIBENEDETTO, and CAROL J. RITCHIE, et al. | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:11-cv-00565-GPM |
| v. | ) ) | |
| STURM FOODS, INC., and TREEHOUSE FOODS, INC., | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT

Peter H. Burke, Esq.
J. Allen Schreiber, Esq.
W. Todd Harvey, Esq. ASB 3215-E64W
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054
E-Mail:  pburke@bhflegal.com
          tharvey@bhflegal.com
*Attorneys for Plaintiffs Richard Mcmanus,
Edna Avakian, Charles Cardillo, Ben Capps,
Deborah Dibenedetto, and Carol J. Ritchie*

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*

Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*

B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN  38103
*Attorney for Plaintiff Carol Carr*

Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORTIES ........................................................................................iii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    1.  The Keurig Coffee Consumer .........................................................................2

    2.  Defendants' Deceptive Packaging...................................................................2

    3.  Experience of Named Plaintiffs in this Action................................................4

    4.  Experience of Other Named Plaintiffs ...........................................................6

    5.  Experience of Other Consumers.....................................................................7

    6.  Defendants' Willful Conduct ..........................................................................7

    7.  Expert Testimony .........................................................................................13

GENERAL REQUIREMENTS OF RULE 23 ...........................................................16

PROPOSED SUBCLASSES ......................................................................................18

RULE 23 (a) FACTORS.............................................................................................19

    A.  Numerosity....................................................................................................19

    B.  Commonality.................................................................................................19

    C.  Typicality.......................................................................................................21

    D.  Adequacy of Representation .........................................................................22

        1.  All of the Named Plaintiffs are Adequate Representative..........................22

        2.  Class Counsel is Adequate.......................................................................24

RULE 23 (b)(2)..........................................................................................................25

RULE 23 (b)(3)'s REQUIREMENTS: Predominance and Superiority .....................26

    A.  Predominance ................................................................................................26

B. Superiority ........................................................................................................29

    1. Members of the class have no interest in individually controlling their claim ..............29

    2. The extent and nature of any litigation concerning the controversy already begun by or against class members ........................................................................30

    3. It is desirable to control litigation in this forum ...........................................30

    4. A class action focusing on this issue of whether defendant willfully marketed their GSCs Presents no management difficulties...................................................30

THE COURT SHOULD CERTIFY THE UNJUST ENRICHMENT SUBCLASSES....................32

THE COURT SHOULD CERTIFY THE CONSUMER FRAUD SUBCLASSES.........................34

Plaintiffs' Counsel will provide the Court with a Notice Plan that provides the best Notice practicable ...............................................................................................................36

CONCLUSION..........................................................................................................36

CERTIFICATE OF SERVICE .......................................................................................38

# TABLE OF AUTHORITIES

CASES:

*Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ...........................32

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) .............................................................22

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615-16 (1997) ...................................................26

*Baffa v. Donaldson*, 2000 U.S. App. LEXIS 22162 at *25 (2d Cir. 2000) .......................................23

*Booe v. Shadrick*, 322 N.C. 567, 369 S.E.2d 554, 555-56 (N.C. 1988) ............................................33

*Buford v. H & R Block*, Inc., 168 F.R.D. 340, 353 (S.D. Ga. 1996, Moore, J.) ...............................23

*Butler v. Sears*, 2012 U.S. App. LEXIS 23284 (November 13, 2012) ...................................... 26, 27

*CEDesign Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011) ...................18

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 724-725 (7th Cir. 2011) ............22

*City of Goodlettsville v. Priceline.com, Inc.*, 267 F.R.D. 523, 533 (M.D. Tenn. 2010) ...................32

*Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) .....................................................23

*Culver v. City of Milwaukee*, 277 F.3d 908, 910 (7th Cir. 2002) .....................................................20

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ................................22

*Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130* 657 f.2d 890, 895 (7th Cir. 1981) ..................................................................................................................................................22

*Elliott v. ITT Corp.*, 150 F.R.D. 569, 575 (N.D. Ill. 1992) ..............................................................19

*FTC v. 120194 Canada, Ltd.*, 2007 U.S. Dist. LEXIS 12657, 10-11, (N.D.Ill. February 12, 2007) ..................................................................................................................35

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ........................35

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364 (1982) .......................................17

*Great Am. Ins. Co. v. Mills*, 2008 U.S. Dist. LEXIS 42570 (D.S.C. May 29, 2008) ......................33

*Ham v. Swift Transp. Co.*, 275 F.R.D 475, 487 (W.D. Tenn. 2011) .................................................32

*Harris v. Circuit City Stores, Inc.*, 2008 WL 400862, at *8 (N.D. Ill. 2008) ..................................29

*Hinman v. M and M Rental Center, Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) .....................21

*Howland v. First American Title Ins. Co.*, 672 F.3d 525, 528 (7th Cir. 2012) ................................18

*In the Matter of Cliffdale Assocs., Inc.* 103 F.T.C. 110, 165 (1984) .................................................35

*In re BearingPoint, Inc. Securities Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006) ............................32

*In Re: Diet Drugs (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) Products Liability Litig.*, MDL NO. 1203, 2000 U.S. Dist. LEXIS 12275 *158-159 (E.D. Pa August 28, 2000) .................................................................................................................................................25

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) ..........................................28, 29

*In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D.C.Minn. 1995) .................................31, 32

*In re VMS Ltd. Pshp. Sec. Lit.*, No. 90 C 2412, 1992 U.S. Dist. LEXIS 14445, at *13 (N.D.Ill. Sept. 23, 1992) ...........................................................................................................................22

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) .......................................................................35

*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 n. 12 (11th Cir. 1997) ......................26

*Jenkins v. Mercantile Mortg. Co.*, 231 F.Supp.2d 737, 744 (N.D.Ill. 2002) ...................................19

*Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) ....................................................................20

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 at 728 (11th Cir. 1987) .................................23

*Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ...........................................................................................................34

*Maniscalco v. Brother International Corp.*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009) ...................33

*Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002) .....................................................................................34

*Medina v. Manufacturer's & Traders Trust Co.*, No. 04 C 2175, 2004 U.S. Dist. LEXIS 25305, 2004 WL 3119019, at * 3 (N.D. Ill. Dec. 14, 2004) .................................................................36

*Messner v. Northshore University HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012) ....................18

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) .................................................36

*New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936 (M.D. Ala. June 26, 2012) ...........................................................................................................33

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ........................................................27, 28

*Pfaff v. Whole Foods Market Group Inc.*, 2010 U.S. Dist. LEXIS 104784 (N.D.Oh. 2010) ...........20, 29

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985) ..............................................................30

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012) ........................................................18

*Roberts v. The Source for Public Data*, 2009 U.S. Dist. LEXIS 107057 (W.D.Mo. November 17, 2009) ..................................................................................................................................24

*Roe v. Town of Highland,* 909 F.2d 1097, 1100 n. 4 (7th Cir. 1990) ...................................19

*Rosario v. Livaditis,* 963 F.2d 1013, 1017-1018 (7th Cir. 1992)........................................20

*Saf-T-Gard Intern., Inc., v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D. Ill. 2008) ............21

*Saltzman v. Pella*, 257 F.R.D. 471, 483 (N.D.Ill. 2009)................................................ 25, 32, 33

*Sanderson v. Winner,* 507 F.2d 477, 479-480 (10th Cir. 1974) (per curium), cert denied, 421 U.S. 914, 95 S. Ct. 1573, 43 L. Ed. 2d 780 (1975) ..................................................................24

*Schnorbach v. Fuqua*, 70 F.R.D. 424, 428 (S.D. Ga. 1975, Alaimo, J.) ...........................................23

*Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) .............................................21

*Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)........................................32

*Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000) ........................35

*Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 370-374, 15 L. Ed. 2d 807, 86 S. Ct. 845 (1966) ..23

*Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)..........................................18

*Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327-28 (S.D. Fla. 1996).............................................23

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010)....................................33

*Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)......................33

*Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000) ................................................18


OTHER AUTHORITIES:

2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 8:2 (8th ed. 2011) ................................31

5-23 Moore's Federal Practice – Civil § 23.45 (3d ed. 2011) ...........................................................31

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed. 2008) ..........................................................................................................................................31

Charles Alan Wright, Arthur R. Miller & Mary K. Kane, 7AA *Federal Practice and Procedure* § 1785, pp. 370-72 (3d ed. 2005)........................................................................................................18

William B. Rubenstein, Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 9:47 (4th ed. 2002 & supp. 2012)........................................................................................................................31

William B. Rubenstein, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2012)....................................26

Come Now the Plaintiffs and pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) hereby move the Court requesting an order certifying eight subclasses of consumers that purchased Defendants' Grove Square Coffees ("GSCs") from September of 2010 up through the date the case is certified.

## INTRODUCTION

Plaintiffs are consumers from eight states that brought suit against Defendants alleging they fraudulently marketed their GSCs, an instant coffee product, to owners of Keurig brewing machines.[1] Defendants marketed the GSCs knowing that consumers expected a product that had fresh ground coffee with a filter in the cartridge, the only type of coffee product that was available for purchase prior to the launch of Defendants' GSCs. Discovery has determined that Defendants' GSCs always contained 95% to 96% freeze dried instant coffee, mixed with a little "microground," placed in a cartridge without a filter.[2]

Defendants' conduct was willful in that it launched the product in order to be favorably positioned in the marketplace as a "first mover" when Keurig's patent on the technology expired in September of 2012. When Defendants first launched their product, Defendants called it "soluble" in order to mask the true nature of the product. After it hit the market, Defendants disseminated false information about the product on the internet and in direct communications to consumers informing them that the product was not instant. Defendants made these representations even though they later removed "soluble" from the box and replaced it in small

---

[1] Contemporaneously herewith, Plaintiffs are filing an Evidentiary Submission (hereinafter "Evid. Sub.") in support of their Motion for Class Certification. Exhibit letters in this document will correspond to the exhibits contained in that document. Because many of the documents and depositions have been stamped highly confidential significant portions of the submission will be filed under seal.

[2] Defendants' Responses to Plaintiffs Interrogatories show that the GSCs always contained at least 95% to 96% instant freeze dried coffee. See Exhibit A to Evid. Sub.

type with the word instant.  Defendants even had employees fabricate favorable reviews of the product on Amazon in order to combat the "black eye" it had received, from other reviews that duped consumers had posted.

Based upon this fraudulent scheme, Plaintiffs seek to represent consumers in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Each of the named Plaintiffs resides in one of these states and asserts claims under that state's respective consumer protection statute.  Claims for unjust enrichment and injunctive relief are also brought.

## STATEMENT OF FACTS

### 1.   The Keurig Coffee Consumer

Defendants commissioned a marketing study that found that all Keurig coffees "are premium branded products and consumers have the perception that they brew premium coffee in their machines." Exhibit B, Grove Square 4365.[3]  Similarly, the research showed "[c]onsumers perceive Keurig coffee as high quality, premium product." (11432). As noted, when the GSCs were first marketed, all of the other coffee products on the market for use in a Keurig contained fresh ground coffee with a filter.  Other factors made the Keurig consumer susceptible to purchasing the GSCs believing they contained fresh ground with a filter.  For instance, Keurig consumers could choose from a wide assortment of brands, are not loyal to any, purchase based on roast and flavor from formulaic packaging, and perceive no risk in choice. (13616).

### 2.   Defendants' Deceptive Packaging

As explained in Plaintiffs' Amended Complaint, Defendants' formulaic packaging of its

---

[3] Exhibit B is comprised of Grove Square documents that are referred to throughout the brief inserted into the exhibit in numerical order.  For simplicity, the Grove Square identifier is not included but only the bates number is referenced.

2

product led consumers to believe that it was similar in kind and quality to other available Keurig products.[4]  For instance, the product contains text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig coffee makers."  (Doc. 53 at ¶ 16.)  The top (or side) of the packaging reads as follows:

Great Coffee.  Plain and Simple.

> For Generations, Americans have appreciated a great cup of coffee.  Long before it became complicated and grandiose, we savored it in neighborhoods coffee shops and diners where the atmosphere was friendly, and the coffee was simply fresh, hot, and delicious.  Grove Square coffee recaptures this rich, traditional cup, and brings it home with single-serve convenience.  Our lives might be more complicated now, but our coffee doesn't have to be.  Grove Square coffee.  It's one cup of coffee you'll feel right at home with, and it's right here in your neighborhood. (Doc. 53 at ¶ 17.)

Of course, the foregoing imagery is not the kind that a consumer would associate with instant coffee.  Similarly, the back of the packaging has a "quality promise" that states "Grove Square coffee is made with some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness."  (Doc. 53 at ¶ 18.)  Again, one would not expect a quality promise such as this to be associated with instant coffee.

Nowhere on its standardized packaging did Defendants disclose that its product was overwhelmingly comprised of instant coffee.  Nowhere on its standardized packaging did Defendants disclose that its product did not contain a filter.  The failure to disclose this information was a material omission.  Instead, Defendants packaged their product to consumers in a manner that led consumers to believe that it contained fresh ground with a filter, and that it was of similar kind and quality as other coffee products for use in a Keurig machine.  And to the

---

[4] Documents attached to the Evid. Sub as Exhibit Z are color copy printouts of Defendants' standardized formulaic packaging.  The packaging was designed to look like other Keurig licensed products.

3

extent Defendants used the word "instant" on the package it was in a small font to minimize its disclosure and surrounded by distracting imagery.

    3.  Experience of Named Plaintiffs in this Action:

Plaintiff Avakian purchased the product in California and seeks to represent a class of California consumers. (Excerpts of her deposition are Exhibit C, at P. 36, lines 17 – p. 37, line 7). She believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P.63, lines 2-11). Avakian has participated in the discovery process, providing answers to document requests and interrogatories, and she has also sat for her deposition. She understands her role as a named Plaintiff in a class action. (P. 83, lines 14-25).

Plaintiff Capps purchased the product in South Carolina and seeks to represent a class of consumers from that state. (Excerpts of his deposition are Exhibit D, at P.29, lines 7-19). He believed he was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 37, lines 4-9). Capps complained directly to the Defendants after he made his purchase. Id. Capps has participated in the discovery process, providing answers to document requests and interrogatories, and he has also sat for his deposition. He understands his role as a named Plaintiff in a class action. (P. 7, lines 6-15).

Plaintiff Cardillo purchased the product in New York and seeks to represent a class of New York consumers. (Excerpts of his deposition are Exhibit E, at P. 18, lines 14-25.) He believed he was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 35, lines 11-20). Cardillo complained to the Better Business Bureau about Defendants' product. Cardillo has participated in the discovery process, providing answers to document requests and interrogatories, and he has also sat for his deposition. He understands his role as a named Plaintiff in a class action. (P. 5, line 16 – p. 6, line 5).

Plaintiff DiBenedetto purchased the product in New Jersey and seeks to represent a class of consumers from that state. (Excerpts of her deposition are Exhibit F, at P. 6, lines 20-24; p. 7, lines 4-5; p. 59, lines 14-17.)   She believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 100, lines 8-19, p. 115, lines 18-24).   After purchasing the product, DiBenedetto sent an e-mail to Sturm complaining that the product was instant; she received a response that the product was not instant.   (Doc. 53 at ¶¶ 27-28)  She has participated in the discovery process, providing answers to document requests and interrogatories, and she has also sat for her deposition.   She understands her role as a named Plaintiff in a class action. (P. 6 line 20-P. 7 line 2).

Plaintiff McManus purchased the product in Alabama and seeks to represent a class of consumers from that state.  (Excerpts of his deposition are Exhibit G, at P. 40, lines 1-18.)  He believed he was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 114, lines 13-22; p. 119, line 3-18). McManus has participated in the discovery process, providing answers to document requests and interrogatories, and he has also sat for his deposition. He understands his role as a named Plaintiff in a class action.  (P. 112, line 13 through p. 113, line 19).

Plaintiff Ritchie purchased the product in North Carolina and seeks to represent a class of consumers from that state. (Excerpts of her deposition are Exhibit H, at P. 16, lines 17-22.)  She believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product.  (P. 75, line 22 – p. 76, line 8).  After purchasing the product, Ritchie complained to the Better Business Bureau.   She has participated in the discovery process, providing answers to

document requests and interrogatories, and she has also sat for her deposition. She understands her role as a named Plaintiff in a class action. (P. 74, line 19 – p. 75, line 24).[5]


4.   Experience of Other Named Plaintiffs

In addition to the named Plaintiffs in this action, there are three other actions that have been consolidated in this forum involving similar allegations. Plaintiff Linda Suchanek is a citizen of Illinois, who purchased Defendants' product in Illinois, and seeks to represent a class of Illinois consumers. (Excerpts of her deposition are Exhibit I, at P. 31, lines 14-17; p. 33, lines 9-14, p. 80, line 17 to p. 81, line 9). Suchanek believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 55, line 1 to p. 57, line 5). She has participated in the discovery process, providing answers to document requests and interrogatories, and she has also sat for her deposition. She understands her role as a named Plaintiff in a class action. (P. 80 Line 11 – P. 81 line 9).

Plaintiff Paula Gladstone is a citizen of New York, purchased defendants' product in New York, and like Plaintiff Cardillo, also seeks to represent a class of New York consumers. (Excerpts of her deposition are Exhibit J, at P. 90, line 21- p. 92, line 9; p. 32 & 33). Gladstone believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 42, lines 13-21). She has participated in the discovery process, providing answers to document requests and interrogatories, and she has also sat for her deposition. She understands her role as a named Plaintiff in a class action. (P. 13 lines 12-16).

Plaintiff Carol Carr is a citizen of Tennessee, purchased Defendants' product in Tennessee, and seeks to represent a class of Tennessee consumers. (Excerpts of her deposition

---

[5] The experience of the foregoing Plaintiffs is set forth in more detail in Plaintiffs' First Amended Class Action Complaint (hereinafter "Amd. Cpl.") at ¶¶ 22 through 32.

are Exhibit K, at P. 40, lines 5-9, p. 13, lines 3-10). Carr believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. (P. 54, line 21 to p. 55, line 19). She has participated in the discovery process, providing answers to document requests and interrogatories, and she has also sat for her deposition. She understands her role as a named Plaintiff in a class action. (P. 13 lines 3-10).

    5.  Experience of Other Consumers

The experience of other consumers was similar to that of the named Plaintiffs. Extensive quotes from complaints of other consumers were set forth in Plaintiffs' Amd. Cpl. at ¶¶ 33 through 51. A February 22, 2011, e-mail from an on-line retailer informed Sturm:

> Grove Square continues to struggle with the high customer complaints. . .INSTANT and BAD taste are the problems. Below are more customer feedback. . . Keep in mind that these are communications that we're receiving from customers that have bought Grove Square at Wal-Mart, Winn-Dixie, Amazon and discount coffee." (DCM0000138 attached as Exhibit L).

See generally, Amd. Cpl. at ¶¶ 52 through 61.

    6.  Defendants' Willful Conduct

When Defendants decided in 2009 to enter the single serve coffee market, it knew that Green Mountain held a patent on filtered cups until 2012, and in order for Sturm to enter the market it needed to come up with another way of delivering its product. (Depo of Craig Lemieux at p. 12, line 11 – p. 13, line 5, Exhibit M.) Likewise, Robert Ruegger, senior vice president, acknowledged that Sturm "could have used ground coffee if we had been able to use a filter," but after realizing "we couldn't use a filter, we wanted to find a different way to provide a coffee and still use the Keurig machine. (Depo of Ruegger at p. 23, lines 7-17, Exhibit N.) Hence, the inability to use a filter "pushed [Sturm] down the path of soluble coffee." (Ruegger at p. 24, lines 7-13).

Because a filtered cup was unavailable to Defendants, they could not make a true analog, i.e. National Brand Equivalent ("NBE"), of the existing Green Mountain product.  (Lemieux at p38, lines 1-7. )  Ruegger explained:

> Q.    You know that if you were going to sell this without a filter and use mostly soluble coffee, you would be the only people on the market doing that?
>
> **A.    There was no one doing it.  In fact, there was no one else selling a cartridge that would work in a Keurig machine at that point.**
>
> Q.    All of the other products on the market entirely, every other one of them, used the filter system of Keurig correct?
>
> **A.    The other products were all licensed products of Keurig and they all used a filter, yes.  There was no one else that was not a licensed entity with Keurig selling a cartridge that would work in a Keurig machine at that point.**"  (Ruegger depo. P. 30, line 11 – p. 31, line 1). (bold added)

Although Defendants have thousands of private label products, Lemieux responded that "nothing comes to mind," when asked about any of its other products not being true analogs of a NBE. (P. 38, line 18, p. 39, line 7).  Ruegger admitted that Defendants went ahead with the instant product in order to "have the company positioned to make [a filtered] product," when Keurig's patent expired in September of 2012. (Ruegger depo. at P. 45, line 11 – page 46, line 6).

Being the first mover was critical because "Sturm will have been packaging and processing for 2 years (Grove Square) by the time this product ships.  During this time we have gained experience and improved production and packaging processes in areas where others have yet to start." (25000)  Another employee of Defendant boasted that "we will be there with comparable if not better products with no perceived disadvantage . . . We will then solve the coffee issue by fall of 2012 and really be able to rock." (26951)

Similarly, in November of 2011, Gary Schacter's goal was "to keep building the business leading up to 10 months from now when the GMCR patent expires and we have the filter cup

and parity coffee." (9795)  "We will be the first to market with this product the day GMCR's patent expires in Sept. 2012." (16775)  A Bay Valley Employee boasted: "We will be shipping a true NBE value proposition by October of 2012." (19410) "Come September of 2012 we will be able to sell fresh roasted coffee in a cup with a filter which is something GMC's patent restricts us from doing until then." (17336)

Several retailers that passed on selling the product also concluded that the GSCs were not a true NBE.  For example, a Target employee wrote Sturm and explained: "we did try them yesterday and unfortunately the feedback was not what I wanted to hear. . . .There was a group of 10 people including 2 avid Keurig users. Overall the group did not find the product to be equal to K-cups." (4986)  John Perinotti, a buyer from A&P who was given samples of GSC, summed it up succinctly: "Jose, they put instant coffee in a K-cup… not cool.  It would not take long for consumers to figure it out. I am not interested." (7340) One Sturm employee lamented: "Supervalue is looking at another supplier on single serve coffee because we failed QA. . . our quality is the issue." (9103)

Piggly Wiggly decided to sell Sturm's ciders but passed on the GSCs because "general consensus is that there would not be repeat sales and could jeopardize other items." (19166). The feedback Defendants received from Rest Depot was similar: "The RD broker and I are concerned that the GSC product is not `ground' and not `filtered' like GM . . . which will result in a negative end user response at RD despite the attractive price point. This would negatively impact future sales growth." (10660)  An employee of Defendants also wondered, "in lieu of all the presentations by Folgers, Starbucks, Green Mountain, etc. . . our coffee doesn't compare and is not well received. I'm not sure the coffee does not put the other Grove Square items in jeopardy as far as repeat sales are concerned." (19165)

As noted, almost immediately after it first started selling the Grove Square product, Defendants started receiving inquiries regarding its composition and nature of product. In fact, a September 28, 2010, e-mail to Sturm employees cautioned:

> There is a possibility you might receive customer or third party inquiries associated with the launch of Sturm's Grove Square Coffee. The product started selling in certain Wal-Mart stores yesterday. The legal Department would like to be made of all inquiries. We have coordinated a formal response to all inquiries and Eric Beringause will be the spokesperson. (6847)

The outcry from consumers was so vitriolic that the general counsel of Treehouse Foods, Sturm's parent company, sent a February e-mail to Beringause which noted: "I am forwarding the link to the customer product comments based on the large number of negative reviews 42 of 44 and most of the comments extremely negative." (26795).   At that time, Jodi Rickert was the main person responsible for responding directly to customer complaints. (Rickert Depo. At p. 8, lines 13-15, Exhibit O.)  If her testimony can be believed, she did not realize that the product was at least 95% to 96% instant in nature, only discovering that fact on the day of her deposition. (Rickert depo. at P. 9, lines 6-18; p. 28, lines 20-24).

Rickert even wrote Plaintiff DiBenedetto and told her that the product was similar in concept to instant but better quality, even though she had never been provided any product description. (P. 32, lines 17-24).   Rickert explained that "she had a flare for words," even though she had nothing to support her statement. (P. 51, lines 14-24).   Rickert and another employee of Defendants developed a script for the call center that was established to respond to consumer complaints.  (Documents 16813; 16820; 16868; 16870; 16872; and 16881 are attached separately as Exhibit P).  Rickert put on the form "not freeze dried," even though she claims she did not know the nature of the product. (P. 53, line 17 – p. 54, line 11).

Amazingly, if a consumer complained that the coffee was instant and didn't taste good, the standard response to the consumer was "we feel this is better quality than instant because it is not freeze dried or instantized."  (Exhibit P at 16881) The product was in fact overwhelmingly freeze dried coffee, always containing at least 95% to 96% instant freeze dried.  "We stayed the route of freeze dried; national testing is being done using the formula with compact freeze dried." (12332)

Schacter cautioned his sales force: "If you're ever confronted with `your coffee is instant coffee, let them know there is no standard identity for instant coffee. Ours is NOT Freeze Dried." (10655)  After Rickert pointed out that Amazon sometimes called out the product as instant and other times did not, another employee named Gina responded: "I guess we can't say it's not instant anymore. Thanks for the info." (Rickert depo at p. 72, line 9 – p. 73, line 18).

Defendants also failed to disclose the true nature of why its product did not contain a filter.  Although Rickert knew that Defendant's product did not contain a filter because of Green Mountain's patent, she informed consumers that the reason for no filter was "[p]art of our product design." (16820)   A product that is 95% to 96% instant freeze dried coffee does not need a filter; neither the existence of the patent nor the true composition of the GSCs was disclosed to consumers.

Because there was no filter Sturm's product weighed less and Defendants were concerned that consumers might notice that their product weighed distinctly less than other true NBE products.  "As with previous tests none of the participants noticed any difference between the single serve cups with respect to weight and none noticed the Sturm cup emitted a distinct rattle when shaken. When facts made known to participants they did not equate with quality." (4517) "By the way the difference in weight was noticed by 30% of respondents . . .but this recognition

did not play into any negative assessment of Sturm . . .but this could be an issue if pointed out to the trade." (6110)  "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (11432)

Rickert received permission from Beringause to refund consumers $10 if they complained that they bought instant coffee.  "We aren't offering refunds but if consumer requests it I am sending $10 cash." (7292)  This refund policy was the first time Rickert ever sent $10 to consumers that complained, and this was not normal practice for Sturm. (P. 17 Line 16-19).  Gary Ross, after talking to Rickert about these "duped" consumers, sent an October 22, 2010, e-mail to Harry Overly inquiring: "can we arm [Rickert] with more info on what to say? Now all she does is say sorry and send $10." (9424)  Overly responded by saying, "I am considering a digital strategy."

This digital strategy – like the $10 refunds -- was highly unusual for Sturm.   Ruegger testified that although Sturm typically did not spend much on marketing it spent $235,000 in 2010 for direct marketing of the product and in 2011 spent another $263,000. (P. 169 lines 4 – 13).   He acknowledged that spending half a million dollars over fifteen months was a lot of money for this particular product, and the "size of this business doesn't justify the amount of expense we incurred." (P. 170 Lines 4 - 9).

In fact, Sturm's marketing agency, BD&H, informed it that the use of "the word `instant' is a real no-no, so they should avoid any reference to it if at all possible." (BDHM 239 attached as Exhibit Q)  Accordingly, the "online marketing campaign was carefully aligned with BD&H Marketing's brand strategy of delivering a delicious traditional cup of freshly brewed hot coffee." (9522)  Of course, there is nothing traditional about instant coffee and one does not need a Keurig brewer to make instant coffee.

12

Defendants went so far as to have friends and family write bogus reviews of the product. In a January 21, 2011, e-mail Overly requested of eight employees: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too. ☺.. I can help with language if needed." (27837)   Ironically, a printout of a slide presentation Defendants gave to potential retailers posed this question: "So what are we selling Overly?" (555).

7.   Expert Testimony

Although the ultimate question of whether Defendants marketed their product in a misleading manner is a question of fact for the jury, Plaintiffs' marketing expert Professor Bobby Calder submitted an Expert report that concluded Defendants' marketing of the Grove Square product is and has been misleading and deceptive. (His report is attached as Exhibit R to Evid. Sub.)   As part of his report Calder interviewed several consumers).   He based his opinion on his marketing experience, examination of Defendants produced materials, and interviews with several consumers.   He opined that a "reasonable consumer would have been led to falsely believe that Grove Square Coffee contained regular ground coffee for Brewing in a Keurig machine." Id at ¶ 6.   He notes that the similarity of the Defendants' product with other K-cup products would have led a consumer to think about the product in this manner, especially when the product was targeted "For use by owners of Keurig coffee makers." Id.

Calder further noted that the term "soluble" was ambiguous and or meaningless for consumers and the failure to use the word instant on the packaging was a deception through omission. Exhibit R at ¶¶ 7-8.   Moreover, when Defendants added the word instant to their packaging he points out that they never used the two-word phrase "instant coffee," which would have provided more information to consumers, and they also made sure that the word instant was

13

not prominently focused.  (Id. at ¶ 9).  He further noted that the consumer complaints confirm that consumers were misled and confused to the true nature of the Grove Square Product, and that Defendants' plan for marketing the product was to distract the consumers from ascertaining the true standard of the product as being instant. (Id. at ¶¶ 11-12).

Calder further explains that the entire way that Defendants marketed GSCs was intended to distract consumers from realizing that the product was instant coffee.  The branding of the GSCs included the Coffee Lover's Bill of Rights and presented GSCs as a way of having a traditional cup of coffee without paying too much.  Hence, he concludes that because the GSCs were marketed as a way for consumers to enjoy their Keurig K-Cup without paying the typical price, but this brand idea could only work if consumers did not realize that the GSCs were instant coffee. (Id. at ¶ 12).  It simply would have made no sense to market the GSCs in this manner "if the intention had been to disclose that Grove Square was instant coffee." (Id. at ¶ 12).

Defendants continued to receive complaints into 2012 from consumers who were noted as "first time users," inquiring if the product was instant which shows that the deception was ongoing.  These documents are attached separately as Exhibit S to Evid. Sub.  Defendants' marketing expert Gary Ford did not offer any conclusions in his report as to whether the Grove Square product was misleading to consumers, but only rendered "an opinion that Professor Calder's research does not show that it is." (Ford depo at p. 18, lines 12-17, attached to Evid. Sub. As Exhibit T)[6]

Defendants' other expert, Neal Roese, P.H.D. provided plentiful deposition testimony that supported Plaintiffs' theory of the case.  For example, he acknowledged that all of the named Plaintiffs "believed that they were buying ground roast coffee," and that they consistently

---

[6] At most, Ford and Calder may be engaged in a classic battle of experts before a jury.

complained "that they thought they had bought something different than soluble or instant coffee."   (Roese depo. At p 6, lines 7-21, attached to Evid. Sub. As Exhibit U)     Roese also admitted that there is a general opinion shared by consumers that instant coffee has a different level of quality than fresh brewed, p. 11, lines 12-17, and further noted that "Green Mountain coffee was perhaps marketed with a target toward premium-minded consumers." (Id. P.23, lines 6-8).

Roese agreed that if the product was 97% instant, it would be inaccurate for the manufacturer to say the product was not instant: "I see. It's not entirely accurate. I agree." (P. 27, lines 1-6).   As with Plaintiff's expert Calder, Roese agreed that "generally speaking," the words "soluble and microground were new to consumers," and he would have been surprised to ever hear a consumer order a cup of "soluble coffee." (P. 36, lines 14-24). Roese did not offer an opinion one way or another on whether Defendants' box was deceptive. (P.29, lines 23-24; p. 30, lines 1-5). He did agree, however, a manufacturer could confuse a consumer "by the way they choose to label their product or not label it," and as a general statement, a manufacturer could further "disguise their product such that they might fool a consumer into thinking they are buying one thing and it's really something else." (P. 71, lines 15-22).

Ruegger confirmed that Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Ruegger depo. at P. 56, line 15; p. 57, line 23.  Again, as Defendants' marketing study showed, all of the K-Cups were sold in "formulaic packaging." (13616)

Roese further admitted that another form of deception could be the price at which the product is marketed.  For instance, a manufacturer could manipulate the price of its product that

it might cause a consumer not to pay as much attention to the product.  (P.107, lines 1-11).  His conclusion is supported by Sturm's marketing study showed that the best price gap for pricing the GSQ was $1.50 because at a price below that the appeal of the product dropped significantly and at a higher price the incremental sales of the product caused a loss of retail profitability. (2769).

Defendants were very keen to price their product to attract consumer attention but not too much consumer attention, as Ruegger admitted: "Yes. I knew that there was a price gap.  We felt there was a good gap. If you actually got the price too low, people would perceive it as poor quality. If you got the price too high, obviously it would be too close to the brand and might damage the sales of the product."  (Ruegger depo. at P. 51 Lines 10-15).

Moreover, Roese acknowledged that generally speaking "certain advertisements or certain marketing information could be misleading even if the statement were true," and furthermore, recognized that it is true that just "because something might be true doesn't mean it can't also be misleading." (P. 103, lines 4-15). He also discussed consumer's "inattention blindness," or people's expectations "can be a guide to how they interpret something." (P. 91, lines 21-22).  If a person had been to a store 50 times and purchased K-cups that had ground roast and a filter and then purchased the Grove Square product and discovered at home that it did not have a filter; this could result from inattention blindness. (P.91, line 24-p. 92, line 6).

## GENERAL REQUIREMENTS OF RULE 23

Rule 23(a) of the Federal Rules of Civil Procedure states:

> (a) Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if:  (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately

protect the interests of the class.

The Supreme Court has said that the final three requirements of Rule 23(a) "tend to merge," with commonality and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364 (1982).

Rule 23(b)(2) of the Federal Rules of Civil Procedure allows the court to provide injunctive relief where a Defendant has "acted or refused to act on grounds that apply generally to the class." Plaintiffs seek injunctive relief pursuant to this subsection regarding the labeling of Defendants' product. As long as Defendants continue to market their GSCs, Plaintiffs seek an injunction requiring Defendants to call out the percentage of instant coffee on their packaging in large print and also alert consumers that the product does not contain a filter.

Rule 23(b)(3) of the Federal Rules of Civil Procedure provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

"A plaintiff who moves for class certification must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of *Rule* 23(a), as well as at least one subsection of Rule 23(b)." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). The determination whether to certify a class is left to the district court, subject to light appellate review. *CEDesign Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011); Charles Alan Wright, Arthur R. Miller & Mary K. Kane, 7AA *Federal Practice and Procedure* § 1785, pp. 370-72 (3d ed. 2005). *Howland v. First American Title Ins. Co.*, 672 F.3d 525, 528 (7th Cir. 2012). While, "a judge should make whatever factual and legal inquiries are necessary under Rule 23," *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001), "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## PROPOSED SUBCLASSES

"Rule 23 specifically provides for multiple classes in a single case, Fed.R.Civ.P. 23(c)(4)(B), and classes have been certified in cases where multiple classes were required." *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000) Rule 23(c)(5) states: "When appropriate , a class may be divided into subclasses that are each treated as a class under this rule." Fed.R.Civ. P. 23(c)(5). MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.634, p. 412 (2004) (noting the option of creating subclasses if the law of only a few jurisdictions applies). Plaintiffs propose that the Court certify the following class or subclasses for each of the named states:

> All persons or consumers that during the Class Period - from September of 2010, until and including the present who purchased in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee Defendants' Grove Square Coffee ("GSQ") products. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSQ primarily for resale; (c)

18

retailers or re-sellers of the GSQ; (d) governmental entities; and (e) any consumer that already received a refund from Defendants.

The named Plaintiffs assert claims under their respective state's consumer protection laws and also assert claims for unjust enrichment and injunctive relief.[7]

## RULE 23(a) FACTORS

A.    Numerosity

It is established that a Plaintiff "cannot rely on 'mere speculation' or 'conclusory allegations' as to the size of the putative class to prove that joinder is impractical for numerosity purposes." *Roe v. Town of Highland,* 909 F.2d 1097, 1100 n. 4 (7th Cir. 1990)). If plaintiffs are unable to provide an exact number, "a good faith effort is sufficient to establish the number of class members." *Jenkins v. Mercantile Mortg. Co.,* 231 F.Supp.2d 737, 744 (N.D.Ill. 2002)

Here, common sense dictates that numerosity is easily satisfied for each of the eight subclasses. Exhibit V and Exhibit W contain the Original and Supplemental Reports of Candace Preston. Relying upon data Plaintiff subpoenaed from SymphonyIRI Group,[8] Preston noted that there are tens of thousands of unit sales in each state during the class period.[9] In fact, she computed retail damages at approximately $5.2 million with approximately 700,000 units sold in the eight states. See Exhibit W at ¶ 7.

B.    Commonality

---

[7]To the extent Defendants argue that there may be some consumers that actually enjoyed their product and/or who were not deceived, it is important to note that "[a] class may be certified even though the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant." *Elliott v. ITT Corp.,* 150 F.R.D. 569, 575 (N.D. Ill. 1992). Moreover, any issue relating to whether class members will ultimately be able to prove their damages goes to the merits of the case and not to class certification.

[8] The Symphony data was provided as an excel spreadsheet and has not been submitted separately as an exhibit.

[9] See Exhibit A to Preston's Supplemental Report breaking out dollar and unit sales for calendar years 2010, 2011, and 2012 up through October 19, 2012.

Rule 23(a) (2) sets forth the commonality requirement which ensures that the class is "reasonably homogeneous." *Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir. 2002) "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario v. Livaditis,* 963 F.2d 1013, 1017-1018 (7th Cir. 1992). Instead, a "common nucleus of operative fact is usually enough to satisfy the commonality requirement." Id. at 1018. Courts have found a common nucleus of operative fact in situations where a defendant has engaged in standardized conduct toward members of the class. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998)

In *Pfaff v. Whole Foods Market Group Inc.*, 2010 U.S. Dist. LEXIS 104784 (N.D.Oh. 2010) plaintiff brought a class action against Whole Foods under Ohio statutory and common law for failing to provide a 10% case discount that was advertized. In finding that commonality was satisfied the court explained:

> Here, there are many common factual and legal issues among the class members. For example, all class members purchased a case of products at an Ohio Whole Foods store, and Whole Foods made the same or substantially similar representations to all class members regarding the 10% case discount. Common legal issues include whether Whole Foods' advertisements or representations were false or misleading and whether they were material, as well as whether Whole Foods breached its contracts with the class members by failing to provide the promised case discount. The resolution of these questions would advance the instant litigation. Accordingly, Pfaff has shown sufficient commonality.

2010 U.S. Dist. LEXIS 104784 at * 11.

Likewise, commonality is easily satisfied in this action. Here, plaintiffs have alleged an overarching fraudulent scheme that Defendants sold instant coffee in a K-cup, hoping that consumers "wouldn't figure it out." Common issues include whether the Defendants' box was misleading and deceptive, or tended to mislead and deceive, whether Defendants'

communications with consumers that complained were false, misleading, and deceptive, and whether Defendants attempted to cover up the scheme with a digital and marketing campaign.

As in *Whole Foods*, resolution of these questions in this action would advance the instant litigation. See *Edwards v. First Am. Corp.*, 385 Fed. Appx. 629, 631 (9th Cir. 2010) (citing Fed. R. Civ. P. 23(b)(3) advisory committee's note ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . [unless] there [is] material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."); see also *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (recognizing that claims based on largely uniform representations to a discrete group could be certified in the appropriate case).

Here, as Defendants' expert Roese recognized, the Keurig K-Cup product was unusual in that it was defined by persons who owned the Keurig machine. (Roese depo. at P. 47, lines 6-18). Other than buying the product for one's own use in a Keurig machine, or as a gift, there is no reason to purchase the product. (P. 45, lines 6-18).  Hence, we are dealing with a distinct group of consumers as it relates to the marketing of this product.  And this distinct group of consumers expected a coffee product that contained fresh ground coffee with a filter; not a product that was overwhelmingly instant in nature that had no filter.[10]

C.      Typicality

A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on

---

[10] A "class is sufficiently definite if its members can be ascertained by reference to objective criteria and may be defined by reference to defendant's conduct." *Hinman v. M and M Rental Center, Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008); (*Saf-T-Gard Intern., Inc., v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D. Ill. 2008) ("definiteness does not require plaintiffs to identify specific class members.")

the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983).    Moreover, typicality is determined with reference to the defendant's actions, not the defenses it may have against particular plaintiffs. *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721 724-725 (7th Cir. 2011) Here, all of the named Plaintiffs bring claims under their respective state's consumer protection laws and further bring a claim for unjust enrichment and seek injunctive relief.  The claims all arise from the named Plaintiffs' purchase of the GSCs. Hence, typicality is clearly satisfied.

D.    Adequacy of Representation

The plaintiff and his counsel satisfy the adequacy requirement. The adequacy inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  "Therefore, a determination of the adequacy of representation includes two inquiries:   (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."

1.    All of the Named Plaintiffs are Adequate Representatives

The adequacy requirement is satisfied where the named representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class. *In re VMS Ltd. Pshp. Sec. Lit.,* No. 90 C 2412, 1992 U.S. Dist. LEXIS 14445, at *13 (N.D.Ill. Sept. 23, 1992).

In determining whether a class representative is adequate, the court should keep in mind the admonition of the Seventh Circuit in *Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130* 657 f.2d 890, 895 (7th Cir. 1981), when it commented on a defendant's propensity for attacking the adequacy of a class representative.  It noted:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

Moreover, as the court in *Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) eloquently explained:

> Class representatives "should have a working knowledge of the case." *Buford v. H & R Block*, Inc., 168 F.R.D. 340, 353 (S.D. Ga. 1996, Moore, J.). **However, requiring too much of class representatives "could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights.**" *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 at 728 (11th Cir. 1987). The "basic issue of adequate representation [is] whether there are significant antagonistic interests between the representatives and the class." *Schnorbach v. Fuqua*, 70 F.R.D. 424, 428 (S.D. Ga. 1975, Alaimo, J.). **A lack of detailed factual knowledge about the case or a lack of understanding regarding the legal theories by the named plaintiffs does not preclude class certification in a complex case.** *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327-28 (S.D. Fla. 1996); *Kirkpatrick* at 727-28.

229 F.R.D. at 258 (bold added).

Here, all of the named Plaintiffs have actively participated in the litigation responding to discovery and sitting for deposition. Plaintiffs Carr, Gladstone, McManus, and Suchanek all filed individual actions against the Defendants after purchasing GSCs. Prior to becoming Plaintiffs, Cardillo and Ritchie complained to the BBB about their experiences with the GSCs. Exhibits X and Y. Before they joined this lawsuit, Plaintiffs Capps and DiBenedetto complained directly to the Defendants about their purchases. All of the Plaintiffs have demonstrated a commitment to this action and are adequate representatives. See *Baffa v. Donaldson*, 2000 U.S. App. LEXIS 22162 at *25 (2d Cir. 2000) ("The Supreme Court in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-374, 15 L. Ed. 2d 807, 86 S. Ct. 845 (1966) expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance.")

23

To the extent Defendants contend that any Plaintiff is inadequate because of a reluctance to be responsible for costs, the court should keep in mind the holding of *Roberts v. The Source for Public Data*, 2009 U.S. Dist. LEXIS 107057 (W.D.Mo. November 17, 2009), a lawsuit involving the improper disclosing of personal information brought under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721, *et seq.*  It reasoned:

> Defendants also argue Roberts is inadequate as a class representative because she cannot bear the costs of litigation. The Court determines this is an improper reason to deny class certification because courts usually do not examine the ability of class representatives to bear the cost of litigation. *See Sanderson v. Winner,* 507 F.2d 477, 479-480 (10th Cir. 1974) (per curium), cert denied, 421 U.S. 914, 95 S. Ct. 1573, 43 L. Ed. 2d 780 (1975) ("We generally eschew the question whether litigants are rich or poor.").
>
> Roberts shares the class interest in procuring relief to address the alleged violation of the putative class's privacy rights. There is no indication that her interest in procuring her relief will be at the expense of other class members or will, in any other way, be antagonistic to the class interests. Finally, Roberts has demonstrated a willingness to prosecute the interests of the class through qualified counsel. Roberts has already actively participated by answering discovery, submitting to a deposition, and reviewing the complaint. Roberts will, therefore, fairly and adequately represent the class.

2009 U.S. Dist. LEXIS 107057 at * 4.

    2.      Class Counsel Is Adequate.

The plaintiff's counsel satisfies the adequacy requirement.  Adequacy of representation also requires a showing that the action will be vigorously prosecuted.  Here, Plaintiffs' counsel has worked together on these consolidated actions vigorously prosecuting these actions.  Counsel has reviewed in excess of 30,000 documents that Defendants have produced.  Counsel has taken at least 12 depositions of Defendants' employees.  And counsel has also engaged in extensive third-party discovery through the use of subpoenas.  Class counsel has also hired a marketing and damages expert. Class counsel has vigorously pursued this action.

See *Newberg on Class Actions* § 3.24 at 3-133 n. 353 (3d ed. 1992) ("[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney;") *In Re: Diet Drugs (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) Products Liability Litig.*, MDL NO. 1203, 2000 U.S. Dist. LEXIS 12275 *158-159 (E.D. Pa August 28, 2000) ("In a massive class action, however, `it is counsel for the class who has the laboring oar. The class representatives furnish the factual basis to invoke jurisdiction of the court and provide the outline of the controversy, but the lawyers shape the claims . . . by the compilation of factual and expert testimony and the presentation of . . . evidence.'")

Plaintiffs would request that as part of any order certifying these subclasses, that the Court name the law firm of Burke Harvey & Frankowski, LLC as lead counsel for the subclasses.  Further, Plaintiffs would also request that the firm of Gori, Julian and Associates, P.C. be named as local counsel for the subclasses.

## RULE 23(b)(2)

Plaintiffs seek declaratory and injunctive relief under Rule 23(b) (2) regarding the labeling of Defendants' GSCs.  As the court stated in *Saltzman v. Pella*, 257 F.R.D. 471, 483 (N.D.Ill. 2009), Rule 23(b)(2): "does not require that all members of the class be aggrieved by the challenged conduct, but proponents of a Rule 23(b)(2) class must be able to demonstrate that the 'conduct or lack of it which is subject to challenge be premised on a ground that is applicable to the entire class,' and that the entry of declaratory or injunctive relief would remove a barrier or impediment common to the class."

Here, Plaintiffs allege that Defendants' standardized, formulaic packaging has affected consumers in the same manner by masking or hiding the true nature of Defendants' GSCs.

Plaintiffs seek equitable relief in the form of an injunction that will require Defendants to change the labeling of their GSCs to inform consumers in large print how much instant coffee the product contains and also alert them to the fact that the GSCs do not contain a filter. Essentially, Plaintiffs want to require Defendants to disclose clearly on their packaging that the GSCs are not true NBEs!

### RULE 23(b)(3)'s REQUIREMENTS: Predominance and Superiority

Plaintiffs also seek certification under Rule 23(b)(3). Each of the factors under that Rule will be addressed below.

A.   Predominance

As most courts recognize, predominance is a question of efficiency. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615-16 (1997); Committee Notes to 1966 Amendment to Fed. R. Civ. P. 23; *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 n. 12 (11th Cir. 1997); William B. Rubenstein, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2012). Recently, in *Butler v. Sears*, 2012 U.S. App. LEXIS 23284 (November 13, 2012), a class action involving consumers from several states that had purchased defective washing machines, the Seventh Circuit granted a Rule 23(f) petition in order to clarify the "predominance" requirement in class action litigation. Reversing the district court's failure to certify a class of consumers that complained about a defect in the washers that caused mold, Judge Posner explained the concept of predominance in this manner:

> Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials? A class action is the more efficient procedure for determining liability and damages in a case such as this involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary, a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of

replacing a defective washing machine—there doesn't seem to be any claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

2012 U.S. App. LEXIS 23284 at * 5-6.

Similarly, Judge Posner affirmed the district court's grant of class certification to a group

of consumers that complained about a defective central control unit ("CCU") on the washer, the

CCU class.  He explained:

> We turn to Sears's appeal from the certification of a class of buyers of Kenmore-brand washing machines who incurred a harm because of the defective control unit. Each washing machine has a computer device that gives instructions to the machine's moving parts. This "central control unit" consists of circuit boards that are soldered together.
>
> The principal issue is whether the control unit was indeed defective. The only individual issues--issues found in virtually every class action in which damages are sought--concern the amount of harm to particular class members. It is more efficient for the question whether the washing machines were defective--the question common to all class members--to be resolved in a single proceeding than for it to be litigated separately in hundreds of different trials, though, were that approach taken, at some point principles of res judicata or collateral estoppel would resolve the common issue for the remaining cases.
>
> Again the district court will want to consider whether to create different subclasses of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

2012 U.S. App. LEXIS 23284 at * 9-10.

Similarly, in *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) the Seventh Circuit,

again in response to a Rule 23(f) petition, upheld the trial court's granting of class certification to

subclasses of consumers from six states who alleged that they bought defective windows.  In a

per curiam opinion, in which Judge Posner participated, the Seventh Circuit found:

The district court held that the commonality requirement of *Rule* 23(a)(2) and the predominance requirement of *Rule* 23(b)(3) are both satisfied because the central questions in the litigation are the same for all class members--whether the ProLine windows suffered from an inherent defect when they left the factory, whether and when Pella knew of this defect, the scope of Pella's warranty, and the nature of the ProLine Customer Enhancement Program and whether it amended the warranty.

In contrast to *Thorogood* where there were no common issues of law or fact and the court questioned whether anyone besides the plaintiff shared the same concerns with the product, here there is an economy to class treatment of the question whether the ProLine windows suffer from a basic design defect, the resolution of which has the potential to eliminate the need for multiple, potentially expensive expert testimony and proof that would cost considerably more to litigate than the claims would be worth to the plaintiffs. *See Thorogood*, 547 F.3d at 748. According to class counsel, they already have been contacted by over 350 consumers who have experienced the same wood rot problems set forth in the complaint. Where there are common issues and the accuracy of the resolution of those issues "is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *Mejdrech*, 319 F.3d at 911.

606 F.3d at 394.

Applying the same reasoning to this action, it is evident that the predominance requirement is satisfied.  The overarching liability issues include whether the marketing of Defendants' GSCs was misleading or deceptive, or was likely or tended to deceive a Keurig consumer, whether Defendants attempted to mask or hide the true nature of their product, and whether they engaged in willful or intentional conduct by informing consumers that the product was not instant in direct communications to consumers and through a digital campaign. Resolving those issues in this proceeding will be more economical, efficient, and will preserve judicial resources than trying them in a myriad of individual actions.

The Third Circuit reached a similar result in *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010), a class action brought on behalf of consumers in the United States and Canada who purchased, or whose pets consumed, wet pet food that was allegedly contaminated

with melamine and cyanuric acid.[11]  The Third circuit held:

> The District Court also concluded that the standards of Rule 23(b)(3) were met, finding the predominance requirement was satisfied because the "same set of core operative facts and theory of proximate cause apply to each member of the class." *Id*. The class actions concern consumers who purchased, used, or obtained recalled pet food products, and if "plaintiffs and potential class members were to bring individual actions, they would each be required to prove the same wrongdoing by defendants in order to establish liability." *Id*. The superiority requirement was satisfied because "absent class certification, the Court may be faced with litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts" and "the resolution of common issues alleged in one action will result in more efficient use of judicial resources and bring about a single outcome." *Id*.
>
> No one has challenged the District Court's findings that the proposed class satisfied the numerosity, commonality, typicality, predominance, and superiority requirements, and we believe these findings were well within the court's sound discretion.

629 F.3d at 335-336. See *Whole Foods*, supra. ("Pfaff's claims pertain largely to actions taken by Whole Foods vis-a-vis the class, the Court finds that the predominance requirement of Rule 23(b)(3) is satisfied.")

B.    Superiority

The superiority requirement is met when the plaintiff demonstrates that the class action is the superior method for adjudication of the controversy.  The superiority requirement is met when the plaintiff demonstrates that there is a standardized conduct by a defendant to the putative class members and a common nucleus of operative facts is present. See *Harris v. Circuit City Stores, Inc.*, 2008 WL 400862, at *8 (N.D. Ill. 2008).

1.    Members of the class have no interest in individually controlling their claim

---

[11]  Plaintiffs alleged in that action violations of state consumer protection and deceptive trade practices statutes, as well as state law claims for product liability, breach of warranty, and negligence.

As the United States Supreme Court explained in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985):

> The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required by the Constitution. If, on the other hand, the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to "opt out."

Here, the claims of most consumers will be for $10, except to the extent a penalty statute provides for a greater sum in statutory damages for intentional or willful conduct. Still, that sum is too small on its own for a deceived consumer to bring his own individual lawsuit.

> 2.  The extent and nature of any litigation concerning the controversy already begun by or against class members

All of the existing class cases have already been consolidated in this forum. Plaintiffs are not aware of any other actions involving the same misconduct.

> 3.  It is Desirable to Control Litigation in this forum

The litigation should be concentrated in this Court as the various consolidated cases have proceeded here for over a year and a half. The Court has presided over discovery matters and is well familiar with the theories asserted in the Complaints.

> 4.  A Class Action Focusing on the Issue of Whether Defendants Willfully Marketed Their GSCs Presents no Management Difficulties

Not only is it evident that a class action is superior to individual litigation but also it is clear that the Court will not face any management difficulties with this action. As noted, supra, the overriding issue in this action is whether Defendants fraudulently marketed their GSCs. The Court can resolve the liability issues first and then if needed have a claims procedure.

One treatise, under the heading, "Issues of Liability and Damages Are Often Severed," states flatly that, "[i]n order to make class action litigation efficient, courts often bifurcate trials

30

into liability and damages phases, severing common liability questions from individual damages

issues." 5-23 Moore's Federal Practice – Civil § 23.45 (3d ed. 2011).  Another leading treatise

explains that it is necessary to consider liability prior to damages:

> Logically, the existence of liability must be resolved before damages are
> considered. . . . Moreover, the evidence pertinent to the two issues often is wholly
> unrelated and there is no efficiency in trying them together. Thus it is not
> surprising that a significant number of federal courts, in many different kinds of
> civil litigation, have ordered the questions of liability and damages to be tried
> separately.

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed.

2008).

Likewise, other authoritative texts approve of similar techniques. See 2 Joseph M.

McLaughlin, *McLaughlin on Class Actions* § 8:2 (8th ed. 2011) ("The most commonly employed

bifurcation in class actions and other contexts is the trial of the issue of the defendant's liability

in Phase I, followed by determinations of the amount of recovery by individual plaintiffs or class

members in follow-on trials."); William B. Rubenstein, Alba Conte & Herbert Newberg,

*Newberg on Class Actions* § 9:47 (4th ed. 2002 & supp. 2012) ("Not infrequently, actions filed

as class actions present predominating common issues of liability, while proof of damages may

remain as individual issues for the several class members.").  For instance, as the court noted in

*In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D.C.Minn. 1995):

> "Moreover, various judicial methods are available to resolve individual
> damage issues without precluding class certification.  Among the methods
> available to the Court are: (1) bifurcating liability and damage trials; (2)
> appointing special masters or magistrates to preside over individual
> damage  proceedings; (3) decertifying the class after the liability trial, if
> liability and damages are separated; (4) establishing presumptions or
> inferences of reliance or causation which are predicates to damage
> entitlement; (5) using the defendants' transactional records to compute
> individual damages; and (6) creating subclasses.  See 1 Herbert H.
> Newberg, Newberg on Class Actions, '4.26 at 4-91-97 (3d ed. 1992)
> (citing cases for each proposed method); see also *In re Bally Mfg.*

> *Securities Corp. Litig.*, (noting that risk "certification would expand the
> litigation beyond all reasonably controlling bounds . . . is better addressed
> further down the road, if necessary, by altering or amending the class, not
> by denying certification at the outset") (quotation omitted)."

159 F.R.D. at 697.

In sum, any potential damages issues do not defeat a finding of predominance.  See

*Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("Numerous

courts have recognized that the presence of individualized damages issues does not prevent a

finding that the common issues in the case predominate."); *Sterling v. Velsicol Chemical Corp.*,

855 F.2d 1188, 1197 (6th Cir. 1988) ("No matter how individualized the issue of damages may

be, these issues may be reserved for individual treatment with the question of liability tried  as a

class action."); see also, *In re BearingPoint, Inc. Securities Litig.*, 232 F.R.D. 534, 542 (E.D. Va.

2006) ("Damages are less central to the predominance inquiry; courts generally hold that

differences in damages among the potential class members do not generally defeat predominance

if liability is common to the class." (quotations omitted))

## THE COURT SHOULD CERTIFY THE UNJUST ENRICHMENT SUBCLASSES

Courts routinely certify classes based on claims of unjust enrichment. See e.g., *City of*

*Goodlettsville v. Priceline.com, Inc.*, 267 F.R.D. 523, 533 (M.D. Tenn. 2010) (certifying claims

for unjust enrichment and conversion); *Ham v. Swift Transp. Co.*, 275 F.R.D 475, 487 (W.D.

Tenn. 2011) (certifying unjust enrichment and other claims).

As the Court explained in *Saltzman v. Pella*:

> A successful unjust enrichment claim requires proof of three elements: "(1) a
> benefit conferred on the defendant by the plaintiff; (2) an appreciation or
> knowledge by the defendant of the benefit; and (3) the acceptance or retention by
> the defendant of the benefit under such circumstances as to make it inequitable for
> the defendant to retain the benefit without payment of its value. The Restatement
> of Restitution provides that a person who has been unjustly enriched at the
> expense of another is required to make restitution to the other." 26 WILLISTON

32

ON CONTRACTS § 68:5 (4th ed. 2009). "Damages differs from restitution in that damages is measured by the plaintiff's loss; restitution is measured by the defendant's unjust gain." 1 D. DOBBS, REMEDIES § 3.1, at 278 (2d ed. 1993).

Case law setting relating to unjust enrichment is similar in the several states. See *New v. CitiFinancial Auto Credit, Inc.*, 2012 U.S. Dist. LEXIS 87936 (M.D. Ala. June 26, 2012) ("The doctrine of unjust enrichment . . . permit[s] the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another."; *Maniscalco v. Brother International Corp.*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009) (Under New Jersey law, to prove unjust enrichment a party must demonstrate that "(1) at the party's expense; (2) the other party received a benefit; (3) and that it would be unjust for that party to retain the benefit without paying for it."); *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) ("[T]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."); *Booe v. Shadrick*, 322 N.C. 567, 369 S.E.2d 554, 555-56 (N.C. 1988) (The law of unjust enrichment in North Carolina proceeds from the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other."); *Great Am. Ins. Co. v. Mills*, 2008 U.S. Dist. LEXIS 42570 (D.S.C. May 29, 2008) (Unjust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff."); *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (Under Tennessee law, courts may impose a contract implied in law where no contract exists using the quasi-contractual theory of unjust enrichment.)

Here, Plaintiffs damages expert Preston set forth several alternative calculations for unjust enrichment damages for each of the subclasses. See Exhibit W at p. 5.   The calculations

are based on Defendants' own cost and profitability calculations relating to sale of the GSCs in the relevant states as well as overall profitability of the GSCs globally.  Hence, there is a verifiable methodology to compute these damages.  See Exhibit W at ¶¶ 9-12.

### THE COURT SHOULD CERTIFY THE CONSUMER FRAUD  SUBCLASSES

Plaintiffs' fraud claims are based upon both active misrepresentations as well as fraud through omission.  Plaintiffs allege that Defendants marketed the GSCs knowing that Keurig consumers expected fresh ground with a filter, not a product that was overwhelmingly instant in nature that did not contain a filter.  Defendants placed the GSCs in a formulaic package similar to other Keurig products, used small print to describe the product as "soluble," a term that would not be known to consumers, and further disseminated false information to the public through its digital marketing campaign and in direct communications to them that the product was not instant.  Defendants engaged in fraud through omission by not informing consumers that the GSCs always contained at least 95% to 96% instant freeze dried coffee.  Defendants further committed fraud by omission by not informing consumers that their GSCs did not contain a filter.

As far as proof of reliance in cases of omission, individual reliance is not required or may be inferred from the purchase itself. See *Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002) (if plaintiffs succeed in proving allegations of a failure to disclose a material fact associated with the purchase of life insurance policies, "the purchases common to each class member would in turn be sufficient to give rise to the inference of common reliance on representations which were materially deficient."); *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance

in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss."); *Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000)("reliance is not an element of a [statutory consumer protection] claim.")

Indeed, Defendants' market research focused in part on whether consumers would notice a difference in weight with their product, and whether consumers would equate this difference with lesser quality. These facts were material and if disclosed to consumers would have helped alert consumers to the fact that the GSCs were not a true NBE. Defendants' conduct was willful and intentional in that Defendants marketed the GSCs in order to be a first mover when the Keurig patent expired in September of 2012.

Most of the state's deceptive trade practices acts give consideration and weight to interpretations of the Federal Trade Commission ("FTC") and federal courts relating to § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). It is well settled that the deception required to state a violation of the FTC Act need not be made with intent to deceive; it is enough that the representations or practices were likely to mislead consumers acting reasonably. *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988). See *In the Matter of Cliffdale Assocs., Inc.* 103 F.T.C. 110, 165 (1984) (deception occurs under the FTC Act when there is an omission likely to mislead consumers acting reasonably under the circumstances, and the omitted information is material; see also, *FTC v. 120194 Canada, Ltd.,* 2007 U.S. Dist. LEXIS 12657, 10-11, (N.D.Ill. February 12, 2007) (materiality shown through consumer declarations and complaints)

**Plaintiffs' Counsel will provide the Court with a Notice Plan that provides the best Notice practicable**

As Plaintiffs seek certification under Rule 23(b)(3), notice is required to the subclasses. Because the identity of the individual consumers is not known, individual notice is not feasible and instead Plaintiffs will provide notice by publication. Such notice complies with due process considerations. "When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) See *Medina v. Manufacturer's & Traders Trust Co.*, No. 04 C 2175, 2004 U.S. Dist. LEXIS 25305, 2004 WL 3119019, at * 3 (N.D. Ill. Dec. 14, 2004) (Rule 23(b)(3) class) ("This [best notice practicable] standard can be satisfied even though a particular class member never receives actual notice.").

Here, Plaintiffs counsel could provide notice in industry trade magazines that Keurig drinkers read. Notice could also be provided by requesting that retailers post notice in stores or on-line. An internet web address could be created that could alert consumers to the lawsuit. Finally, print notice could be provided in the largest newspaper of the eight relevant states. After all, Defendants had no problems engaging in a digital campaign to promote the GSCs and Plaintiffs counsel will not encounter any problems in providing adequate notice.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully pray for the relief requested herein.

Respectfully submitted,

By:____/s/ Peter H. Burke_____
Peter H. Burke, Esq.

36

**OF COUNSEL:**

J. Allen Schreiber, Esq.
W. Todd Harvey, Esq. ASB 3215-E64W
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone:   (205) 930-9091
Facsimile:   (205) 930-9054
E-Mail:   pburke@bhflegal.com
          tharvey@bhflegal.com
*Attorneys for Plaintiffs Richard Mcmanus,*
*Edna Avakian, Charles Cardillo, Ben Capps,*
*Deborah Dibenedetto, and Carol J. Ritchie*

___/s/ Patrick C. Cooper
Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*

___/s/ Randy L. Gori
Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*

___/s/ B.J.Wade
B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN  38103
*Attorney for Plaintiff Carol Carr*

___/s/ Michael H. Maizes
Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

37

## CERTIFICATE OF SERVICE

I do hereby certify that on the 7th day of January, 2013, I served the foregoing via the Court's CM/ECF which will send notification to the following:

Michael Conway
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, IL 60654-5313
*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

/s/ Peter H. Burke_____
Of Counsel