**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LINDA SUCHANEK, et. al., individually and on behalf of others similarly situated, | |
| Plaintiffs, | Case No. 3:11-cv-00565-GPM-PMF |
| vs. | JUDGE: Hon. G. Patrick Murphy |
| STURM FOODS, INC. and TREEHOUSE FOODS, INC., | |
| Defendants | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO STRIKE EXPERT WITNESS REPORT OF
<u>BOBBY CALDER AND TO EXCLUDE HIS EXPERT TESTIMONY</u>**

Michael M. Conway
Rebecca R. Hanson
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Phone: 312.832.4500
Fax:    312.832.4700

*Attorneys for Defendants Sturm Foods, Inc.
and TreeHouse Foods, Inc.*

## TABLE OF CONTENTS

Table Of Authorities ............................................................................................................. ii

I.        Facts ..................................................................................................................... 1

II.       Argument .............................................................................................................. 2

          A.     Calder's Testimony And Report Fails A *Daubert* Analysis ................................... 2

          B.     Calder's First Set Of Opinions Regarding How He Thinks Consumers
                 Will Perceive The Grove Square Package Are Inadmissible................................. 4

          C.     Calder's "Experimental Study" And Opinions Based Thereon Are Not
                 Admissible Because Calder's Study Failed To Follow Accepted Scientific
                 Principles................................................................................................................. 5

                 1.     Studies Must Conform to Accepted Professional Standards To Be
                        Admissible ................................................................................................. 5

                 2.     Calder's "Experiment" Failed In Multiple Fatal Ways To Comply
                        With Survey Principles .............................................................................. 7

III.      Conclusion ...........................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*American Footwear Corp. v. General Footwear Co., Ltd.*,
  609 F.2d 655 (2d Cir. 1979)..................................................................................17

*American Honda Motor Company, Inc. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ............................................................................. 3-4

*Apple Inc. v. Motorola, Inc.*,
  No. 11-08540, 2012 U.S. Dist. LEXIS 105387 (N.D. Ill. May 22, 2012)................6

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................................4, 16

*Citizens Financial Group, Inc. v. Citizens Nat'l Bank*,
  383 F.3d 110 (3d Cir. 2004)..................................................................................9

*Competitive Edge, Inc. v. Staples, Inc.*,
  763 F. Supp. 2d 997 (N.D. Ill. 2010) ................................................9, 12, 15, 18

*Daubert v. Merrell Dow Pharmaceutical, Inc.*,
  509 U.S. 579 (1993)..........................................................................................2, 4

*DeKoven v. Plaza Associates*,
  599 F.3d 578 (7th Cir. 2010) ....................................................................*Passim*

*Evory v. RJM Acquisitions Funding, LLC*,
  505 F.3d 769 (7th Cir. 2007) ................................................................................6

*First Health Group Corp. v. United Payors & United Providers, Inc.*,
  95 F. Supp. 2d 845 (N.D. Ill. 2000) ......................................................................4

*Innovation Ventures, LLC v. N2G Distriuting, Inc.*,
  No. 08-cv-10983, 2011 U.S. Dist. LEXIS 137115 (E.D. Mich. Nov. 30, 2011)....................13

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone Poulenc Rorer Pharms Co.*,
  19 F.3d 125 (3d Cir. 1994)..............................................................................4, 13

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04-cv-7203, 2006 U.S. Dist LEXIS 20787 (S.D.N.Y. April 19, 2006) ............17

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  No. 06-cv-550, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007)................16

*Kumho Tire Co. v. Carmichael*,
  119 S. Ct. 1167 (1999)..........................................................................................2

*L.G. Electronics. U.S.A., Inc. v. Whirlpool Corp.*,
    661 F. Supp. 2d 940 (N.D. Ill. 2009) ................................................................4, 6

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ....................................................................................4

*MDK, Inc. v. Village of Grafton*,
    No. 03-CV-0026, 2005 U.S. Dist LEXIS 18455 (E.D. Wis. 2005)...........................5

*Menasha Corp. v. News America Mktg. In-Store Inc.*,
    238 F. Supp. 2d 1024 (N.D. Ill. 2003), *aff'd* 354 F.3d. 661 (7th Cir. 2004).......................5, 18

*Nat'l Football League Properties, Inc. v. ProStyle, Inc.*,
    57 F. Supp. 2d 665 (E.D. Wis. 1999)................................................................12, 16

*Native American Arts, Inc. v. Bud K. World Wide, Inc.*,
    No. 10-cv-124, 2012 U.S. Dist. LEXIS 69715 (N.D. Ga. May 18, 2012)..............16

*Simon Property Group L.P. v. MySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................13

*Spraying Systems Co. v. Delavan*,
    975 F.2d 387 (7th Cir. 1992) ....................................................................................9

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
    913 F. Supp. 1454 (D. Kan. 1996)..........................................................................15

## RULES

Federal Rule of Evidence 702................................................................................1, 2

## OTHER AUTHORITIES

Shari S. Diamond, "Reference Guide on Survey Research," Reference Manual on
    Scientific Evidence, 361-417 (Fed. Judicial Ctr. ed., 3d ed. 2011) .................................*Passim*

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:181 (4th
    ed. 2012) .......................................................................................................................5

Defendants TreeHouse Foods, Inc. and Sturm Foods, Inc. (collectively "Defendants"), by their attorneys, respectfully submit this memorandum of law and supporting exhibits in support of their motion, pursuant to Federal Rule of Evidence 702, (i) to strike the expert witness report of Bobby Calder, Ph.D. ("Calder") attached as Exhibit R to plaintiffs' motion for class certification and memorandum in support (Dkt. 99) and (ii) to exclude the expert testimony and report of Calder in support of the pending class certification motion.

I.     **Facts**

In the fall of 2010, Sturm began selling "Grove Square" brand coffee cartridges for use in "Keurig" brand coffee makers.  Sturm's Grove Square Coffee is, and was, a proprietary blend of soluble (or instant) and microground coffee.  The coffee is similar to Starbucks' VIA®-branded coffee products.  (Exhibit E, Harry Overly Tr. at 15-16).  The microground, or finely ground, coffee contributes substantial flavor and aroma compared to soluble coffee alone.  (Exhibit F, Peskie Tr. at 42-43).

While Grove Square coffee was the first blend of soluble and microground coffee sold in a container for use in a Keurig machine, it was not the first cartridge containing instant coffee sold for use in Keurig machines.  Green Mountain Coffee Roasters, Inc. ("GMCR") and Keurig were already selling a coffee product, Café Mocha, containing, *inter alia*, instant coffee and no filter.  (Ex. E, Overly Tr. at 9).  Subsequently, Keurig added other coffee drinks, cappuccino mixes, containing instant, not ground, coffee and no filter.  (Calder Tr. 59-65 and Calder Dep. Exs. 5-7).  Keurig and GMCR also sold tea and cocoa for use in Keurig brewers.

Plaintiffs rely on the declaration of Professor Bobby Calder to support their motion for class certification.  Calder's declaration contains two sets of opinions.  The first set is said to be

based on Calder's review of Sturm's packaging, marketing practices[1] and his experience in consumer psychology and marketing.  (Calder Report at 3-7).[2]  The second is based on what Calder terms an "Experimental Study of Consumers" conducted in Chicago of 23 non-randomly selected individuals.  Plaintiffs rely on Calder's declaration to support, *inter alia*, its allegations that "Defendants' marketing of the Grove Square product is and has been misleading and deceptive," that "a reasonable consumer would have been led to falsely believe that Grove Square Coffee contained regular ground coffee" and that the term "soluble" was "ambiguous and or meaningless for consumers and the failure to use the word instant on the packaging was a deception through omission."  (Plaintiffs' Brief, Dkt. 99 at 13).

## II.      Argument

### A.      Calder's Testimony And Report Fails A *Daubert* Analysis

Under the standards articulated in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999), Calder's written report, opinion and deposition testimony are unreliable.  They, therefore, should be excluded by this Court in its gatekeeper function pursuant to Rule 702 of the Federal Rules of Evidence in deciding the pending motion for class certification.  Calder's first set of opinions, ¶¶ 5-13, are not based upon evidence of actual consumer perceptions, and, therefore, are inadmissible.

---

[1] Calder, however, did not bother to read any depositions of Sturm personnel or of Plaintiffs' taken in this case, or even go to the store to observed how Grove Square is marketed. (Calder Dep. 48:16-49:6; 20:13-16).

[2] While the heading on page 5 of Calder's declaration states that consumer complaints are a basis for these opinions, paragraph 11 of his report indicates that these consumer comments merely "confirm" his own pre-existing opinions.  Calder did not review all complaints, instead, he relied solely on those that Plaintiffs' counsel provided him.  (Calder Dep. 15:12-16:12). (Excerpts from Calder's deposition taken on September 25, 2012 are attached as Exhibit A). Additionally, Calder does not identify which specific comments "confirm" those opinions and which contradict it, and testified that he relied upon comments of consumers who did not like the taste of the product—comments that are irrelevant.

Calder's second set of opinions which are based upon his Experimental Study of 23 individuals, ¶¶ 14-21, are inadmissible because Calder did not conduct a proper and reliable study.  In his study, Calder failed, in multiple ways, to adhere to the principles and scientific standards required to conduct a valid consumer survey.[3]  Under applicable case law regarding the admissibility of survey evidence, including Seventh Circuit precedent, Calder's report and opinion testimony should be excluded.

Plaintiffs rely on Calder's report in seeking class certification, and because class certification is not proper unless, among other things, class members interpreted the Grove Square packaging in the same way for the same reasons, this *Daubert* motion challenging the admissibility of his opinion evidence is to be decided before the class certification motion is adjudicated.  The Seventh Circuit in *American Honda Motor Company, Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010), directed district courts to conduct a full *Daubert* analysis prior to ruling on a class certification motion.

> We hold that when an expert's report or testimony is critical to class certification, as it is here, . . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion.  That is, the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants.

As in *American Honda*, this motion does not challenge Calder's professional qualifications, but rather challenges Calder's opinions which are not based upon accepted

---

[3] Presumably aware of the flaws in his methodology which are contrary to professional principles in the development of valid survey evidence, Calder refers in his expert report to his consumer interviews in this case as an "experimental study" rather than a survey (Ex. R attached to plaintiffs' motion for class certification, p. 2) and called it an "experiment" in his deposition testimony (Calder Dep. 88:2-4).

scientific and professional standards for the development of a valid consumer survey.  The

Seventh Circuit's admonition in *American Honda* is directly applicable here:

> [E]ven the most "qualified expert cannot waltz into the courtroom
> and render opinions unless those opinions are based upon some
> recognized scientific method and are reliable and relevant under
> the test set forth by the Supreme Court in *Daubert*." (quoting *Clark
> v. Takata Corp.,* 192 F.3d 750, 759, n. 5 (7th Cir. 1999).

600 F.3d at 817.

Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that

Calder's expert testimony should be admitted.  *Daubert,* 509 U.S. at 592, n. 10; *Lewis v. CITGO

Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009).  Plaintiffs cannot satisfy that burden.

### B.    Calder's First Set Of Opinions Regarding How He Thinks Consumers Will Perceive The Grove Square Package Are Inadmissible.

An expert may not render an opinion about whether consumers were misled.  *See First

Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 849 (N.D.

Ill. 2000).  In *Bracco Diagnostics, Inc. v. Amersham Health, Inc*., 627 F. Supp. 2d 384 (D.N.J.

2009), the district court barred the expert testimony of Mr. Russell regarding whether consumers

were misled, stating: "Mr. Russell's opinion as to falsity of messages is not only unsupported,

but it is irrelevant to the issue of customers' understanding and reaction to the advertisements."

*Id* at 439.  In so ruling, the court cited the Court of Appeals opinion in *Johnson & Johnson-

Merck Consumer Pharms. Co. v. Rhone Poulenc Rorer Pharms Co*., 19 F.3d 125, 136 (3d Cir.

1994), which held that an expert's "personal opinion is not the legal standard by which courts

must determine whether customers were misled" and that absent evidence such as customer

surveys, no court "can conclude that consumers were misled."  Calder's personal opinion

testimony on the ultimate legal issue of deception is inadmissible.  *See Johnson & Johnson-

Merck Consumer Pharms.*, 19 F.3d at 136; *see also L.G. Elecs. U.S.A., Inc. v. Whirlpool Corp.*,

661 F. Supp. 2d 940, 957 (N.D. Ill. 2009) (striking an expert's opinion as to the "lay" definition of a contested term).

Additionally, Calder's opinion is based upon an erroneous understanding of the relevant facts. Calder's opinion relies on the fact that "[l]icensed Keurig products contain ground coffee and an internal filter." Yet, it is undisputed that some "licensed Keurig products" contain instant coffee and no filter and that Keurig tells consumers these products, along with cocoa and tea, are "brewed" in the Keurig machine. Additionally, Calder's opinion that "soluble" is ambiguous and meaningless to coffee purchasers has no support[4] and ignores that Linda Suchanek, a named plaintiff, testified she read the Grove Square package and understood and knew what the terms "soluble" and "microground" meant. (Ex. G, Suchanek Tr. at 50:22-54:16; 56:2-12).

### C.  Calder's "Experimental Study" And Opinions Based Thereon Are Not Admissible Because Calder's Study Failed To Follow Accepted Scientific Principles.

#### 1.  Studies Must Conform to Accepted Professional Standards To Be Admissible

To be admissible, a survey must be shown to have been conducted in accordance with generally accepted principles of survey research. *Menasha Corp. v. News America Mktg. In-Store Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003), *aff'd* 354 F.3d. 661, 664 (7th Cir. 2004); *accord: MDK, Inc. v. Village of Grafton*, No. 03-CV-0026, 2005 U.S. Dist LEXIS 18455, at *3-5 (E.D. Wis. 2005); 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:181 (2010). An authoritative analysis of these principles authored by Shari S. Diamond has been published by the Federal Judicial Conference in a guide entitled "Reference Guide on

---

[4] Calder bases this opinion never having heard a consumer use of the term "soluble" in interviews he had conducted, but, in his deposition, he disclosed that none of these interviews dealt with a coffee product. (Calder Dep. 11:4-20.). He also mentions a report by Professor Wright, as to which he did not know whether it was final. (Calder Dep. 36:12-37:8.)

Survey Research," Reference Manual on Scientific Evidence, 361-417 (Fed. Judicial Ctr. ed., 3d ed. 2011) (hereinafter "*Diamond*").  (A copy of this publication is attached as Exhibit B).  The Seventh Circuit has made clear that a survey which does not comply with the professional principles is simply inadmissible.[5]  *Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 776 (7th Cir. 2007) ("[S]urvey evidence in debt collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible").

The following key factors are relevant in determining whether a survey is reliable and admissible under *Daubert*:  (1) the identification of a proper universe of participants, (2) the selection of the sample, (3) the adequacy and appropriateness of the sample surveyed, (4) whether the questions were "open-ended" or "close ended" and specifically whether the participants had the option of saying "no opinion" rather than guessing, (5) whether the order of questions was rotated to avoid bias, (6) whether the survey contained an appropriate "control group," (7) whether the survey process was "double blind" *and* (8) whether the questions were clear, precise and unbiased, so that neither the interviewer nor the entity designing the survey aware of the survey's sponsorship or intended use.  (*Diamond*, pp. 373-411).

Last year, Judge Posner (sitting by designation in the district court) discussed the framework for evaluating whether to exclude expert witness reports under *Daubert* and ruled the testimony of three expert witnesses, including an expert report based upon a faulty consumer survey, inadmissible.  *Apple Inc. v. Motorola, Inc.*, No. 11-08540, 2012 U.S. Dist. LEXIS

---

[5]  In *L.G. Electronics, U.S.A., Inc.,* 661 F. Supp. 2d at 952 & n. 6, the district court observed that the Seventh Circuit evaluated consumer survey evidence using precedent applying both the Lanham Act, 15 U.S.C. § 1125(a) (which proscribes false description of goods) and the Fair Debt Collection Practices Act  and added: "Consequently where the Seventh Circuit precedent has not addressed a given issue relating to survey reliability, the Court looks to Lanham Act precedent from other circuits, focusing on precedent that the Seventh Circuit previously has cited with approval."

105387 at *17, 22-23, 39-40, 48 (N.D. Ill. May 22, 2012) ("The focus thus is not on results but on methodology.  The expert must use a 'proper methodology,' an 'acceptable methodology.'") (citing *Walker v. Soo Line R.R.*, 208 F.3d 581, 587 (7th Cir. 2000)).  The Calder study does not meet even one of the relevant requirements.

### 2.     Calder's "Experiment" Failed In Multiple Fatal Ways To Comply With Survey Principles

Calder's so-called experiment violated virtually every requirement for a valid consumer survey:

- <u>Improper Universe</u>:  Calder did not attempt to survey the proper universe — prospective purchasers of Grove Square coffee in eight distinct states.

- <u>Inadequate "Convenience" Sample</u>:  Calder's survey of 23 persons in the Chicago area was an unacceptable "convenience sample" and its results are not projectable to the relevant population.  The Seventh Circuit has held such "convenience samples" are "no good" and inadmissible.

- <u>Vague Leading and Misleading Questions And Biasing Procedures</u>:  Calder's questions were not framed in a clear, precise and non-leading manner.  He did not accurately describe the content of the Grove Square Coffee.  He omitted any reference to the microground content of the coffee.  He compared answers to a question about Green Mountain and Grove Square collectively with answers to the same question limited to only Grove Square asked after educating consumers about differences between the two brands.  Additionally, Calder excessively used "closed end" questions and failed to permit accurate responses or responses of "don't know" or "no opinion."

- <u>Absence of a "Control Group"</u>:  Calder failed to use a control group.  Instead, he used a "before-after" design of the survey which had all participants view the Grove Square and Green Mountain products together at the outset without a control group to measure impact.

- <u>Failure to Replicate Consumer Settings</u>:  Calder, by his own admission, did not attempt to — and did not in fact — replicate the store environment in which the consumer would encounter Grove Square coffee.

- <u>Failure to Make Survey "Double Blind"</u>:  Calder failed to use a double-blind survey.  Instead, knowing plaintiffs' purpose in hiring him to conduct the survey he conducted it himself, contravening the core principle that the survey should be "double blind."

Gary T. Ford, Ph.D., professor emeritus of marketing at the Kogod School of Business of American University and a qualified expert in survey evidence, prepared an expert report identifying these material deficiencies in the Calder experiment and Calder's deviation from accepted professional standards.  Defendants submit his rebuttal report in further support of this *Daubert* motion.  An excerpt from Ford's deposition transcript authenticating his report is attached as Exhibit C and his report is attached as Exhibit D (hereinafter "Ford Report").

Each component of a survey is vital to the overall validity of the survey — the effect of a defect in one aspect cannot be nullified by compliance with a different element.  For example, a strong sample does not compensate for having a biased interviewer or a lack of a "control." While each of the single fatal flaws renders the survey invalid (Ford Report ¶ 13), the cumulative effect of Calder's errors overwhelming demonstrates that his expert report and testimony should be excluded under *Daubert*.

Following is a detailed listing of these deviations from accepted survey standards and the case law directing that these errors require exclusion of his expert opinion.

A.    Improper Universe:

*Diamond* (and the case law) stress the importance of selecting a proper universe in designing a consumer survey so that it is representative of the targeted population—neither under-inclusive nor over-inclusive:

> The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and non-members.  For example consumers who are prospective purchasers may know more about the product category than consumers who are considering making a purchase.

(*Diamond*, p. 376).  Diamond added: "A survey that provides information about a wholly irrelevant population is itself irrelevant."  (*Diamond*, p. 377).  Failure to identify the proper universe warrants exclusion.  *See Competitive Edge, Inc. v. Staples, Inc.,* 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (finding consumer survey unreliable and granting motion to exclude expert testimony); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 120-21 (3d Cir. 2004) (affirming exclusion of survey evidence because the wrong universe was surveyed); *see also Spraying Systems Co. v. Delavan*, 975 F.2d 387, 394 n. 5 (7th Cir. 1992) (holding, in a non-jury trial context, that the value of a survey which, *inter alia*, had the wrong universe was a "mere scintilla").

Calder acknowledged that the relevant consumer group is potential purchasers of Grove Square coffee.  (Calder Tr. 80:19-22).  The only criterion Calder used in selecting the 23 participants in his  experiment was that each was the owner of a Keurig machine.  (Calder Report ¶¶ 14-15).  But by selecting owners of Keurig machines for the experiment, Calder was both over-inclusive and under-inclusive.

Calder's universe was over-inclusive because the machine owners may have stopped using the brewer, never used it (e.g., received it as a gift), or may not be the person who actually shops for single serve coffee "K-Cups."  The primary shopper (and prospective purchaser of Grove Square coffee) in the family could be a spouse or other family member.  Furthermore, the Keurig brewer owner may not use it for coffee.  Keurig and Sturm both sell non-coffee products such as tea, cocoa, or cider.  (Calder Tr. 27:18-28:5).  An owner who uses a  Keurig machine only for these products is not a potential purchaser of Grove Square coffee, making the sample over-inclusive.

The sample is also under-inclusive as non-owners could be potential purchasers of Grove Square coffee including the owner's family members who use the machine, buyers of gifts for machine owners and employees of businesses that own the machine.  (*See* Ford Report ¶¶ 81-83).  Calder made no attempt to account for these factors.

        B.      <u>The 23-Person Convenience Sample Was Too Small, Non-Projectable and Invalid:</u>

An equally-fatal defect is Calder's use of a non-random, non-projectable sample that he testified was a "convenience sample" of 23 Chicago area residents.  This "convenience sample" fails to satisfy fundamental survey principles.  The Seventh Circuit has been sharply critical of a survey based upon a convenience sample of 27 respondents, holding that the survey was "no good:"[6]

> Determining the minimum sample size from which reliable extrapolations can be made to the sampled population is tricky. Floyd J. Fowler, Jr., *Survey Research Methods* 45 (4th ed. 2008). But 27 is too small a sample, especially when one considers the mismatch between the population to be sampled – people who receive dunning letters from debt collectors – and the sample,

---

[6] *DeKoven v. Plaza Associates*, 599 F.3d 578, 581 (7th Cir. 2010).

> which consisted of mall patrons none of whom, for all one knows,
> may ever have received such a letter.  The sample drawn by the
> plaintiffs' expert is what is called a "convenience" sample –
> convenient to the sampler – as distinct from a "representative"
> sample – representative of the population sampled.

*DeKoven v. Plaza Associates*, 599 F.3d 578, 581 (7th Cir. 2010).

Calder had no role in selecting the sample—the 23 Chicago-area residents were supplied to him by Smith Surveys.  (Calder Tr. 89:18-23).  This is not surprising because Calder did not bother to learn the demographics of potential Grove Square coffee purchasers (Calder Tr. 25:5-13) or screen for a sample matching those demographics.  (Ford Report ¶ 86).

Further, Calder testified that a random sample is necessary to project results to the subject universe and that his sample was not random.  (Calder Tr. 93:5-6; 7-18).  Calder also acknowledged that consumers in different cities could have different perceptions (Calder Tr. 93:19-94:13) and that his experiment does not allow him to statistically conclude that the results from 23 persons in Chicago would be applicable to consumers in Los Angeles.  (Calder, Tr. 94:14-95:1).

One of Judge Posner's central inquiries in *Apple* was whether the litigation-hired expert used sufficient intellectual and professional rigor.  Calder utterly failed to meet this standard.  Calder acknowledged that for survey results to be validly extrapolated to a larger universe, the quantitative survey must be statistically projectable.  (Calder Tr. 100:20-102:15).  Calder stated:

> "If you're doing a statistical projectable study, you need to use
> accepted statistical procedures."  (Calder Tr. 102:11-13).

Subsequently, Calder testified that he was unaware of any statistically projectable study respecting what consumers would understand to be communicated by the Grove Square Coffee

package, confirming that his study cannot be used in that manner.  (Calder Tr. 108:24-109:4).[7]

Finally, Calder never discussed the possibility of undertaking any other type of study other than the convenience sample experiment.  (Calder Tr. 90:1-11).  As Ford confirms, no statistical confidence could be placed in a sample of 23 persons and he had never seen a litigation survey of a nationally-distributed consumer product based on 23 persons from one locale.  (Ford Report ¶ 87).

      C.     Calder's Flawed And Vague Questions And Biasing Procedures Render The Survey Inadmissible:

Both *Diamond* (Ex. B, pp. 387-89) and case law stress the vital importance that the questions posed in the survey be clear, precise and unbiased.  *See Competitive Edge*, 763 F. Supp. 2d at 1008; *Nat'l Football League Props, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999) (ambiguous question invalidated survey).  Calder's questions were ambiguous, imprecise and biased.  For example, in Step 2 of his study, Calder placed Grove Square boxes and cartridges with boxes and cartridges of a Green Mountain ground coffee product together between ground coffee on one side and instant coffee on another.  (Calder Report at 38).  Calder then asked the participants (all but one of whom were not "very familiar" with the Grove Square product) to choose whether the K-Cups in the middle of the display (both Green Mountain with ground coffee and a filter and Grove Square coffee) were "more similar to" three bags of ground coffee to the left or three jars of instant coffee to the right, with a small sample of ground coffee and instant coffee on a paper in front of the respective packages.  (Calder Report ¶ 15; Ford

---

      [7] *Diamond* states that probability sample surveys are the "recommended approach" in academic and governmental publications on surveys.  (*Diamond*, p. 382).  Calder admitted that his experiment is a a non-probabilistic sample and therefore not projectable.  (Calder Tr. 90:12-19). While acknowledging that courts have admitted into evidence non-probability samples, *Diamond* states that the expert witness would need to justify the method used to select the non-random sample.  (*Diamond*, p. 382).

Report ¶ 22).  By forcing respondents to answer the question as to *both* the Green Mountain K-Cups and the Grove Square K-Cups, Calder effectively told the respondents, who were unfamiliar with Grove Square, that Grove Square was like the Green Mountain product.

Even putting aside the above bias, the respondents' answers are highly ambiguous because the standard "more similar to" is itself highly ambiguous: similar to what – similar to the amount of time to prepare, similar to whether the coffee could be made one cup at a time; similar to the packaging, similar in price, similar in coffee content, similar in taste, or something else. The responses to such ambiguous questions are of no probative value, especially here, where they are forced to treat two different types of products as being the same.  *See also Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, l048 (S.D. Ind. 2000) (survey is biased by implicitly suggesting some sort of relationship between different items).

The deficiency in Calder's questioning was compounded by his use of close ended questions, refusing to allow "no opinion" or "don't know" answers, his conduct before certain questions were asked, and the construction of questions in ways that biased the answers. Another improper survey technique is the use of closed end questions prior to exhausting the respondent's opinion with open-ended questions (such as asking a series of "anything else" questions) and the refusal to allow the participants to answer "no opinion" or "don't know." (*Diamond,* pp. 389-95); *DeKoven*, 599 F.3d at 581 (7th Cir. 2010); *Johnson & Johnson-Merck Consumer Pharm.*, 19 F.3d at 134.  Use of such improper closed-ended questions renders the survey results inadmissible.  *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-cv-10983, 2011 U.S. Dist. LEXIS 137115, at *11-13 (E.D. Mich. Nov. 30, 2011) (interviewer's failure to tell participants that they could answer "don't know" contributed to flawed and unreliable foundation for survey results).  Again, Calder principally used "closed end" questions.

(Ford Report ¶ 38).  For example, Calder first effectively told respondents that Grove Square was like the Green Mountain ground coffee product in Step 2 and then forced them to choose whether Grove Square and the Green Mountain product were more "similar to" ground coffee or instant coffee with no option to choose "neither, or "don't know."

Later, Step 7 asked the following series of leading questions seeking responses along a sliding scale of 1 ("Not at All Expect") to 10 ("Very Much Expect"), again without a "don't know" option:

> I expect Grove Square to have ground coffee from roasted beans.
>
> I expect Grove Square to be a traditional tasting coffee like that of neighborhood coffee shops and diners.
>
> I expect that Grove Square contains instant coffee.
>
> I expect that Grove Square filters ground coffee in the tub like other single tub brands.

(Calder Report at 44-45).  *Diamond* instructs that closed end questions, particularly when the participants are not provided the option of giving "no opinion," may result in guessing or suggest conclusions that the respondent would not have otherwise considered.  (*Diamond*, pp. 390-92).  As Judge Posner explained in *DeKoven*, the omission of the "don't know" option taints a survey because it could lead participants to guess:[8]

> The survey was bad for still another reason: the omission of the "don't know/not sure" option in the oral questioning.  The omission was likely to make respondents guess. . . .

---

[8] This would be particularly true here in asking the participants about Grove Square coffee as 22 of 23 participants had little or no knowledge about the product before participating in Calder's experiment.  (Calder Report ¶ 16; Ford Report ¶ 40).

599 F.3d at 581.  Similarly in *Competitive Edge*, the court found the absence of the "don't know" option undermined the survey's reliability in the analysis leading to exclusion of the expert report.

> The survey's reliability is significantly compromised by its failure to use open-ended questions or to allow for "don't know" responses.

763 F. Supp. 2d at 109.[9]

Further, Calder's close-ended question about what Grove Square was "more similar to" as between ground coffee and instant coffee[10] in Step 10 was biased because it did not give the correct answer, "soluble and microground," as a possible answer, or even the choice of saying "neither" ground nor instant.  Moreover, respondents were biased before the question was asked by Calder's conduct.  Calder focused respondents on selected portions of the Grove Square packaging by describing or reading to them creating a slanted product picture.  For example, he stated "On the sides it says For use by owners of Keurig coffee makers", but did not read the disclaimer "Sturm Foods Inc. has no affiliation with Keurig Incorporated."  In addition, he had respondents compare the weight of the Green Mountain and the Grove Square k-cup before asking his Step 10 dichotomous "ground" or "instant" question.

---

[9] Another proper survey procedure that Calder ignored is rotating the order of questions to guard against influencing participants by the sequence in which questions are asked. (*Diamond*, p. 396). Failure to rotate questions is a survey defect.  *Winning Ways, Inc. v. Holloway Sportswear, Inc*., 913 F. Supp. 1454, 1465-67 (D. Kan. 1996).

[10] Step 10 asked the following:

> Thinking about the Grove Square Coffee, and looking at the display with brands of ground coffee from roasted beans used to make freshly brewed coffee on one side and brands of instant coffee on the other side, which of the two is Grove Square more similar to (POINT)?

(Calder Report at 40.)

D.      The Absence of a Control Group Renders the Experiment of No Value:

The absence of a control is such a critical factor that, standing alone, it merits exclusion

of an expert's survey evidence. *Bracco Diagnostics, Inc.*, 627 F. Supp. 2d at 477 ("Accordingly,

the Court finds no basis for Dr. Rappeport to fail to use a control group in this case, and his

survey is unreliable for lack of a control mechanism. . . .); *accord*: *Nat'l Football League Prop.,*

*Inc.*, 57 F. Supp. 2d at 668 (barring survey evidence).

Even if Calder had not chosen the wrong universe, used an inadequate sample and

improper question and otherwise biased the results of his study, the data it yielded from the 23

participants is meaningless with respect to the issues here if it is not compared with another

group—a "control group"—to see if the consumer's impressions arise from the packaging or

something else, including pre-existing impressions.  (*Diamond*, pp. 397-401).  As Ford explains,

Calder had no control group to determine upon what the participant's perceptions were based.

(Ford Report ¶¶ 57-64).  Calder did not present the participants (or any other group) a copy of a

different package, such as the current Grove Square package which uses the words "instant and

microground" in place of "soluble and microground" or a modified package that Plaintiffs would

agree contains no false advertisement.  If a control exists, then the outcomes of the control group

can be measured against the outcome of group exposed to the packaging to determine how much

(if at all) the accused packaging element affected the pre-existing consumer perceptions.

E.      The Failure To Replicate Consumer Experience Requires Exclusion:

"In order to be considered reliable [and therefore admissible], a survey must resemble the

way consumers would view the products in the marketplace." *Native American Arts, Inc. v. Bud*

*K. World Wide, Inc.*, No. 10-cv-124, 2012 U.S. Dist. LEXIS 69715, at *15 (N.D. Ga. May 18,

2012).  Courts have routinely held that surveys which fail to approximate real-world conditions

are inadmissible.  In *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06-cv-550,

2007 U.S. Dist. LEXIS 57320, at *17 (S.D.N.Y. Aug. 6, 2007), the court excluded a survey because it "failed to approximate real world conditions."  *See also American Footwear Corp. v. General Footwear Co., Ltd*., 609 F.2d 655, 660 (2d Cir. 1979) (district court not clearly erroneous in excluding survey because of a "failure to conduct it under actual marketing conditions."); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04-cv-7203, 2006 U.S. Dist LEXIS 20787, at *78 (S.D.N.Y. April 19, 2006) (survey failed to replicate marketplace conditions).

Calder made no pretense of replicating the consumer shopping experience in a grocery store or retail setting in which a customer would first encounter the Grove Square single serve coffee cartridge package.[11]  Calder testified that a consumer encountering Grove Square in a grocery store would look at the product for "two seconds."  (Calder Tr. 22:9-16).  Additionally, Calder testified that different consumers would look at different things on the packaging as different consumers find different aspects more "salient" or "important to them." (Calder Tr. 22:17-24:5).  Rather than let the participants pick up and examine the Grove Square package as they would in the coffee aisle of a retail store (*see* Ford Report ¶ 43 for an example of such a method) and let the person view what he or she wanted, *i.e.*, on average for two seconds, Calder took ten minutes with each participant holding the package, pointing to certain aspects reading six selected sections of the Grove Square package aloud to the participants, but not pointing out (Calder Tr. Tr. 134:14-137:8) or reading all relevant information on the package such as the disclaimer "Sturm Foods, Inc., has no affiliation with Keurig Incorporated."  (Ford Report at

---

[11] None of the named plaintiffs in this civil action had any awareness of the Grove Square product before first encountering it in a retail store setting.  (*See* Suchanek Tr. at 74; Gladstone Tr. at 30; Carr Tr. at 35; Capps Tr. at 58; Cardillo, Tr. at 20; Ritchie Tr. at 68: McManus Tr. at 116; Avakian Tr. at 75; DiBenedetto Tr. at 87, Exhibits G-O, respectively) and 22 of the 23 participants in Calder's survey were unfamiliar with Grove Square coffee prior to the survey. (Calder Report ¶ 15).

¶ 94).  Calder admitted in his deposition that he "wasn't trying to duplicate the in-store situation."  (Calder Tr. 156:17-157:9).

As set forth in the expert report of Neal Roese, Ph.D., attached to Defendants' opposition to the class certification motion, different consumers will be affected by different factors in viewing the Grove Square product in the retail setting.  This is corroborated by the depositions of the named plaintiffs (many of whom did not even read the package information), Calder's experiment was highly contrived, misleading and unlike the actual marketplace experience.

F.      The Failure to Conduct a "Double Blind" Survey Requires Exclusion:

Fundamental to accepted survey methodology is guarding against interviewer bias by requiring the survey to be "double blind."

> To ensure the objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible:  Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose.

(*Diamond*, p. 411).

Calder's experiment was not double blind.  (Ford Report ¶¶ 65-67).  Calder knew Plaintiffs' purpose in having him conduct his experiment.  This created the real risk of interviewer bias, whether intentional or inadvertent, which courts have found warrant exclusion of surveys.  In *Menasha Corp.*, 238 F. Supp. 2d at 1030, the district court, in excluding an expert's survey, highlighted this issue: "Tenser [expert] breached a fundamental principle of survey research by being aware of both the sponsor of the survey and its purpose while conducting his interviews."  *See also Competitive Edge*, 763 F. Supp. 2d at 1009 (granting *Daubert* motion to strike expert witness's survey testimony quoting that "failure to conduct an appropriate double-blind study limits the reliability of the survey").

18

The bias resulting from the lack of a double-blind protection is evidenced in Calder's actions in focusing the participants on certain aspect of the Grove Square packages for over 10 minutes, including opening up the Grove Square and Keurig-brand K-Cups, something consumers would never do in the store setting[12] or, for that matter, in any setting.  (Ford Report ¶¶ 69-70).  This exercise was of no value in determining whether consumers would have been misled by the Grove Square coffee package, but rather was an overt attempt to steer the participants' responses in ways Calder wanted.

## III.    Conclusion

For the foregoing reasons, Defendants respectfully request that the Court strike the expert report of Bobby Calder and exclude his testimony.[13]

Dated:  February 25, 2013                    Respectfully submitted,

                                                           /s/ Michael M. Conway
                                                           Michael M. Conway
                                                           Rebecca R. Hanson
                                                           **FOLEY & LARDNER LLP**
                                                           321 North Clark Street, Suite 2800
                                                           Chicago, IL 60654-5313
                                                           Phone:  312.832.4500
                                                           Fax:      312.832.4700

                                                           *Attorneys for Defendants Sturm Foods, Inc.*
                                                           *and TreeHouse Foods, Inc.*

---

[12] K-Cups are sold in boxes of differing quantities, including 12 and 18 count packages. A shopper would not be able to open the box to retrieve a K-Cup and then open a K-Cup before deciding whether to purchase the box.

[13] Magistrate Judge Philip M. Frazier has previously stricken the supplemental expert witness report of Candace Preston (Exhibit W to Plaintiffs' motion) because it was submitted 10 weeks after the deadline for expert witness disclosures.  (Dkt. 103).

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

LINDA SUCHANEK, et. al., individually
and on behalf of others similarly situated,

                     Plaintiffs,

           vs.

STURM FOODS, INC. and TREEHOUSE
FOODS, INC.,

                   Defendants

Case No. 3:11-cv-00565-GPM-PMF

JUDGE: Hon. G. Patrick Murphy

       I, Michael M. Conway, an attorney, hereby certify that on February 25, 2013, I filed **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE EXPERT WITNESS REPORT OF BOBBY CALDER AND TO EXCLUDE HIS EXPERT TESTIMONY** via the Court's CM/ECF system which will send notification to the following counsel of record:

Randy L. Gori
D. Todd Mathews
Gori Julian and Associates P.C.
156 North Main Street
Edwardsville, IL 62025

Peter H. Burke
William Todd Harvey
Burke Harvey et al.
2151 Highland Avenue, Suite 120
Birmingham, AL 35205

B. J. Wade
Skouteris & Magee, PLLC
Morgan Keegan Tower
50 North Front Street, Suite 920
Memphis, TN 38103

Michael H. Maizes
Maizes & Maizes LLP
2027 Williamsbridge Road
Bronx, NY 10461

James Steven Ward
Patrick Charles Cooper
Ward & Wilson, LLC
2100 Southbridge Parkway, Suite 580
Birmingham, AL 35309

John V. Wertheim
Jones, Snead, Wertheim & Wentworth
P.O. Box 228
Santa Fe, NM 87504

                   /s/ Michael M. Conway
                   Michael M. Conway