IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RICHARD MCMANUS, EDNA AVAKIAN, CHARLES CARDILLO, BEN CAPPS, DEBORAH DIBENEDETTO, and CAROL J. RITCHIE, et al. | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:11-cv-00565-GPM |
| v. | ) ) | |
| STURM FOODS, INC., and TREEHOUSE FOODS, INC., | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit their Opposition to Defendants' Motion for Summary Judgment. For the reasons shown below, summary judgment is not appropriate because there are genuine issues of material fact and Defendants are not entitled to judgment as a matter of law.

### Introduction

Defendants' summary judgment filing is little more than a selective cherry-picking of deposition testimony from each of the Plaintiffs, which patently ignores other relevant evidence and testimony in the record, followed by citations to case parentheticals. Defendants attempt to focus the Court's attention on each purchasing decision of the individual consumer and thereby deflect the inquiry away from the central issue before the Court: under each states' consumer protection statute, from an objective standpoint of a reasonable consumer, is the packaging of the Grove Square Coffees ("GSCs") deceptive or misleading, or did it have the capacity, likelihood or tendency to mislead the public?

This liability determination must focus on the actual words and images used on Defendants' packaging, taking into account the overall context of the purchasing decision. Defendants actually concede this point, perhaps unwittingly, when they allege "any misunderstandings regarding the nature of the product came from general assumptions about k-cup products used in Keurig brewers and the fact that the GROVE SQUARE product they bought was a coffee product in a cartridge in the same shape and used the same way, i.e., in Keurig brewers, as many other k-cups that contain ground coffee, and was sold next to k-cups containing only ground coffee."[1] (Doc. 137 at p. 8 of 26).

---

[1] Exactly, the product was designed to look like all other Keurig coffees so that consumers would purchase the product without looking at it closely because there was little consumer risk

1

After putting the purchase decision in proper context, the answer to the liability question becomes a resounding yes, and in fact, it is undisputed that all named Plaintiffs were in fact misled; all of them did not know they had purchased instant coffee; and all of them would not have purchased instant coffee for use in their Keurig machines. At a minimum, Plaintiffs have presented a material question of fact on this issue for the jury. Plaintiffs have also presented a jury question on their claims for unjust enrichment.

## STATEMENT OF UNDISPUTED FACTS

A. <u>Sturm's Targeting of the Keurig Consumer.</u>

Prior to launching the GSCs, Defendants received a marketing study that found all Keurig coffees "are premium branded products and consumers have the perception that they brew premium coffee in their machines." Similarly, the research showed "[c]onsumers perceive Keurig coffee as high quality, premium product." Keurig consumers could also "choose from a wide assortment of brands," are not loyal to any, "purchase based on roast and flavor" from "formulaic packaging," **and "perceive no risk in choice**." (bold and underline added).

To make their GSCs look like Keurig products, Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Doc. 99 at p. 22 of 45) The GSCs contain text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig coffee makers." (Doc. 53 at ¶ 16.) The top (or side) of the

---

in trying new brands. The GSCs were marketed as a traditional cup of brewed coffee, a true National Brand Equivalent ("NBE"), not as a cheap instant coffee alternative to the NBEs. The "online marketing campaign _ _ _ carefully aligned with BD&H's brand strategy of delivering a delicious traditional cup of freshly brewed hot coffee." (Doc. 99 at p. 19 of 45)

packaging stated that it was "Great Coffee. Plain and Simple," with text that evoked drinking coffee in a diner. The back of the packaging has a "quality promise" that states "Grove Square coffee is made with some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness." Defendants even included a "Coffee Lover's Bill of Rights."

Defendants' marketing agency, BD&H, warned them that "the use of the word 'instant' is a real no-no" and Defendants "should avoid any reference to it if at all possible." Instead, BD&H's brand strategy for the GSCs focused on "delivering a delicious traditional cup of freshly brewed hot coffee." Hence, the word "instant" does not appear on any of the GSCs Plaintiffs purchased, but rather, Defendants placed "soluble" on the packaging instead.

  B. Each of the Plaintiffs saw and Relied upon the same Formulaic Packaging prior to Purchasing the GSCs, and Each were Misled or deceived about the Nature of the GSCs.

It is undisputed that each of the Plaintiffs purchased the GSCs at a retail establishment, were exposed to the same formulaic packaging of the product, and then decided to purchase the product. After purchasing the product, each of the Plaintiffs felt misled or deceived by the packaging and did not realize he or she had purchased instant coffee.

**Charles Cardillo**: Defendants point out the fact that he bought the GSCs because they were near other k-cup products and he had previously tried all of the other brands and was looking forward to tasting another brand of coffee. (Doc. 137 at p. 8 of 26). Plaintiff Cardillo "fits to a T" the profile of the Keurig consumer Defendants' marketing company described: (1) "is aware of many brands," (2) has "no strong brand preference," (3) purchases

based "on roast and flavor" from (4) "formulaic packaging," and (5) perceives "no risk in choice." (13616) [2] (Exh A)

**Carol Ritchie.** She purchased her GSCs on September 30, 2011, and contacted Sturm the next day to no avail, so she wrote the BBB. "The produce is Grove Square Coffee K-cups stating that the coffee is soluble & microground this is an instant coffee but who knew because nowhere on the package does it state this is instant coffee and not ground. The word microground leads people to believe this is a ground coffee not instant at 10.00 dollars a box this can be a very expensive mistake. I've called the company and as of 2pm est on 10/3/2011 I am still waiting for a response. Packaging should be labeled clearly and in lettering large enough for people to see. . ."[3] (Doc. 100-12 at p. 5 of 15)(Exh D)

**Edna Avakain**: Ms. Avakain purchased her GSC in November, 2011. Ms. Avakian thinks the labeling of the whole package is a misrepresentation. p. 70 l. 3-4. The fact that it was packaged in K-cups and it was for a Keurig Brewer (the other K-cups she purchased were ground coffee). p. 44-45, l. 24-7. Keurig is associated with a brewing cup of coffee: "For me, Keurig and brewing go hand-in-hand." p. 49 l. 5-6; p. 70, l. 7-11.[4] (Exh E)

---

[2] Mr. Cardillo wrote the Better Business Bureau and complained: "It is false advertisement. What is in that product is not what is portrayed on the box. All it is is instant coffee crystals in a cup that is supposed to be used for the Keurig coffee maker. All you need is hot water from the tap to make this coffee that they sell." (Doc. 100-11 at p. 3 of 13)(Exh B) Mr. Cardillo requested that the product be pulled off the shelves because of the false advertising. (Id at p. 5 of 13)

[3] Ritchie testified in her deposition that she looked at the package, saw picture of K cup with beans, made for Keurig machine, microground term, brewed fresh, great taste, aribica beans (Exh C. p. 17) She also testified that soluble means capable of dissolving but doesn't recall reading the term. (Id. p. 18). Daughter said she was crazy to buy instant coffee in a K-cup. (Id. p 21). Misleading because box says "microground" (Id. pp. 19-20) and naturally roasted" (Id. p. 69).

[4] Further the photo of the coffee beans is misleading. p. 70, l. 12-13. She read that it was Arabica coffee and she saw the coffee lover's bill of rights p. 38 l. 23; p. 39 l.12-13. The picture on the box of the K-cups with the coffee beans and the word "caffeinated medium roast" led her to believe she was purchasing ground coffee as she does not think that instant coffee is a roast coffee p. 71 l.5-7. The picture of the coffee bean influenced her decision to purchase because it

**Benjamin Capps:** Mr. Capps only looked at information he deemed pertinent in the store: that it was for use in Keurig brewer, the different roasts… p. 34 l. 10-17. The box says Grove Squire Coffee is made with some of the world's highest quality Arabica beans roasted and ground to ensure peak flavor and packaged to lock in optimum freshness. p. 34 l. 9-15. It was important to him to know that it was made from fine Arabica bean, it was ground and packaged for use in k-cup brewer. p. 34-35 l. 22-3. He saw the whole coffee beans on the front and the picture of the k-cup p. 57 l 2-3.[5] (Exh F)

**Deborah DiBenedetto:** Ms. DiBeneditto bought GSC  January 2011 in New Jersey. p. 76 l. 13-14. She feels she was misled because she bought a product that she thought was one thing and then it is really something else. p. 8, l. 4-6. She remembers the K-cups on the front of the package. p.44 l. 15-16. She read that it was for Keurig. p. 45 l. 11. When she made the coffee, it tasted like instant. p. 47, l. 9-10. She does not drink instant coffee. p. 48, l. 16-17. She emailed the company. p. 47, l. 16-18. The K-cup on the package, its location amongst the other K-cups, the fact it worked in the Keurig brewer, that all the other K-cups contained ground coffee led her to believe that GSC K-cups contained ground coffee.p. 115 l. 4-116, l. 12.(Exh G)

**McManus:** Mr. McManus bought GSC around June of 2011. p. 40, l. 1-2; p.44 l. 4-6.

---

made her think it was ground coffee, which was one of the reasons she bought GSC. p. 41-42, l. 25-4; p. 44 l. 19-23. The fact that it did not say that it was instant coffee was misleading. p. 63 l. 2-5. She looked at the box to see if it was instant. p. 48-49 l. 25-2.  She does not drink instant coffee. p. 25 l. 21-22. The addition of the word "instant" would have cause the box not to be misleading. p. 82 l. 20-24. "People understand instant and associate it with coffee." p. 84 l. 13-14. "You put a spec of microground coffee, you can say its microground but that doesn't make it anything other than …misleading." p. 87 l. 3-5.

[5] The entire reason he purchased a Keurig brewing machine was so he would brew single serve (pg. 73 l. 2-5) cup of fresh coffee, identical to the same coffee I would brew if I were to take ground coffee, put it is a traditional coffeemaker and have it just single serve. p. 72 l. 23-25. He believed he was purchasing fresh ground with a filter and was deceived as to the nature of the product. p. 37, l. 4-9. Capps complained directly to the Defendants after he made his purchase. p. 37, l. 4-9.

The text on the box said it was great coffee, not instant coffee and it depicted coffee beans. p. 19. l. 19-23. The box says for use by owners of the Keurig coffee maker. p. 59, l. 8-9. "[i]t was the most foul tasting thing I have ever had I my mouth. It was not coffee. It was instant coffee. It was absolutely awful." p. 64, l. 2-5. Mr. McManus regards the following aspects about the Grove Square packaging deceptive: 100% Arabica coffee, had coffee beans on it, its placement with the K-cups which are real coffee, with a filter and made for people who want a fresh brewed cup of coffee, nothing on the box says instant. p. 40, l. 13-17; p. 72, l. 14-19.[6] (Exh H)

**Linda Suchanek:** Ms. Suchanek believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. p. 55, line 1 to p. 57, line 5. The picture on box looked like a "nice, fresh cup of hot, brewed coffee." p. 70 l. 16-17. Ms. Suchanek tried the Grove Square and it tasted like instant. p. 32 l. 9-17. She looked at the box to see if it said instant on the box but did not say instant on the box. P.46 l. 23-24; p. 47 l. 1-2. Ms. Suchanek felt it was misrepresented because it was not a freshly brewed cup. p. 63 l. 15-17.[7] (Exh I)

**Paula Gladstone:** Paula Gladstone is a citizen of New York, purchased Defendants' product in New York. p.90, l. 21- p.92, l. 9; p.32 8; 33). Gladstone believed she was purchasing fresh ground with a filter and was deceived as to the nature of the product. p.42, l. 13-21. (Exh J)

---

[6] Even though the box does not say there was a filter or that is was for a brewer, the product being placed with the other K-cups alludes to the GSC doing the same thing as the other K-cups. p. 74, l.12-23. Mr. McManus paid $9.95. p. 103, l. 17-19. The whole purpose of buying a Keurig make is to have fresh brewed coffee. p. 109, l. 1-5. If the box clearly said it was instant coffee it would not be deceptive, Mr. McManus would not have bought it, and he would not have a problem with it. p. 114 l. 17-22.

[7] The Grove Square had a quality promise "made with some of the world's highest quality Arabica beans roasted and ground to ensure peak pleasure…"; "made for use by owners of Keurig Coffee makers p. 44 l. 11-14 l. 18-19. She thought that the following quote meant that she was making a fresh, delicious cup that was going to be brewed: "The fresh, hot, delicious Grove Square coffee recaptures the rich, traditional cup and brings it home in a single-serve convenience." p. 64 l. 7-12. Further, "Keurig brews coffee," "[i]f I was going to buy a k-cup of instant coffee, I would have used my hot water tap that has boiling water at the sink instead of buying an expensive Keurig machine." p. 70 l. 2-8.

**Carol Carr:** Ms. Carr bought the GSC at Big Lots in 2010. p. 36, l. 14-18. She only made one K-cup and threw the rest away. p. 37 l. 4-6. She paid $7 for that box. p. 38, l. 23. The box was attractive, it was a good price and it had a picture of a K-cup on it. p. 40, l. 7-9. She bought GSC again on May 19, 2011. p. 43, l. 23. When she made a cup of coffee from that second purchase, the flavor was terrible. p. 52, l. 10-11. She is a coffee drinker and coffee lover. p. 54, l. 21-22. Her expectation from the picture of the K-cup was that it was going to be as good as the other K-cup she has bought in the past. p. 55, l. 13-16. She did not return the product or get a refund. p. 63, l. 3-5.[8] (Exh K)

Neal Roese, Defendants' expert, acknowledged that all of the named Plaintiffs "believed that they were buying ground roast coffee," and that they consistently complained "that they thought they had bought something different than soluble or instant coffee."   (Roese depo. At p 6, lines 7-21, attached to Doc 101 Evid. Sub. As Exhibit U)

C.   The Word "Soluble," even if a Consumer had seen it on the Packaging because of its Small Type, Was Ambiguous and Unknown to Consumers.

Because a filtered cup was unavailable to Defendants, they could not make a true analog, i.e., NBE, of the existing Green Mountain product.[9]

Q.   You know that if you were going to sell this without a filter and use mostly soluble coffee, you would be the only people on the market doing that?

A.   **There was no one doing it.  In fact, there was no one else selling a cartridge that would work in a Keurig machine at that point**.

Q.   All of the other products on the market entirely, every other one of them, used the filter system of Keurig correct?

A.   **The other products were all licensed products of Keurig and they all used a filter, yes.  There was no one else that was not a licensed entity with**

---

[8] She felt like she was misled because it is a product that comes across as being something it is not and it is not fair to consumers. p. 64-65, l. 23-6. Ms. Carr thought that it was instant coffee, but nowhere on the box did it say instant coffee. p. 65 l. 9-11.

[9] (Lemieux at p. 38, lines 1-7.)

**Keurig selling a cartridge that would work in a Keurig machine at that point.**" (Ruegger depo. P. 30, line 11 – p. 31, line 1). (bold added)

In fact, after being bombarded with consumer outrage, the Defendants engaged in a digital marketing campaign, part of which entailed establishing a "[m]icrosite designed to inform consumers of soluble/instant." (13655)  Obviously, if the word soluble was known to consumers – again assuming they were able to see it in fine print on the packaging – there would have been no need to inform consumers of soluble/instant.  Defendants' own expert, Neal Roese agreed that "generally speaking," the words "soluble and microground were new to consumers," and he would have been surprised to ever hear a consumer order a cup of "soluble coffee." (Doc. 99 p. 22 of 45) Plaintiffs' expert, Bobby Calder, opined that the term "soluble" was ambiguous and or meaningless for consumers.

D.  Defendants Engaged in Fraudulent Concealment

Ironically, Defendants contend that nothing on their packaging is false, misleading or deceptive and that consumers could not have been misled about the nature of the product. Defendants make this assertion even though they received complaints and inquiries regarding the composition of the GSCs for well over two years. Moreover, when consumers inquired into the true nature of the GSCs the Defendants lied.  For example, Plaintiff DiBenedetto sent an e-mail on January 14, 2011, which stated:

> I purchased a box of your Grove Square Coffee for my Keurig machine. I never read the box closely enough to see your play on words . ."soluble and microground arabica coffee." Shame on you; call it what it is in a language everyone is familiar with. . . .INSTANT COFFEE IN A K-CUP. And, what does "natural flavor with other natural flavor" mean? Properly and clearly label your product as *Instant Coffee*.

Sturm lied to her in its response: "**While the Grove Square Coffee Cups are different from other K-cups, it is not instant coffee**. It is a similar concept to instant because it does dissolve,

but it is actually a high quality coffee bean pulverized into a powder so fine that will dissolve.[10] The natural flavor is coffee extracts. I hope you find this information helpful, please let me know if I can be of further assistance."[11] (bold and underline added)

   E.  Defendants Did Not Disclose Material Facts About Their GSCs

   Defendants were concerned whether consumers would notice that their product weighed less than true NBEs, as their marketing studies showed that although 30% of consumers noticed that Grove Square product weighed less, they did not equate that lesser weight to be a result of the instant coffee and lack of a filter. (Doc. 99 at p. 18 of 45) "Minimal consumer Risk based on 2/23 Research; cup weight cup rattle Coffee color while dispensing." (11432)  Nonetheless, Defendants never disclosed that their product did not contain a filter or that it was always comprised of 95% to 96% instant coffee.  These were facts within the knowledge of the Defendants, and would not otherwise be discoverable or known by the

---

[10] Jodi Rickert and another employee of Defendants developed a script for the call center that was established to respond to consumer complaints.  (Documents 16813; 16820; 16868; 16870; 16872; and 16881 are attached separately as Exhibit P to Doc 101).  Rickert put on the form "not freeze dried," even though she claims she did not know the nature of the product. (P. 53, line 17 – p. 54, line 11).  Amazingly, if a consumer complained that the coffee was instant and didn't taste good, the standard response to the consumer was "we feel this is better quality than instant because it is not freeze dried or instantized."  (Exhibit P at 16881) The product was in fact overwhelmingly freeze dried coffee, always containing at least 95% to 96% instant freeze dried. "We stayed the route of freeze dried; national testing is being done using the formula with compact freeze dried." (12332)

[11] Schacter cautioned his sales force: "If you're ever confronted with `your coffee is instant coffee, let them know there is no standard identity for instant coffee. Ours is NOT Freeze Dried." (10655)  After Rickert pointed out that Amazon sometimes called out the product as instant and other times did not, another employee named Gina responded: "I guess we can't say it's not instant anymore. Thanks for the info." (Rickert depo Doc 101 at p. 72, line 9 – p. 73, line 18). Finally, Defendants even fabricated favorable reviews on the internet: "Guys – please go online this weekend and write up some good reviews on GSC on Amazon. Tell all your friends too . . . ☺. . . I can help with language if needed." (Doc. 99 at p. 20 of 45)

consuming public.[12]

    F.   <u>The Facts of this Lawsuit Support a Claim for Unjust Enrichment</u>

    Defendants marketed their product as a true National Brand Equivalent ("NBE")
knowing that is was not. Accordingly, Defendants were able to achieve a price point for the
product that would not have been available if not marketed as a true NBE. Accordingly, all of
the Plaintiffs and consumers paid a premium price for instant coffee.[13] Defendants' expert Roese
admitted that there is a general opinion shared by consumers that instant coffee has a different
level of quality than fresh brewed, p. 11, lines 12-17, and further noted that "Green Mountain
coffee was perhaps marketed with a target toward premium-minded consumers." (<u>Id</u>. P.23, lines
6-8).

    Defendants essentially used Keurig consumers as guinea pigs in order to position
themselves in the market when Keurig's patent expired. Hence, they launched their GSCs in
October 2010 as a 95% instant freeze dried product without a filter in order to "have the

---

[12] John Perinotti, a buyer from A&P who was given samples of GSC, summed it up succinctly:
"Jose, they put instant coffee in a K-cup… not cool. It would not take long for consumers to
figure it out. I am not interested." (7340)

[13] I do not appreciate being charged for something that is well below the expectations. <u>If I
wanted instant coffee, I would have bought about 5 jars of what I paid for one box (18 servings)
of your product</u>." (GROVE SQUARE 0001968) (underline added)   Sturm received this
complaint November 11, 2010: "How greedy can a company get? You guys must be proud of
yourself by screwing consumers every day. <u>The fake coffee you guys sell is nothing more than
garbage!!trying to pass off instant coffee as gourmet coffee for the keurig.you are a joke</u>! Our
united states is in the condition it is, because of companies like you. <u>If I wanted instant coffee, I
wouldn't need a keurig, would i?</u> Charging consumers $9.98 for a quarter cup of no brand instant
coffee is simply outrageous and iresponsible! Greed must be your first priority. you suck!!"
(GROVE SQUARE 0001969) (underline added) "I have a Kuerig coffee maker and came across
your Grove Square product the other day at Wal-Mart. <u>As it was next to the Green Mountain
brand I usually buy, and it was $2 cheaper, I thought I would try it. Imagine my disbelief when I
took the first cup out of the package. It felt different in weight and upon shaking it, sounded
different. I am a coffee drinker. If I'd wanted instant, I would have bought a jar for considerably
less money than I paid for 2 boxes of your crap.</u>" (GROVE SQUARE 0001971 and GROVE
SQUARE 0001972) (underline added)

company positioned to make [a filtered] product," when Keurig's patent expired.[14]

## **APPLICABLE STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). Where the moving party fails to meet its strict burden of proof, a court cannot enter

summary judgment for the moving party even if the opposing party fails to present relevant

evidence in response to the motion. *Cooper v. Lane,* 969 F.2d 368, 371 (7th Cir. 1992).    In

determining whether a district court properly granted summary judgment, "all factual inferences

are to be taken against the moving party and in favor of the opposing party." *International*

*Admin., Inc. v. Life Ins. Co. of N. Am.,* 753 F.2d 1373, 1378 (7th Cir. 1985). In instances in

which "inferences contrary to those drawn by the trial court might be permissible," a district

court's grant of summary judgment must be reversed.  *Munson v. Friske,* 754 F.2d 683, 690 (7th

Cir. 1985).

Recently, in *Adeyeye v. Heartland Sweeteners, LLC.*, 721 F.3d 444, 449 (7th Cir. 2013)

the Seventh Circuit reversed the district court's granting of summary judgment stating: "We

must reverse if a genuine issue of material fact exists that would allow a reasonable jury to find

in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S.

---

[14]Being the first mover was critical because "Sturm will have been packaging and processing for
2 years (Grove Square) by the time this product ships.  "During this time we have gained
experience and improved production and packaging processes in areas where others have yet to
start.  Another goal was "to keep building the business leading up to 10 months from now when
the GMCR patent expires and we have the filter cup and parity coffee." "We will be the first to
market with this product the day GMCR's patent expires in Sept. 2012." "We will be shipping a
true NBE value proposition by October of 2012." "Come September of 2012 we will be able to
sell fresh roasted coffee in a cup with a filter which is something GMC's patent restricts us from
doing until then."

Ct. 2505, 91 L. Ed. 2d 202 (1986); *Forrest v. Prine,* 620 F.3d 739, 742-43 (7th Cir. 2010). To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.")

ARGUMENT

A. <u>Whether Defendants' Packaging was Misleading or Deceptive or Tended to Mislead and Deceive, Must be Determined from the Objective Standard of a Reasonable Consumer in the Context of the Purchasing Decision.</u>

Whether the Defendants' packaging is actively misleading, whether the packaging is misleading by omission, or whether the packaging is misleading for both of these reasons, is a question of fact for the jury to decide. According to the FTC, deception requires a material representation, omission or practice that is likely to mislead a reasonable consumer acting reasonably in the circumstances. FTC Policy Statement on Deception, appended to *Matter of Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984).[15]

Whether a defendant's representation, omission, or practice is likely to mislead an objective reasonable consumer cannot be resolved by looking at the representation, omission, or practice in a vacuum. The liability determination must rest on the actual words and images used in the packaging and the context in which those words and images are used.[16] Moreover, additional evidence such as "the circumstances" surrounding a particular representation,

---

[15] Plaintiffs previously filed with the Court state law summaries setting forth the consumer protection statutes of the respective states (Doc. 111-1 at pp. 2-8 of 11) and the law of unjust enrichment in each of the respective states. (Doc. 111-1 at pp. 9-11 of 11) Plaintiffs incorporate that filing by reference as space constraints preclude Plaintiffs from restating the respective law in this pleading.

[16] Again, Defendants concede this point when they allege "any misunderstandings regarding the nature of the product came from general assumptions about k-cup products used in Keurig brewers and the fact that the GROVE SQUARE product they bought was a coffee product in a cartridge in the same shape and used the same way, i.e., in Keurig brewers, as many other k-cups that contain ground coffee, and was sold next to k-cups containing only ground coffee.

omission, or practice--which inevitably includes, for example, other related representations, omissions, or practices of the defendant--is often relevant to determine whether the specific act is likely to mislead an objective reasonable consumer.

Plaintiffs' have produced facts which show that GSCs' packaging was false, misleading and deceptive or, at the very least, show that there exists a genuine issue as to whether the GSCs' packaging was false, misleading and/ or deceptive. Contrary to Defendants' averments, Plaintiffs' have contended since the inception of this suit that the entirety of the GSC packaging, branding and messaging is misleading. (Plaintiffs' Amnd. Complaint ¶10-12)  Each Plaintiff took the product as a whole, from its placement next to other k-cups in the grocery store to the picture of the whole coffee beans on the package and the text on the package, and understood it to be a brewed coffee product similar to the other products packaged for use in single serve coffee brewing systems.[17]  See, supra, at pp. 3-7.[18]

1. Consumer Complaints and Survey Evidence create a Question of Fact on this Issue

Defendants received complaints and inquiries as soon as they launched the GSCs and these complaints and inquiries continued for over two years.  Even after Defendants changed their formulaic packaging to include the word instant instead of soluble, they continued to receive inquiries if the product was instant coffee.  See Exhibit S to the Evidentiary Submission in Support of Class certification previously filed under seal. (Doc. 101)  This Exhibit shows that

---

[17] Ackerman v. Coca-Cola Co., Not Reported in F.Supp.2d, 2010 WL 2925955, E.D.N.Y. 2010 ("The plaintiffs have sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer into believing that vitaminwater is either composed solely of vitamins and water, or that it is a beneficial source of nutrients rather than a "food of little or no nutritional value [which has been fortified] for the sole purpose of" claiming or implying that it is "healthy.")

[18] Part of Defendants' script when a consumer called was to acknowledge "we have been receiving feedback from that this is not what they are accustomed to with a Keurig." (16881)

13

throughout 2012 "first time users" continued complaining about the deceptive nature of the packaging and the fact that the GSCs were instant. See *Hilt v. Arizona Bev. Co... LLC,* 2009 U.S. Dist. LEXIS 16871, at *16-19 (S.D. Cal. Feb. 4, 2009) (permitting plaintiff "the opportunity to present evidence, such as a consumer survey, showing that [Defendant's] labeling and promotion is likely to deceive a reasonable consumer).

In addition, Plaintiffs submitted the Expert Report of Bobby Calder which contained results from in person surveys he performed, concluding that the packaging of the GSCs was deceptive and misleading. See Exhibit R to (Doc. 101) at ¶¶ 14-22. Attached to the Notice of Filing is the Supplemental expert report of Robert Klein submitted in the *Keurig, Inc. v. Sturm Foods, Inc.,* action in Delaware. (Exh L) He also concluded the packaging was deceptive based on his survey.

Most telling, however, are the results contained in TABLE 1 of the expert report of Defendants' own expert, George Mantis. See Exhibit M at p. 10.  Mantis had three different groups of consumers view the Defendants' packaging; Test Group 1 viewed the packaging that contained "Instant & Microground Arabica Coffee;" Test Group 2 viewed the packaging that contained "Soluble & Microground Arabica Coffee; the Control Group viewed "Arabica Coffee." Of the 151 people that viewed the packaging in Test Group 1, 14 people noted that the product was instant and ground coffee, while another 4 noted that the product was instant coffee. Hence, 18 people out of 151, or 12%, noted that the product was instant coffee.  More remarkable, however, are the results from Test group 2 where only 1 person noted that Soluble and Microground was instant and ground coffee!

   2.  Rulings from *Keurig, Inc. v. Sturm Foods, Inc.,* 2012 U.S. Dist. LEXIS
       130762 are Relevant to the Inquiry

14

The court in *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at * 35-36, denied Sturm summary judgment on Keurig's trade dress claim finding material facts exists with respect to the existence of a consistent overall look between the two products. The trade dress was described as:

> [1] an image of single-serve beverage cartridges, with at least one beverage cartridge depicted on its side and one beverage cartridge depicted right-side up, and a tagline below the image of the cartridges that states they are for use in Keurig brewers, [2] an image of spilled coffee beans, [3] an indication of the coffee's roast strength on a graded bar with shading varying from light to dark, along with an indication whether the coffee is caffeinated, [4] perforations for opening the package that form an opening that is tapered in a vshape and ending in a u-shaped tab, [5] prominent lettering displaying the name of the beverage, and [6] another face of the packaging providing a product story.

As previously noted, Sturm had to "rearrange the packaging operation to put them into a display like Keurig had on the shelf," because Sturm wanted the finished product "to look like the Keurig product in box style," with a "round cartridge into a rectangular display similar to Keurig." (Doc. 99 at p. 22 of 45) The GSCs contain text on the bottom left hand corner of the front of the package that reads "*For use by owners of Keurig coffee makers." (Doc. 53 at ¶ 16.) See *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 at *32 n.9 ("For instance, with respect to factor four, actual confusion (a highly relevant factor), plaintiff has produced survey, consumer testimonial and consumer complaint evidence which suggests that defendant's use of the word "Keurig®" on its packaging is misleading.")

3. The Subjective Intent of the Individual Consumer is not at Issue.

Defendants spend much time pointing out differences between the individual Plaintiffs, regarding what they remember seeing on the GSC package, whether they knew what soluble meant, did they know the product did not contain a filter, etc. All of these differences are simply irrelevant, because the actual inquiry must be judged from the perspective a reasonable

consumer, not the subjective views of a plaintiff. See *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1145 (N.D.Cal. 2005); *Cirone-Shadow v. Union Nissan*, 955 F.Supp. 938, 944 (N.D.Ill. 1997) (standard for materiality of Illinois Consumer fraud Act claim is objective standard). As explained in *Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 19 (S.D.Cal. July 30, 2013)

> Moreover, "individual experience with a product is irrelevant" because "the injury under the UCL, FAL and CLRA is established by an objective test. Specifically, this objective test states that injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that 'members of the public are likely to be deceived.'" *citing Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011).

Hence, whether one named Plaintiff saw one aspect of the packaging as opposed to another simply makes no difference as to whether the overall packaging was deceptive. *Papaspiridakos v. Educational Affiliates, Inc.*, Slip Copy, 2013 WL 4899136, E.D.N.Y., 2013 (Under the objective standard of N.Y. GBL § 349, the challenged representation or omission must be one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances.")

### 4. Something Literally true can be Deceptive and Misleading

Defendants also contend the Plaintiffs could not be deceived or misled by their packaging because nothing on the packaging was false. Such a contention has no merit in law or fact. See *Bronson v. Johnson & Johnson, Inc.*, Slip Copy, 2013 WL 1629191, N.D.Cal.,2013("Deceptive labeling claims under the UCL, the FAL, and the CLRA are evaluated by whether a "reasonable consumer" would likely be deceived. Williams, 552 F.3d at 938 (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995)). The California Supreme Court has recognized "that these laws prohibit not only advertising which is false, but also advertising which[,] **although true**, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the

16

public." *Id.* (quoting *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 450 (2002)) (internal quotations omitted) (bold and underline added).[19]

Defendants' expert, Roese, acknowledged that generally speaking "certain advertisements or certain marketing information could be misleading even if the statement were true," and furthermore, recognized that it is true that just "because something might be true doesn't mean it can't also be misleading." (P. 103, lines 4-15). He also discussed consumer's "inattention blindness," or people's expectations "can be a guide to how they interpret something." (P. 91, lines 21-22). See *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.,* 131 F. 3d 430, 434 (4th Cir. 1997) ("For liability to arise under the false advertising provision of the Lanham Act, "the contested statement of representation must be either false on its face **or, although literally true,** likely to mislead and to confuse consumers given the merchandising context.") (bold and underline added)

B    Plaintiffs Have Stated a Claim for Fraudulent Omission

Under Illinois' statute a "material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information on which a buyer would be expected to rely in making a decision [regarding] whether to purchase the product." *Perona v. Volkswagen of America, Inc.* 292 Ill. App. 3d 59, 67-68(Ill. App. Ct. 1st. Dist. 1997) Disclosing that the GSCs were 95% to 96% instant coffee, and that the product did not contain a filter, are material facts that would affect a consumer's purchase decision. Whether a consumer knew

---

[19]*Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, N.D.Cal.,2012. ("Defendant contends that no reasonable consumer could be misled in light of the nutrient label on the package. This argument is not persuasive. As the *Williams* court said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.")

before purchasing the GSCs that the other Keurig products were 100% ground coffee with a filter is not important; the consumer knew the standard of quality associated with those other products.

If Sturm displayed "This product does not contain a filter" on its packaging, such words would put a consumer on notice to the fact that ground coffee was not being filtered. Similarly, if Sturm displayed "This product is 95% to 96% instant coffee" on its packaging, such words would put a consumer on notice that he or she was paying a premium price for instant coffee. Moreover, a "defendant need not have intended to deceive a plaintiff; innocent misrepresentations or material omissions intended to induce the plaintiff's reliance are actionable." *Hart v. Boehner Chevrolet Sales, Inc.*, 337 Ill.App. 3d 742, 750 (2d Dist. 2003).

Given Defendants' overriding concern about the weight of their product, and whether consumers would equate the lesser weight with lesser quality, a jury question on whether Defendants' omission was intentional is certainly presented.[20] See *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ("[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.")

C        Defendants Engaged in Fraudulent Concealment

---

[20] In New Jersey, there is a duty to disclose conditions that are material to the transaction. *Strawn v. Caruso*, 675 A.2d 420, 430 (N.J. 1995). In New York, a duty to disclose exists where a material omission is likely to mislead a reasonable consumer acting reasonably under the circumstances. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995). A matter is material if it is relevant to a reasonable consumer acting reasonably under the circumstances. *Id.* In North Carolina, a failure to disclose is tantamount to a misrepresentation and thus an unfair or deceptive practice in violation of the statute. *Kron Medical Corp v. Collier Cobb & Assocs., Inc.*, 420 S.B.2d 192, 196 (N.C. Ct. App. 1992). South Carolina's Unfair Trade Practices Act contains a duty to disclose and failure to disclose was unfair or deceptive as it had the potential for repetition and thus affected the public interests. *Wright v. Craft*, 640 S.E.2d 486, 499 (S.C. App 2006). In sum, omitting or failing to disclose material information, where a buyer would have acted differently knowing the information, is actionable under each relevant state's law.

18

As demonstrated, *supra*, Defendants lied to Plaintiff DiBenedetto and other consumers about the true nature of the GSCs. See *Jensen v. Bayer AG*, 371 Ill.App. 682, 689 (2007) ("The Act indicates that sellers have a duty not to conceal or suppress known material facts regarding products from potential buyers." "For liability to attach due to an alleged concealment, a plaintiff must establish that the fact concealed was known to the seller at the time of concealment. Moreover, a plaintiff must establish that defendants intended that they rely on the suppression in making their choice to buy.") See also, *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 752 A.2d 807, 813-814 (2000)  These requirements are satisfied in this action.

D.    All of the Plaintiffs Suffered Damages Because They Purchased the GSCs after Viewing the Formulaic Packaging and Purchased a Product they Either did not want or Received an Inferior Product to what they Expected.

Importantly, Defendants do not allege that Plaintiffs have not suffered actual damages. Rather, they contend that the measure of damages is the "benefit-of-the-bargain" approach. Defendants offer no facts to dispute Plaintiffs' damages claim as alleged in the Complaint, written discovery responses and their depositions. All Plaintiffs have stated that they purchased the GSCs and did not receive the benefit of what they thought they purchased.  Accordingly, Defendants seem to concede the issue of actual damages and instead are arguing the measure of damages.

Again, the crux of Plaintiffs' damages claim is that they paid a premium for an instant coffee product believing it was ground coffee, and if the true nature of the product had been disclosed and they had not been misled, none of them would have purchased the product for their Keurig brewer. *Astiana v. Kashi*, 2013 U.S. Dist. LEXIS 108445 at * 20 (S.D.Cal. July 30, 2013) ("Plaintiff Larsen testified that she would not have purchased the Kashi product or would have paid less for the Kashi product had she known it contained artificial ingredients. Thus,

19

Plaintiff Larsen alleges to have suffered the same type of economic injury and seeks the same type of damages as the putative class members; namely, a refund of all or part of the purchase price.")

As the court explained in *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 164-165 (D.N.J. 2010):

> Under the NJCFA, Plaintiffs do not need to demonstrate that they actually relied on the company's misrepresentations or omissions. N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); *Int'l Union of Operating Eng'rs*, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover."). Rather, they must show an "ascertainable loss," meaning that they "**paid for a product and got something less than what had been promised.**" Elias, 252 F.R.D. at 249 (internal quotations omitted). (bold underline added)

E.    A Jury Should Decide if Defendants have Been Unjustly Enriched

The basis for Plaintiffs' unjust enrichment claim is that the Defendants marketed the GSCs as a true NBE knowing they were not, and in doing so, were able to achieve a premium price for their product. Disgorgement of defendant's profits, under a theory of unjust enrichment, is a purely equitable remedy. See *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 172 (3d Cir. 2005); see also *Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp. 2d 332, 344 (D.N.J. 2001). Plaintiffs have submitted the Supplemental Expert Report of Candace Preston for trial purposes. See Doc. 101 Exhibit W. She has computed unjust enrichment damages based upon three different methodologies. She relied on Defendants' own internal calculations for her figures. A jury should decided this issue.

## CONCLUSION

For the above stated reasons, Defendants' Motion for Summary Judgment is due to be denied.

20

Respectfully submitted,


By:___/s/ Peter H. Burke_____
Peter H. Burke, Esq.

**OF COUNSEL:**

W. Todd Harvey, Esq. ASB 3215-E64W
J. Allen Schreiber, Esq.
BURKE HARVEY & FRANKOWSKI, LLC
2151 Highland Avenue, Suite 120
Birmingham, Alabama 35205
Telephone: (205) 930-9091
Facsimile:  (205) 930-9054
E-Mail:  pburke@bhflegal.com
        tharvey@bhflegal.com
*Attorneys for Plaintiffs Richard Mcmanus, Edna Avakian,*
*Charles Cardillo, Ben Capps, Deborah Dibenedetto, and Carol J. Ritchie*


Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*


Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*


B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN  38103
*Attorney for Plaintiff Carol Carr*


Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on the 20th day of September, 2013, I served the foregoing via the Court's CM/ECF which will send notification to the following:

Michael Conway
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, IL 60654-5313

*Attorneys for Defendants Sturm Foods, Inc.*
*and TreeHouse Foods, Inc.*

/s/ Peter H. Burke
Of Counsel

22