*In the*

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

_____

No. 13-3843

LINDA SUCHANEK, *et al.*, individually and
on behalf of others similarly situated,

*Plaintiffs-Appellants*,

*v.*

STURM FOODS, INC., and TREEHOUSE FOODS, INC.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Illinois.
Nos. 11-565, 11-889, 11-1035, 11-1068, & 12-224 — **G. Patrick Murphy**,
*Judge*.

_____

ARGUED JUNE 4, 2014 — DECIDED AUGUST 22, 2014

_____

Before WOOD, *Chief Judge*, and CUDAHY and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. This case is about coffee. Not just any coffee—it is about the individual coffee pods that are used in the popular Keurig coffeemakers. The Keurig system solved a problem with which coffee drinkers had struggled for

years: how to make individual portions of fresh-brewed cof-
fee in a tidy, flavorful, easy, and relatively inexpensive way.
The defendants, Sturm Foods, Inc., and Treehouse Foods,
Inc., wanted to enter the market for Keurig-compatible pods
once patent protection expired, but they jumped the gun in a
way that the plaintiffs, who hope to represent a class, believe
was deceptive and in violation of the consumer protection
laws of a number of states. The district court refused to certi-
fy the class, and then ruled against each of the named plain-
tiffs' individual claims. We conclude that the court erred in
its class certification decision; if its approach were correct, it
would never be possible to certify a consumer class action
because some individual proof is always needed. We also
conclude that the court overlooked genuine issues of fact
when it granted summary judgment against the individual
plaintiffs. We therefore reverse and remand for further pro-
ceedings.

## I

Keurig coffee machines are one of the most popular sin-
gle-serve coffeemakers on the market. To prepare a cup of
freshly brewed coffee, the Keurig user need only drop a
small pod (known as a K-Cup) filled with ground coffee into
the machine, push a button, and wait a few moments. The
machines are not only quick and easy to use; surveys show
that its users appreciate the quality of the coffee they pro-
duce. According to the defendants' marketing studies,
Keurig machines are "premium branded products and con-
sumers have the perception that they brew premium coffee
in their machines." For this union of convenience and quali-
ty, consumers shell out hefty sums for both the machine it-
self and the K-Cups.

No. 13-3843                                                                 3

K-Cups, which are sold separately from the machines,
are small plastic cartridges designed to be used exclusively
with Keurig machines. The K-Cups are typically filled with
an individual serving of ground coffee beans, although other
hot beverages like cider, tea, and hot chocolate are also
available. Until 2012 when its patent expired, only Keurig
itself could make K-Cups with filters because Keurig held a
patent over the K-Cup's filter technology. Sturm Foods and
its parent company Treehouse (collectively Sturm) badly
wanted a piece of the Keurig market. Blocked from direct
competition by the patent, Sturm turned to the substitute
that is at the heart of this case. In 2010, it introduced a prod-
uct that used the external K-Cup design but whose innards
were entirely different. For starters, the Sturm cup did not
contain any type of filter. In internal emails, Sturm's execu-
tives discussed their plan to gain a first-mover advantage in
the post-patent Keurig coffee market by selling the filter-less
product before the patent's expiration. One employee com-
mented that by the time the Keurig patent expired, "Sturm
will have been packaging and processing for 2 years … .
During this time, we [will] have gained experience and im-
proved packaging and production processes in areas where
others will have yet to start." Sturm marketed its product
under the name Grove Square Coffee (GSC).

The lack of a filter created a quandary for Sturm: it made
the use of fresh coffee grounds impossible. Sturm decided to
put instant coffee into the cups—essentially, small chunks of
freeze-dried brewed coffee that dissolve and are reconstitut-
ed when hot water is added to them. That is not the kind of
premium product that Keurig customers expected, as
Sturm's marketing surveys confirmed. Indeed, Sturm's con-
sultants warned that "use of the word 'instant' is a real no-

no" and should be avoided "if at all possible" in marketing
the GSC product to the only people who would buy a K-
Cup: Keurig machine owners. Sturm followed that advice.
The GSC packaging stated in small font that it contained
"naturally roasted soluble and microground Arabica coffee";
it never explained that soluble coffee is instant coffee. Nor
did it mention that the GSC pods contained over 95% instant
coffee with only a tiny bit of microground coffee mixed in.

The rest of the GSC packaging was mute about the true
nature of the product, except insofar as it implied that these
were genuine K-Cups like those Keurig users had come to
expect. We have included some images of the GSC product
packaging in an Appendix to this opinion. Those images
show that like many of the premium Keurig coffee products
shelved nearby, the front of the GSC package contained an
image of K-Cups with fresh roasted coffee beans and the
admonition that the GSC product was intended "[f]or use by
owners of Keurig© coffee makers." As one Sturm executive
admitted, the company "rearrange[d] the packaging opera-
tion to put [GSC] into a display like Keurig had on the
shelf." Its objective was to package the product "to look like
the Keurig product in box style."

The back of the package featured a number of representa-
tions about the product. A "quality promise" indicated that
the coffee was "made with some of the world's highest quali-
ty Arabica beans, roasted and ground to ensure peak flavor,
then packaged to lock in optimum freshness." It failed to
add that, except for the trivial amount of "microground" cof-
fee dusting the instant chunks, the coffee was no longer in
the form of ground beans. One version of the package set
forth a "Coffee Lover's Bill of Rights," which included the

No. 13-3843                                                              5

right to a "fresh, delicious cup." Another version stated that
its contents were "simply fresh, hot and delicious" and "re-
captured [the] rich, traditional cup" that is "savored … in
neighborhood coffee shops." At some point, Sturm added
the word "instant" to the packaging, but the record is un-
clear whether this new package was ever distributed and, if
so, how widely. Interestingly, the package also included this
warning: "DO NOT REMOVE the foil seal as the cup will
not work properly in the coffee maker and could result in
hot water burns." Except as a measure designed to ensure
that the user did not view the true contents of the pod, this
makes no sense: the presence or absence of a foil seal on top
would have no effect on the risk of burns or the use of the
cup.

Numerous expert surveys in the record concluded that
few consumers understood the true nature of the GSC prod-
uct. One of them, conducted by plaintiff's expert Robert L.
Klein, attempted to recreate conditions of in-store buying by
presenting participants first with a photograph of the GSC
product on shelves near other Keurig-related products, and
then presenting participants with images of the GSC box to
look over for 30 seconds. Only 14% of participants in Klein's
study identified GSC's product as containing instant coffee.
Sturm's own expert, George Mantis, employing a different
methodology, found that only one in 151 test participants
equated the term "soluble and microground" with the term
"instant and microground." Another expert, Bobby J. Calder,
using still another methodology, asked participants to score
the product on a scale of 1 to 10 on various measures based
on its packaging, with "1" being least likely and "10" being
most likely. When asked whether participants expected GSC
to contain instant coffee, the mean answer was 1.61. Asked

whether the GSC product filtered ground coffee just as other Keurig-compatible coffee products did, participants essentially said yes, recording an average score of 9.26. And even if consumers saw and understood that the term "soluble" meant "instant" in context, they had no way to know that GSC actually was more than 95% "soluble" (instant) coffee.

Sturm put a lot of money and thought into marketing GSC. In addition to following its consultants' warning against using the term "instant coffee," Sturm conducted focus-group testing to determine whether participants would notice anything amiss about GSC. One test comparing reactions to GSC and licensed Keurig K-Cups containing ground coffee and filters concluded that the participants did not "notice[] any difference between the single serve cups [*i.e.*, between the GSC product and licensed K-Cups] with respect to *weight* and none noticed [that] the [GSC] cup emitted a distinct *rattle* when shaken." (Emphasis added.) Even when these differences were pointed out, participants "did not equate [those differences] with quality." Sturm also priced GSC at near-premium levels, about 10% less than Keurig products. This had the dual benefit of reaping a high profit and forestalling consumer suspicions. As one executive admitted candidly, "If you actually got the price too low, people would perceive it as poor quality." The plaintiffs' expert Klein opined that the GSC product was "three to four times more expensive than the typical instant coffee that may be spooned into a cup of hot water" and that "only a very 'price insensitive' consumer, or one who was misled, would use a $100 brewer [*i.e.*, the Keurig machine] to heat water to make instant coffee."

No. 13-3843                                                                 7

The public response after the release of GSC was awful.
The day after the product started selling in Wal-Mart stores,
Sturm emailed its employees to request that the legal de-
partment, not the quality control or sales department, be
immediately informed about any complaints regarding GSC.
One retailer, Discount Coffee, informed Sturm that "[GSC]
has been the poorest performing introductory product that
we have had in our 12 year history." Several purchasers
brought their complaints to the Better Business Bureau. Al-
though a few comments were favorable, the vast majority
were negative and many "extremely negative," according to
Treehouse's general counsel. Customers who complained,
including named plaintiff Deborah DiBenedetto, were told
that GSC was "not instant coffee" but rather "a high quality
coffee bean pulverized into a powder so fine that [it] will
dissolve," which was false except for the "microground" cof-
fee that constituted less than 5% of GSC. (It also wrongly
implied that coffee is made by dissolving ground beans in
water; it is actually produced when hot water extracts oils
and other solids from the ground coffee bean.) To mitigate
the negative reviews, Sturm encouraged employees to write
fictitious favorable reviews online; the marketing depart-
ment even offered to supply the language.

## II

Four separate consumer protection lawsuits, involving
plaintiffs from four states who purchased GSC, were consol-
idated into the present action. Later the plaintiffs amended
their complaint to add consumers from an additional four
states. The plaintiffs sought to certify a class representing
GSC purchasers in the eight states. As we noted earlier, the
district court refused to certify the class and granted sum-

mary judgment against all eight individual plaintiffs. On
appeal, the plaintiffs challenge both the individual rulings
and the denial of class certification.

We begin with the district court's decision to deny class
certification, as this will determine the proper scope of the
case, and then turn to the individual cases. We conclude that
the court based its class determination on a misunderstand-
ing of the correct legal approach and thus further proceed-
ings are necessary. We also conclude that the court over-
looked genuine issues of material fact on each of the indi-
vidual claims.

### A

The plaintiffs sought to certify the following class:

> All persons or consumers that during the Class
> Period—from September of 2010, until and in-
> cluding the present—purchased in Alabama,
> California, Illinois, New Jersey, New York,
> North Carolina, South Carolina, and Tennes-
> see, Defendants' [GSC] products. Excluded
> from the class are: (a) Defendants' Board mem-
> bers of [*sic*] executive-level officers, including
> its attorneys; (b) persons or entities who pur-
> chased the [GSC] primarily for resale; (c) re-
> tailers or re-sellers of the [GSC]; (d) govern-
> mental entities; and (e) any consumer that al-
> ready received a refund from Defendants.

In response to the district court's concern that online pur-
chasers of GSC may not be similarly situated to in-store pur-
chasers, the plaintiffs later offered to exclude online pur-

No. 13-3843    9

chasers. Our analysis presumes that these online purchasers have been excluded from the class.

We discern two errors in the district court's decision to deny class certification. First, the court failed to recognize the question common to the claims of all putative class members: whether the GSC packaging was likely to mislead a reasonable consumer. See FED. R. CIV. P. 23(a)(2); see also *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); compare *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014) (Lanham Act case about misleading packaging). Second, the court applied too strict a test when it considered whether common questions predominate over individual questions. See FED. R. CIV. P. 23(b)(3); see also *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013); *In re IKO Roofing Shingle Prods. Liab. Litig.*, No. 14-1532, 2014 WL 2958615 (7th Cir. July 2, 2014). Our review of the decision to deny class certification is for abuse of discretion. *Payton v. Cnty. of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007).

*Rule 23(a)(2).*—One of the requirements for a class action in federal court is the existence of "questions of law or fact common to the class." See FED. R. CIV. P. 23(a)(2). The Supreme Court has explained that "for purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart*, 131 S. Ct. at 2556 (quotation marks and alteration omitted). Commonality demands more than a showing that the class members "have all suffered a violation of the same provision of law" at the hands of the same defendant. *Id.* at 2551. Hence, in *Wal-Mart*, no common question existed where the only connection among a huge number of adverse employment actions was that the same defendant allegedly discriminated against numerous people on the same basis (sex). As

the Court put it, "[o]ther than the bare existence of delegated discretion, respondents have identified no 'specific employment practice'—much less one that ties all their 1.5 million claims together." *Id.* at 2555–56. *Cf. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 487–90 (7th Cir. 2012) (holding a company-wide policy that had disparate impact on African-American employees appropriate for class-wide treatment).

"What matters to class certification … [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (quotation marks omitted). The critical point is "the need for *conduct* common to members of the class." *IKO Roofing*, *supra*, at 3; see also *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (common questions arise where "the defendants have engaged in standardized conduct towards members of the proposed class"). Where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff, as it did among Wal-Mart's 2,000 stores, no common answers are likely to be found. That is why the Court there held that plaintiffs could not proceed with a class action without a showing that Wal-Mart had adopted a company-wide discriminatory policy. *Wal-Mart*, 131 S. Ct. at 2555–56; see also *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 (1982); Suzette M. Malveaux, *How Goliath Won: The Future Implications of* Dukes v. Wal-Mart, 106 Nw. U. L. Rev. Colloquy 34, 37–45 (2011).

Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question. See *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (common questions whether product sold to all class members was inherently defective,

whether defendant knew of this defect, and whether the product warranty covered the defect); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (common questions whether defendant unlawfully leaked dangerous chemicals and whether the chemicals contaminated the contiguous area underlying class members' homes); *IKO Roofing, supra,* at 3–4 (common question whether roofing shingles sold to all class members complied with national industry standard as represented on packaging); *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 798 (7th Cir. 2013) (common question whether products sold to class members contained certain defects, "although damages [were] likely to vary across class members"). Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common. It is routine in class actions to have a final phase in which individualized proof must be submitted. As we noted in *IKO Roofing,* if commonality of damages were also essential, "then class actions about consumer products are impossible." 2014 WL 2958615 at 3.

In this case, the plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct by Sturm: the marketing and packaging of GSC. The same legal standards govern every class member's claim; Sturm admits in its brief that "[a]ll of the applicable state consumer protection laws require proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer." See *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir. 1995) (California law); *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 655 A.2d 417, 430 (N.J. 1995); *Marcus v. AT&T Corp.,* 138 F.3d 46, 64 (2d Cir. 1998) (New York law); *Johnson v. Phoenix Mut. Life Ins. Co.,* 266 S.E.2d 610, 622 (N.C. 1980),

*rev'd on other grounds by Myers & Chapman, Inc. v. Thomas G.
Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988); *Davis v. McGuigan*, 325
S.W.3d 149, 162 (Tenn. 2010); *Chrysler Corp. v. Schiffer*, 736
So.2d 538, 543–44 (Ala. 1999); *Barbara's Sales, Inc. v. Intel
Corp.*, 879 N.E.2d 910, 927 (Ill. 2007); *Johnson v. Collins Entm't
Co.*, 564 S.E.2d 653, 665 (S.C. 2002).

The district court agreed that "each state law consumer
protection statute cited by Plaintiffs requires an objective
showing that [Sturm] engaged in an unfair or deceptive act
or practice." It nevertheless found that there were no ques-
tions common to the class. In so doing, the court overlooked
the fact that the question whether the GSC packaging was
likely to deceive a reasonable consumer is common. The
claims of every class member will rise or fall on the resolu-
tion of that question. *Cf. Amgen Inc. v. Conn. Ret. Plans &
Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("[A] failure of proof
on the issue of materiality would end the case … . As to ma-
teriality, therefore, the class is entirely cohesive: It will pre-
vail or fail in unison. In no event will the individual circum-
stances of particular class members bear on the inquiry.").

It may be helpful to pinpoint some of the ways in which
the district court's analysis of commonality veered off
course. The court concluded, for example, that the class
could not be certified because some class members may have
purchased a later version of the GSC packaging that includ-
ed the descriptive term "instant" and therefore were not sub-
jected to the same Sturm conduct as other class members.
But the fact that some people may have bought the new
package does not diminish the fact that many others pur-
chased and allegedly were deceived by the old package.
Tens (perhaps hundreds) of thousands of the original pack-

aging units already had been distributed by the time the
packaging was altered. Moreover, the record is unclear how
widely the new packaging was distributed; the plaintiffs
contend its in-store distribution was minimal. As we have
cautioned before, "[i]n circumstances such as these, involv-
ing minor overbreadth problems that do not call into ques-
tion the validity of the class as a whole, the better course is
not to deny class certification entirely but to amend the class
definition as needed to correct for the overbreadth." *Messner
v. Northshore Univ. HealthSys.*, 669 F.3d 802, 826 n.15 (7th Cir.
2012).

The court was also mistaken to think that the proposed
class could not be certified because it includes a "great num-
ber of members who for some reason could not have been
harmed by the defendant's allegedly unlawful conduct." It
did not cite any evidence in the record to support this as-
sumption, which was squarely contradicted by the named
plaintiffs' affidavits. If the court thought that no class can be
certified until proof exists that every member has been
harmed, it was wrong. See *Parko v. Shell Oil Co.*, 739 F.3d
1083, 1085 (7th Cir. 2014) ("How many (if any) of the class
members have a valid claim is the issue to be determined *af-
ter* the class is certified."); *Kohen v. Pac. Inv. Mgmt. Co.*, 571
F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include
persons who have not been injured by the defendant's con-
duct … . Such a possibility or indeed inevitability does not
preclude class certification … ."); *Messner*, 669 F.3d at 823
("[T]hat some class members' claims will fail on the merits if
and when damages are decided [is] a fact generally irrele-
vant to the district court's decision on class certification."). If
very few members of the class were harmed, that is "an ar-
gument not for refusing to certify the class but for certifying

it and then entering a judgment that would largely exoner-
ate" Sturm. See *Butler*, 727 F.3d at 799; see also *Schleicher v.
Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Rule 23 allows certi-
fication of classes that are fated to lose as well as classes that
are sure to win.").

The cases on which the district court relied stand for a
subtly different proposition that is not implicated here. If "a
class is defined so broadly as to include a great number of
members who for some reason could not have been harmed
by the defendant's allegedly unlawful conduct, the class is
defined too broadly to permit certification." *Messner*, 669
F.3d at 824; *Kohen*, 571 F.3d at 677. But there is a distinction
"between class members who *were not* harmed and those
who *could not* have been harmed." *Messner*, 669 F.3d at 825.
For example, in *Messner*, we noted that an antitrust plaintiff
class could not be defined to include persons who purchased
a product before the defendant possessed market power, for
those persons *could not* have been injured by the defendant's
alleged abuse of market power. *Id.* at 824–25. Similarly, in
this case, a class definition that included online purchasers
of GSC might be overbroad if such purchasers could not
have been deceived by the product packaging found in
stores. (We take no position on that point. Often the online
"store" shows an image of the package that the customer can
examine in detail; if that was done here, then the online
group may be in essentially the same position as those who
bought in physical stores.) On the other hand, in-store pur-
chasers that were exposed to the allegedly deceptive packag-
ing could have been injured by it, even if it turns out later
that a few were not. This was not a legitimate basis for deny-
ing certification.

No. 13-3843                                                              15

From the record amassed for the class certification deci-
sion, it is apparent that this is not a case where few, if any, of
the putative class members share the named representative's
grievance against the defendant. If it were, things would be
different. A person whose claim is idiosyncratic or possibly
unique is an unsuitable class representative. See *Falcon,* 457
U.S. at 156–59; *Thorogood v. Sears, Roebuck & Co.,* 547 F.3d 742,
747 (7th Cir. 2008) (no evidence that anyone in 500,000 per-
son class other than Thorogood believed the allegations);
*Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006)
(Oshana appeared to be the only person in million-plus class
that believed defendant deceived consumers by using differ-
ent formulae in fountain and bottled soda products). In this
case, the evidence showed that the named representatives
suffered the same injury as members of the proposed class.
The plaintiffs proffered evidence to show the overwhelming-
ly negative response to the GSC product, the flood of com-
plaints that followed the introduction of GSC, and numerous
surveys that shed light on the preferences of Keurig users for
premium (freshly brewed) coffee.

The question whether the GSC packaging was likely to
mislead a reasonable consumer is common to the claims of
every class member. (Note that this is an objective question,
not one that depends on each purchaser's subjective under-
standing of the package.) The district court abused its discre-
tion in failing to recognize that this question satisfied the
commonality requirement of Rule 23(a)(2). There may be
other common questions, such as those related to Sturm's
*scienter*, but we leave determination of those issues under the
proper standard to the district court on remand.

*Rule 23(b)(3).*—Plaintiffs sought certification under Rule 23(b)(3), which requires the court to "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution … of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.* We assess those requirements against the common question we have identified: whether the GSC packaging was likely to deceive a reasonable consumer.

The district court concluded that individual issues overshadow whatever commonality might exist because each class member's claim may require individualized inquiries on causation. In support of this conclusion, the court relied on a supposed rule that individual issues necessarily predominate "in cases requiring individual subjective inquiries into causality." Or as the court put it elsewhere, "[t]he problem with the proposed class here is that showing reliance or causation—as required to establish liability—requires an investigation of each purchaser." This was an error of law. See *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("Proximate cause … is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification."); *IKO Roofing, supra,* at 3–5 (reaffirming *Pella* and remanding for reconsideration of class cer-

No. 13-3843                                                        17

tification despite the existence of potential individualized
questions of causation).

Rule 23(b)(3) class actions are designed to "cover cases in
which a class action would achieve economies of time, effort,
and expense, and promote uniformity of decision as to per-
sons similarly situated, without sacrificing procedural fair-
ness or bringing about other undesirable results." *Amchem
Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quo-
tation and alteration omitted). The (b)(3) "opt-out" class fa-
cilitates the "vindication of the rights of groups of people
who individually would be without effective strength to
bring their opponents into court at all." *Id.* at 617 (quotation
omitted). As we have said: "The policy at the very core of the
class action mechanism is to overcome the problem that
small recoveries do not provide the incentive for any indi-
vidual to bring a solo action prosecuting his or her rights. A
class action solves this problem by aggregating the relatively
paltry potential recoveries into something worth someone's
(usually an attorney's) labor." *Mace v. Van Ru Cred. Corp.*, 109
F.3d 338, 344 (7th Cir. 1997), quoted with approval in *Am-
chem*, 521 U.S. at 617. We reiterated that view in *Butler* in not-
ing that a "class action is the efficient procedure for litiga-
tion of … a case involving a defect that may have imposed costs
on tens of thousands of consumers, yet not a cost on any one
of them large enough to justify the expense of an individual
suit." See *Butler*, 727 F.3d at 798. The same can be said about
a deceptive practice.

Every consumer fraud case involves individual elements
of reliance or causation. As we commented in *IKO Roofing,* a
rule requiring 100% commonality would eviscerate consum-
er-fraud class actions. And because few if any injured parties

would bring suit to recover the paltry individual damages
available in most consumer fraud cases, such a rule would
undermine enforcement against "tortious harms of enor-
mous aggregate magnitude but so widely distributed as not
to be remediable in individual suits," in direct contradiction
of Rule 23(b)(3)'s purpose. See *Butler*, 729 F.3d at 801; see also
*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.
2004) ("The *realistic* alternative to a class action is not 17 mil-
lion individual suits, but zero individual suits, as only a lu-
natic or a fanatic sues for $30."). The importance of the class
action device in vindicating the rights of consumers is one
reason why the Supreme Court held that "[p]redominance is
a test readily met in certain cases alleging consumer …
fraud," among others. See *Amchem*, 521 U.S. at 625.

In determining whether to certify a consumer fraud class,
the court should begin with a "rigorous analysis" into
whether the plaintiffs' "damages are susceptible of meas-
urement across the entire class." *Comcast*, 133 S. Ct. at 1433.
In this case, the answer is yes: for example, plaintiff's dam-
ages might be computed by taking the difference between
the actual value of the package she purchased (instant cof-
fee) and the inflated price she paid (thinking the pods con-
tained real coffee grounds). See Dkt. 29, Ex. V, Expert Report
of Candace L. Preston (discussing two potential damages
models: retail measure and wholesale measure).

If damages can be estimated, the court next should exam-
ine the matters identified in Rule 23(b)(3). See *Amchem*, 521
U.S. at 615–16. These considerations deal with "the interests
of individual members of the class in controlling their own
litigations and carrying them on as they see fit." *Id.* at 616
(quotation marks omitted). Thus, the court needs to assess

No. 13-3843                                                      19

the difficulty and complexity of the class-wide issues as
compared with the individual issues. The class issues often
will be the most complex and costly to prove, while the indi-
vidual issues and the information needed to prove them will
be simpler and more accessible to individual litigants. For
example, in *Butler* and *IKO Roofing*, proving that the prod-
ucts were defective required technical expertise and consid-
erable expert testimony, as well as extensive discovery into
the defendant's manufacturing processes. By contrast, the
individual issues in those cases could be "readily deter-
mined" in individualized follow-on proceedings. See *Butler*,
727 F.3d at 801.

   In this case, resolution of the merits may require costly
survey evidence and expert testimony, along the lines plain-
tiffs have proffered for certification purposes, to prove the
allegation that the GSC packaging was likely to mislead a
reasonable consumer. The district court might conclude on
remand that the class device is superior, because no rational
individual plaintiff would be willing to bear the costs of this
lawsuit. See *Carnegie*, 376 F.3d at 661 ("[A] class action has to
be unwieldy indeed before it can be pronounced an inferior
alternative—no matter how massive the fraud or other
wrongdoing that will go unpunished if class treatment is
denied—to no litigation at all."). At the back end, if the class
prevails on the common issue, it would be a straightforward
matter for each purchaser to present her evidence on reliance
and causation. Indeed, if the class prevails, "the case would
probably be quickly settled." *Butler*, 727 F.3d at 798.

   Finally, the court should assess whether the class allega-
tions are "satisf[ied] through evidentiary proof." *Comcast
Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); see also *Wal-*

*Mart*, 131 S. Ct. at 2551 (class certification analysis "over-lap[s] with the merits of the plaintiff's underlying claim"); *Falcon*, 457 U.S. at 160 (emphasizing the need "for the court to probe behind the pleadings before coming to rest on the certification question" because "class determination general-ly involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action"). Such proof might include, for example, survey or other evi-dence suggesting the relevant common traits of the class members, expert testimony supporting the classwide allega-tions, or analysis of the relative costs of prosecuting the class and individual issues in the case. The court should evaluate the evidence pragmatically. See *Amchem*, 521 U.S. at 621 (ex-plaining that the "safeguards provided by the Rule 23(a) and (b) class-qualifying criteria … are not impractical impedi-ments [or] checks shorn of utility"); *cf. Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (discussing the underpinnings of the "fraud-on-the-market" presumption in securities law).

Ultimately, the court must decide whether classwide res-olution would substantially advance the case. See *Butler*, 727 F.3d at 801–02 (explaining that the class issue is "central to liability"). The named plaintiffs in our case allege that Sturm deceived consumers by telling them that the GSC pods con-tained freshly ground coffee, when at most 5% of the pod did so, and by concealing the fact that the product was overwhelmingly instant coffee. In fact, the substance of this claim is quite similar to the behavior at issue in *POM Won-derful LLC, supra,* in which the Court upheld the right of POM to bring an action for deceptive practices against Coca-Cola under the Lanham Act, 15 U.S.C. § 1125, complaining about Coca-Cola's labeling of a juice product as "pomegran-ate-blueberry" even though the product actually contained

only 0.3% pomegranate juice and 0.2% blueberry juice. 134 S. Ct. at 2223.

All of that said, we are not holding that the district court must certify the class on remand. See *id.*at 802; *IKO Roofing*, *supra*, at 5. We leave that determination to the district court to make in the first instance, applying the legal standards and principles we have described.

### B

Finally, we turn to the district court's grant of summary judgment against the eight putative class representatives. The court based its decision on the alternative grounds that the GSC packaging was not likely to mislead a reasonable consumer and, even if it were, none of the individual plaintiffs put forth evidence that he or she was deceived. We review grants of summary judgment *de novo*, taking the facts in the light most favorable to the plaintiffs. *Thacker v. Menard, Inc.*, 105 F.3d 382, 385 (7th Cir. 1997).

With respect to the misleading nature of the packaging, the district court had almost nothing to say. This is it: "The Court has seen the packaging at issue—Plaintiffs bring it to each hearing—and finds that it is not designed to mislead consumers. It says what it is." That is a conclusion, not a reason. It appears to assume that a package cannot be misleading if it does not contain literal falsehoods. But that is not the law. Moreover—ironically—it appears the district court itself was confused about the product: the court's analysis reveals that it failed to understand that "soluble" coffee and "microground" coffee are not the same thing.

All of the applicable state consumer protection laws at issue here may be satisfied by proof that a statement is likely

to mislead a reasonable consumer, even if the statement is literally true. See cases cited *supra* at 12. Under this reasonable-consumer standard, the plaintiff "must show that members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (California law) (quotation marks omitted); *Kraft, Inc. v. Fed. Trade Comm'n*, 970 F.2d 311, 314 (7th Cir. 1992) (Illinois law) ("[A]n advertisement is deceptive … if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect."). Overall, "the determination [] whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law." *Kraft*, 970 F.2d at 317.

Our *de novo* review of the summary judgment record satisfies us that there are genuine questions of material fact in each of the individual cases whether the GSC packaging was likely to mislead a reasonable consumer. Sturm consciously avoided use of the term "instant" and designed the package to resemble Keurig products; several of the plaintiffs testified that they were misled; the packaging contained numerous statements that implied the product was premium fresh (*i.e.* unbrewed) coffee; and the package did not explain that it was little more than instant coffee. At least three independent expert surveys, all employing different methodologies, found that consumers were confused about the product. A jury should have decided the question whether the packaging was likely to mislead reasonable consumers.

The district court's analysis of each individual plaintiff's reliance on the alleged deception was also too hasty, and failed to take the facts in the light most favorable to the plaintiffs. In two short pages, the court zipped through all

No. 13-3843                                                                23

eight individual claims. Although the court professed that
the brevity of its order "[did] not reflect a mere surface anal-
ysis of the motion for summary judgment," we cannot find
more than that. All that is visible are some cherry-picked
facts adverse to the plaintiffs, with no mention of the evi-
dence favoring the plaintiffs' claims. *Cf. Malin v. Hospira Inc.*,
No. 13-2433, 2014 WL 3896175, at 11 (7th Cir. Aug. 7, 2014)
(disapproving the practice of "repeatedly cherry-pick[ing]
isolated phrases from [the plaintiff]'s deposition and
claim[ing] that these 'admissions' doomed her case"). For
example, the court emphasized that Suchanek admitted that
she understood the word "soluble" to mean that something
is capable of dissolving. But the fact that Suchanek correctly
understood the definition of that English word is not enough
to throw out her entire consumer-fraud claim. Did she know
that soluble coffee is instant coffee? Did she understand that
the GSC product was over 95% instant? Suchanek says not.
As she stated, "Keurig brews coffee. … If I was going to buy
a k-cup of instant coffee, I would have used my hot water
tap that has boiling water at the sink instead of buying an
expensive Keurig machine." Taking all disputed facts in the
light most favorable to Suchanek, a reasonable juror could
conclude that Suchanek was deceived.

The district court's analysis of the other plaintiffs' claims
similarly "amounted to nothing more than selectively quot-
ing deposition language it like[d] and ignoring deposition
language it [did] not like." *Id.* The court threw out
McManus's claim on the ground that he did not rely on the
GSC package when he decided to purchase, but McManus
testified to the contrary that he read the words on the pack-
age and purchased GSC in part based on the impressions he
gathered from the packaging. The court dismissed Carr's

claims because she admitted that she had not read the *text* on
the packaging, but Carr said she was misled because the
package was attractive and had a K-cup *picture* on the box.
Gladstone's claim was tossed even though the court
acknowledged that Gladstone testified that she "believed she
was purchasing fresh ground [coffee] with a filter." The
court decided Avakian's claim on the ground that she pur-
chased GSC for its low price, but it overlooked that Avakian
also testified that she thought GSC was ground coffee. The
court kicked aside Cardillo's claim on the ground that he
could not show he was deceived, but Cardillo said he decid-
ed to try GSC after seeing the coffee beans on the box and he
later filed a complaint with Better Business Bureau alleging
false advertising. The court jettisoned Capps's claim because,
even though he read and relied on the packaging, according
to the court there were no literal misrepresentations or mate-
rial omissions. That conclusion confuses the elements of the
inquiry and misapplies the reasonable-consumer standard.
DiBenedetto lost because, in the court's view, she erroneous-
ly believed "k-cups contain only ground, versus mi-
croground (instant) coffee." But the cup did not contain any
conventional ground coffee, and the district court misunder-
stood the distinction between "soluble" coffee and mi-
croground coffee. A jury could find that DiBenedetto's mis-
conception was caused by the misleading packaging. Finally,
Ritchie's claim failed because she stated that she purchased
GSC because it "looked pretty good." But Ritchie also stated
in her complaint to the Better Business Bureau that the
"word microground leads people to believe this is a ground
coffee not instant at 10.00 dollars a box."

In short, the district court's analysis failed to take the dis-
puted facts in the light most favorable to the non-moving

No. 13-3843                                                        25

parties. The individual plaintiffs should not have had sum-
mary judgment entered against them.

### III

In summary, we find that the district court abused its dis-
cretion when it denied class certification and granted sum-
mary judgment in the defendants' favor on the individual
claims. We VACATE the decision denying class certification,
REVERSE the grants of summary judgment, and REMAND for
further proceedings consistent with this opinion.

26                                                No. 13-3843

# APPENDIX





No. 13-3843                                                        27

