# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA SUCHANEK, RICHARD )
MCMANUS, CAROL CARR, )
PAULA GLADSTONE, EDNA )
AVAKIAN, CHARLES CARDILLO, )
BEN CAPPS, DEBORAH )
DIBENEDETTO, and CAROL )
J. RITCHIE, et al. )
         )
        Plaintiffs, )   Case No. 3:11-cv-00565-NJR-
         )   PMF
         )
v. )   Consolidated Cases:
         )   3:11-00889-NJR-PMF
STURM FOODS, INC., and )   3:11-01035- NJR-PMF
TREEHOUSE FOODS, INC., )   3:11-01068- NJR-PMF
         )   3:12-00224- NJR-PMF
        Defendants. )

## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

Peter H. Burke, Esq.
J. Allen Schreiber, Esq.
W. Todd Harvey, Esq.
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054
E-Mail:  pburke@burkeharvey.com
aschreiber@burkeharvey.com
tharvey@burkeharvey.com

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, AL 35209

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORTIES .................................................................................. iii

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

CONCLUSIONS OF LAW ................................................................................... 4

GENERAL REQUIREMENTS OF RULE 23 .................................................... 9

PROPOSED SUBCLASSES ............................................................................... 10

ARGUMENT........................................................................................................ 11

    A. This Small Dollar Consumer Case is the Exact Type of Lawsuit that Rule 23 Envisions Proceeding on a Class Basis ................................................. 11

    B. Each of the Rule 23(a) Factors are Satisfied ................................................ 13

        1. Numerosity ............................................................................................. 13

        2. The Seventh Circuit has Already Found Commonality is Satisfied by the Common Question of Whether the GSC's Packaging was Deceptive to a Reasonable Consumer ............................................................................. 13

        3. There are Additional Common Questions as the Seventh Circuit Hinted at in its Opinion ................................................................................................. 14

        4. Typicality is Satisfied ............................................................................. 16

        5. Adequacy of Representation is Present for both the Named Plaintiffs and Class Counsel ........................................................................................... 18

            a. All of the Named Plaintiffs are Adequate Representatives ................... 18

            b. Class Counsel is Adequate................................................................... 20

        6. The Subclasses are Capable of Identification by Objective Criteria ........ 21

RULE 23(b)(3)'s REQUIREMENTS: Predominance and Superiority ................... 25

    A. Seventh Circuit Case Law Equates Predominance with Efficiency and Further acknowledges the Viability of Consumer Class Actions................................. 25

B. Plaintiffs Have a Methodology to Compute Class-wide Damages that Fits Their Theory of Liability..................................................................................................29

C. The Superiority Requirement is Satisfied........................................................32

    1. Members of the class have no interest in individually controlling their claim..........32

    2. The extent and nature of any litigation concerning the controversy already begun by or against class members .....................................................................34

    3. It is Desirable to Control Litigation in this forum ......................................34

    4. A Class Action Focusing on the Common Liability Issues of this Lawsuit Followed by Damages Proceedings Does not Present Insurmountable Management Difficulties .......................................................................35

D. Plaintiffs have Gathered Evidentiary Proof to Prove their Class Allegations.................40

CONCLUSION........................................................................................................40

CERTIFICATE OF SERVICE ..............................................................................42

# TABLE OF AUTHORITIES

CASES:

*Alsup v. 3-Day Blinds, Inc.*, 435 F.Supp.2d 838, 842 (S.D. Ill. 2006) ............................................. 1

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615-16, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) .................................................................................................11, 18, 26, 35

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) ............................................................. 22

*Astiana v. Kashi*, 291 F.R.D. 409, 501 (S.D.Cal. 2013) ............................................................ 38

*Buford v. H & R Block*, Inc., 168 F.R.D. 340, 353 (S.D. Ga. 1996, Moore, J.) ........................... 19

*Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir. 2013) .................. 12,26,28,33,35,36

*Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012) .......................................................................... 25

*CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 723, 724-725 (7th Cir. 2011) .......................................................................................................................10,17

*Cf. Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013) ..................................................................................................................................... 5

*Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ...............................4,26,28

*Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) .......................... 8

*Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) ................................................ 19

*Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir. 2002) ................................................ 13

*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) ............................ 17

*Donovan, Philip Morris USA, Inc.*, 2012 U.S. Dist. LEXIS 37974, at * 91–92 (D. Mass. Mar. 21, 2012) .......................................................................................................... 23

*Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130* 657 f.2d 890, 895 (7th Cir. 1981) ...................................................................................................................... 19

*FTC v. 120194 Canada, Ltd.*, 2007 U.S. Dist. LEXIS 12657, 10-11, (N.D.Ill. February 12, 2007) ......................................................................................................... 39

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) .................. 38

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364 (1982) .................................. 9

*Harris v. Circuit City Stores, Inc.*, 2008 WL 400862, at *8 (N.D. Ill. 2008).............................. 32

*Hinman v. M and M Rental Center, Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) ................. 21

*Howland v. First American Title Ins. Co.,* 672 F.3d 525, 528 (7th Cir. 2012)............................ 10

*Hughes v. Kore of Ind. Enter.*, 731 F.3d 672 (7th Cir. 2013) ....................................................... 12

*In Re: Diet Drugs (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) Products Liability Litig.*, MDL NO. 1203, 2000 U.S. Dist. LEXIS 12275 *158-159 (E.D. Pa August 28, 2000) ......................................................................................................................................... 20

*In re IKO Roofing Shingle Prods. Liab. Litig.,* No. 14-1532, 757 F.3d 599, 2014 U.S. App. LEXIS 12684, 2014 WL 2958615 (7th Cir. July 2, 2014) .....................................................4,28,31

*In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D.C.Minn. 1995) .......................................... 37

*In re VMS Ltd. Pshp. Sec. Lit.,* No. 90 C 2412, 1992 U.S. Dist. LEXIS 14445, at *13 (N.D.Ill. Sept. 23, 1992).......................................................................................................................... 19

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536-537 (3d Cir. 2004) .......................... 23

*In the Matter of Cliffdale Assocs., Inc.* 103 F.T.C. 110, 165 (1984) ........................................... 38

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007)......................................................................... 38

*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 n. 12 (11th Cir. 1997).................... 26

*Jenkins v. Mercantile Mortg. Co.,* 231 F.Supp.2d 737, 744 (N.D.Ill. 2002) .............................. 13

*Johnson v. General Mills, Inc.,* 275 F.R.D. 282 (C.D. Cal., 2011) ............................................. 17

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 at 728 (11th Cir. 1987) ................................ 19

*Langendorf v. SkinnyGirl Cocktails,* et. al., 2014 U.S. Dist. LEXIS 154444 (C.D.Ill) (October 30, 2014)...............................................................................................................................21,39

*Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001)........................................................................................................... 38

*Macarz v. Transworld Sys., Inc.,* 201 F.R.D. 54, 59 (D. Conn. 2001) ........................................ 23

*Mace v. Van Ru Cred. Corp.,* 109 F.3d 338, 344 (7th Cir. 1997) ..........................................7, 12

*Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002).................................................................................. 38

*Messner v. Northshore University HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012)................ 10

*Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781, 786 (7th Cir. 2004) .......................................... 23

*Minch v. City of Chicago,* 486 F.3d 294, 301 (7th Cir. 2007)..................................................... 1

*Mullins v. Direct Digital, LLC,* 2014 U.S. Dist. LEXIS 155 at * 5 (N.D.Ill.) (Sept. 30, 2014) ............................................................................................................... 21-22

*Mullins v. Direct Digital, LLC,* 2014 U.S. Dist. LEXIS 155 at * 8-9 (N.D.Ill.) (Sept. 30, 2014)........................................................................................................................ 31

*Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006)...................................... 12

*Parko v. Shell Oil Co.,* 2014 U.S. App. LEXIS 1018 at * 8 .......................................................... 12

*Pella Corp. v. Saltzman,* 606 F.3d 391 (7th Cir. 2010) ......................................................... 27,28

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 813 (1985) ..................................................... 32

*POM Wonderful LLC v. Coca-Cola Co.,* 134 S. Ct. 2228, 189 L. Ed. 2d 141 (2014) ............... 4,8

*Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 716 (7th Cir. 2012)................................................... 10

*Ries v. Ariz. Bevs. United States Llc, Hornell Brewing Co.,* 287 F.R.D. 523, 536 (N.D. Cal. 2012)................................................................................................................................ 22

*Roe v. Town of Highland,* 909 F.2d 1097, 1100 n. 4 (7th Cir. 1990) ......................................... 13

*Saf-T-Gard Intern., Inc., v. Wagener Equities, Inc.,* 251 F.R.D. 312, 315 (N.D.Ill. 2008) ......... 21

*Schleicher v. Wendt,* 618 F.3d 679, 686 (7th Cir. 2010) ...................................................... 31,36

*Schnorbach v. Fuqua,* 70 F.R.D. 424, 428 (S.D. Ga. 1975, Alaimo, J.) ..................................... 19

*Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000) ..................... 38

*Suchanek v. Sturm Foods Inc.,* 764 F.3d 750 (7th Cir. 2014) .............................................. 1,33

*Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)...................................... 10

*Tousley v. North American Van Lines, Inc.*, 752 F.2d 96, 1985 U.S. App. LEXIS 31374 (4th Cir. S.C. 1985) .................................................................................................................. 15

*Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327-28 (S.D. Fla. 1996)........................................ 19

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ...........................4, 28

*Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000) ......................................... 10

OTHER AUTHORITIES:

2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 8:2 (8th ed. 2011) ........................... 37

5-23 Moore's Federal Practice – Civil § 23.45 (3d ed. 2011) ...................................................... 36

7AA Wright, Miller, & Kane § 1781, at 235-237 ......................................................................... 10

Committee Notes to 1966 Amendment to <u>Fed. R. Civ. P. 23</u>..................................................... 26

FED. R. CIV. P. 23(a)(2) ............................................................................................................... 13

FED. R. CIV. P. 23(b)(3) ...........................................................................................................11,25,32

Fed.R.Civ. P. 23(c)(5)................................................................................................................... 11

Lanham Act, *15 U.S.C. § 1125* .................................................................................................. 8

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.634, p. 412 (2004) .................... 11

*Manual for Complex Litigation (Fourth)* § 21.222, at 270 (2004).............................................. 21

*Newberg on Class Actions* § 3.24 at 3-133 n. 353 ...................................................................... 20

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed. 2008)..................................................................................................................... 37

Charles Alan Wright, Arthur R. Miller & Mary K. Kane, 7AA *Federal Practice and Procedure* § 1785, pp. 370-72 (3d ed. 2005)................................................................................ 10

William B. Rubenstein, Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 9:47 (4th ed. 2002 & supp. 2012) ........................................................................................................ 37

Tenn. Code Ann. § 47-18-109(a)(3). .......................................................................................... 15

William B. Rubenstein, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2012)................................ 26

Come Now the Plaintiffs, and pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure, hereby move the Court for an order certifying eight subclasses of consumers who purchased Defendants' Grove Square Coffees ("GSCs") from September of 2010 up through the date the case is certified and notice is disseminated.

## INTRODUCTION

If any consumer fraud case ever deserved certification it is the one presented here. The named Plaintiffs are consumers from Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee, all of whom purchased Defendants' GSCs for use in their Keurig machines. Each of the named Plaintiffs asserts claims against the Defendants under his or her respective state consumer protection statute. Claims for unjust enrichment and injunctive relief have also been asserted.[1]

Rather than restate many of the factual assertions that are already contained within the district court record, Plaintiffs will rely whenever possible upon the findings of fact and conclusions of law contained in the Seventh Circuit's controlling decision in *Suchanek v. Sturm Foods Inc.*, 764 F.3d 750 (7th Cir. 2014). Those findings constitute law of the case as further proceedings continue in this Court. See *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007); see also, *Alsup v. 3-Day Blinds, Inc.*, 435 F.Supp.2d 838, 842 (S.D. Ill. 2006).[2]

---

[1] Plaintiffs believe their Rule 23(b)(2) claim for injunctive relief, which sought to have the labeling of the product changed to call out the amount of instant coffee in the product and sate that it did not contain a filter, is now moot, as it is unlikely the instant product is still being sold. After all, the Defendants' goal was to get to September of 2012 when the patent expired and it would have parity coffee. The amount of instant coffee in the product and the lack of a filter are still relevant to the lawsuit, however, as they provide the basis of Plaintiffs' fraudulent omission claim.

[2] Plaintiffs have attached as Exhibit "A" to the Evidentiary Submission a certified transcript of the oral argument held before the Seventh Circuit on June 4, 2014. While Plaintiffs' counsel believes the GSCs are no longer being sold, Exhibit A at p. 10, counsel for Defendants asserted at oral argument that "it continues to be sold." Exhibit A at p. 41.

# STATEMENT OF FACTS[3]

"According to the defendants' marketing studies, Keurig machines are 'premium branded products and consumers have the perception that they brew premium coffee in their machines.' For this union of convenience and quality, consumers shell out hefty sums for both the machine itself and the K-Cups." 764 F.3d at 752.

"Until 2012 when its patent expired, only Keurig itself could make K-Cups with filters because Keurig held a patent over the K-Cup's filter technology. Sturm Foods and its parent company Treehouse (collectively Sturm) badly wanted a piece of the Keurig market. Blocked from direct competition by the patent, Sturm turned to the substitute that is at the heart of this case. In 2010, it introduced a product that used the external K-Cup design but whose innards were entirely different." 764 F.3d at 752.

"The lack of a filter created a quandary for Sturm: it made the use of fresh coffee grounds impossible. Sturm decided to put instant coffee into the cups--essentially, small chunks of freeze-dried brewed coffee that dissolve and are reconstituted when hot water is added to them. That is not the kind of premium product that Keurig customers expected, as Sturm's marketing surveys confirmed. Indeed, Sturm's consultants warned that 'use of the word 'instant' is a real no no' and should be avoided 'if at all possible' in marketing the GSC product to the only people who would buy a K-Cup: Keurig machine owners." 764 F.3d at 752-753.

"The rest of the GSC packaging was mute about the true nature of the product, except insofar as it implied that these were genuine K-Cups like those Keurig users had come to expect. . . . Those images show that like many of the premium Keurig coffee products shelved nearby, the front of the GSC package contained an image of K-Cups with fresh roasted coffee beans and

---

[3] Unless otherwise noted, the facts contained herein are taken from the Seventh Circuit's opinion.

the admonition that the GSC product was intended `[f]or use by owners of Keurig© coffee makers.' As one Sturm executive admitted, the company `rearrange[d] the packaging operation to put [GSC] into a display like Keurig had on the shelf.' Its objective was to package the product `to look like the Keurig product in box style.'" 764 F.3d at 753.

"Interestingly, the package also included this warning: `DO NOT REMOVE the foil seal as the cup will not work properly in the coffee maker and could result in hot water burns.' Except as a measure designed to ensure that the user did not view the true contents of the pod, this makes no sense: the presence or absence of a foil seal on top would have no effect on the risk of burns or the use of the cup." 764 F.3d at 753.

"[E]ven if consumers saw and understood that the term `soluble' meant `instant' in context, they had no way to know that GSC actually was more than 95% `soluble' (instant) coffee." 764 F.3d at 754.

"Sturm put a lot of money and thought into marketing GSC. In addition to following its consultants' warning against using the term `instant coffee,' Sturm conducted focus-group testing to determine whether participants would notice anything amiss about GSC. One test comparing reactions to GSC and licensed Keurig K-Cups containing ground coffee and filters concluded that the participants did not `notice[] any difference between the single serve cups [*i.e.*, between the GSC product and licensed K-Cups] with respect to *weight* and none noticed [that] the [GSC] cup emitted a distinct *rattle* when shaken.' (Emphasis added.) Even when these differences were pointed out, participants `did not equate [those differences] with quality.'" 764 F.3d at 754.

"The public response after the release of GSC was awful. The day after the product started selling in Wal-Mart stores, Sturm emailed its employees to request that the legal department, not the quality control or sales department, be immediately informed about any

complaints regarding GSC." 764 F.3d at 754.

"Customers who complained, including named plaintiff Deborah DiBenedetto, were told that GSC was 'not instant coffee' but rather 'a high quality coffee bean pulverized into a powder so fine that [it] will dissolve,' which was false except for the 'microground' coffee that constituted less than 5% of GSC. (It also wrongly implied that coffee is made by dissolving ground beans in water; it is actually produced when hot water extracts oils and other solids from the ground coffee bean.)" 764 F.3d at 754.

"To mitigate the negative reviews, Sturm encouraged employees to write fictitious favorable reviews online; the marketing department even offered to supply the language." 764 F.3d at 754.

## CONCLUSIONS OF LAW

"We discern two errors in the district court's decision to deny class certification. First, the court failed to recognize the question common to the claims of all putative class members: whether the GSC packaging was likely to mislead a reasonable consumer. See FED. R. CIV. P. 23(a)(2); see also *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011); compare *POM Wonderful LLC v. Coca-Cola Co.,* 134 S. Ct. 2228, 189 L. Ed. 2d 141 (2014) (Lanham Act case about misleading packaging)." 764 F.3d at 755.

"Second, the court applied too strict a test when it considered whether common questions predominate over individual questions. See FED. R. CIV. P. 23(b)(3); see also *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013); *In re IKO Roofing Shingle Prods. Liab. Litig.,* No. 14-1532, 757 F.3d 599, 2014 U.S. App. LEXIS 12684, 2014 WL 2958615 (7th Cir. July 2, 2014)." 764 F.3d at 755.

"Neither Rule 23 nor any gloss that decided cases have added to it requires that *every*

4

question be common. It is routine in class actions to have a final phase in which individualized proof must be submitted. As we noted in *IKO Roofing*, if commonality of damages were also essential, 'then class actions about consumer products are impossible.' 2014 U.S. App. LEXIS 12684, 2014 WL 2958615 at 3. )." 764 F.3d at 756.

"In this case, the plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct by Sturm: the marketing and packaging of GSC. The same legal standards govern every class member's claim; Sturm admits in its brief that '[a]ll of the applicable state consumer protection laws require proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer.'" 764 F.3d at 756. (citing relevant cases).

"[T]he court overlooked the fact that the question whether the GSC packaging was likely to deceive a reasonable consumer is common. The claims of every class member will rise or fall on the resolution of that question. *Cf. Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013) ('[A] failure of proof on the issue of materiality would end the case . . . . As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry.'").764 F.3d at 757.

"But the fact that some people may have bought the new package does not diminish the fact that many others purchased and allegedly were deceived by the old package. Tens (perhaps hundreds) of thousands of the original packaging units already had been distributed by the time the packaging was altered."[4] 764 F.3d at 757.

---

[4] Plaintiffs assert Defendants' changing of the packaging from "soluble" to "instant" did not alter the deceptive nature of the GSCs, as consumers continued to be misled well into 2012 as evidenced by the numerous inquiries Defendants received about the GSCs. <u>See</u> redacted

"In this case, the evidence showed that the named representatives suffered the same injury as members of the proposed class. The plaintiffs proffered evidence to show the overwhelmingly negative response to the GSC product, the flood of complaints that followed the introduction of GSC, and numerous surveys that shed light on the preferences of Keurig users for premium (freshly brewed) coffee." 764 F.3d at 758.

"The question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member. (Note that this is an objective question, not one that depends on each purchaser's subjective understanding of the package.) The district court abused its discretion in failing to recognize that this question satisfied the commonality requirement of Rule 23(a)(2)." 764 F.3d at 758.

"There may be other common questions, such as those related to Sturm's *scienter*, but we leave determination of those issues under the proper standard to the district court on remand." 764 F.3d at 758.

"The district court concluded that individual issues overshadow whatever commonality might exist because each class member's claim may require individualized inquiries on causation. In support of this conclusion, the court relied on a supposed rule that individual issues necessarily predominate `in cases requiring individual subjective inquiries into causality.' Or as the court put it elsewhere, `[t]he problem with the proposed class here is that showing reliance or causation--as required to establish liability--requires an investigation of each purchaser.' This was an error of law." 764 F.3d at 758.

---

version of Exhibit "S" to Appellate Court record attached as Exhibit "D" to the Evidentiary Submission. Of course, whether the changing of the label "cured" the deception is just one more common question for the jury to decide in the liability phase.

"As we have said: 'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.' *Mace v. Van Ru Cred. Corp.,* 109 F.3d 338, 344 (7th Cir. 1997), quoted with approval in *Amchem,* 521 U.S. at 617." 764 F.3d at 759.

"We reiterated that view in *Butler* in noting that a 'class action is the efficient procedure for litigation of ... a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any one of them  large enough to justify the expense of an individual suit.'"764 F.3d at 759.

"Every consumer fraud case involves individual elements of reliance or causation. As we commented in *IKO Roofing*, a rule requiring 100% commonality would eviscerate consumer-fraud class actions. And because few if any injured parties would bring suit to recover the paltry individual damages available in most consumer fraud cases, such a rule would undermine enforcement against "tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits," in direct contradiction of Rule 23(b)(3)'s purpose." 764 F.3d at 759-760.

"In determining whether to certify a consumer fraud class, the court should begin with a `rigorous analysis` into whether the plaintiffs' `damages are susceptible of measurement across the entire class.' *Comcast,* 133 S. Ct. at 1433. In this case, the answer is yes: for example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds). See Dkt. 29, Ex. V, Expert Report of Candace L. Preston

(discussing two potential damages models: retail measure and wholesale measure)." 764 F.3d at 760.

"Thus, the court needs to assess the difficulty and complexity of the class-wide issues as compared with the individual issues. The class issues often will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." 764 F.3d at 760.

"In this case, resolution of the merits may require costly survey evidence and expert testimony, along the lines plaintiffs have proffered for certification  purposes, to prove the allegation that the GSC packaging was likely to mislead a reasonable consumer. The district court might conclude on remand that the class device is superior, because no rational individual plaintiff would be willing to bear the costs of this lawsuit." 764 F.3d at 760.

"Finally, the court should assess whether the class allegations are 'satisf[ied] through evidentiary proof.' *Comcast Corp. v. Behrend,* 133  S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013). . . . Such proof might include, for example, survey or other evidence suggesting the relevant common traits of the class members, expert testimony supporting the class wide allegations, or analysis of the relative costs of prosecuting the class and individual issues in the case. The court should evaluate the evidence pragmatically." 764 F.3d at 760-761.

"The named plaintiffs in our case allege that Sturm deceived consumers by telling them that the GSC pods contained freshly ground coffee, when at most 5% of the pod did so, and by concealing the fact that the product was overwhelmingly instant coffee. In fact, the substance of this claim is quite similar to the behavior at issue in *POM Wonderful LLC, supra,* in which the Court upheld the right of POM to bring an action for deceptive practices against Coca-Cola under the Lanham Act, *15 U.S.C. § 1125,* complaining about Coca-Cola's labeling of a juice

product as "pomegranate-blueberry" even though the product actually contained only 0.3% pomegranate juice and 0.2% blueberry juice." 764 F.3d at 761.

## GENERAL REQUIREMENTS OF RULE 23

Rule 23(a) of the Federal Rules of Civil Procedure states:

> (a) Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if:  (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Supreme Court has said that the final three requirements of Rule 23(a) "tend to merge," with commonality and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364 (1982).

Rule 23(b)(2) of the Federal Rules of Civil Procedure allows the court to provide injunctive relief where a defendant has "acted or refused to act on grounds that apply generally to the class."  Plaintiffs seek injunctive relief pursuant to this subsection regarding the labeling of Defendants' product.  As long as Defendants continue to market their GSCs, Plaintiffs seek an injunction requiring Defendants to set forth the percentage of instant coffee on their packaging in large print and also alert consumers that the product does not contain a filter.  Again, if Defendants no longer sell the instant product this claim is now moot.

Rule 23(b)(3) of the Federal Rules of Civil Procedure provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

9

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D) the likely difficulties in managing a class action.

"A plaintiff who moves for class certification must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a), as well as at least one subsection of Rule 23(b)." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). The determination whether to certify a class is left to the district court, subject to appellate review. *CEDesign Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011); Charles Alan Wright, Arthur R. Miller & Mary K. Kane, 7AA *Federal Practice and Procedure* § 1785, pp. 370-72 (3d ed. 2005). *Howland v. First American Title Ins. Co.*, 672 F.3d 525, 528 (7th Cir. 2012). While "a judge should make whatever factual and legal inquiries are necessary under Rule 23," *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001), "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## PROPOSED SUBCLASSES

"Rule 23 specifically provides for multiple classes in a single case, Fed.R.Civ.P. 23(c)(4)(B), and classes have been certified in cases where multiple classes were required." *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000) Rule 23(c)(5) states: "When

appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed.R.Civ. P. 23(c)(5). MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.634, p. 412 (2004) (noting the option of creating subclasses if the law of only a few jurisdictions applies).

Plaintiffs propose the following class[5] or subclasses for each of the eight states:

> All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSQ") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSQ primarily for resale; (c) retailers or re-sellers of the GSQ; (d) governmental entities, including this Court; and (e) any consumer that already received a refund from Defendants. The named Plaintiffs assert claims under their respective state's consumer protection laws and also assert claims for unjust enrichment and injunctive relief.

## ARGUMENT

A.    This Small Dollar Consumer Case is the Exact Type of Lawsuit that Rule 23 Envisions Proceeding on a Class Basis.

For nearly twenty years *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591(1997), stood as the Supreme Court's definitive announcement of its interpretation of Rule 23 standards. The Court explained:

> While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Kaplan, Prefatory Note 497. As concisely recalled in a recent Seventh Circuit opinion: 'The policy at the very core of the class action mechanism is to overcome the

---

[5] To the extent the Court were to find that a class definition is not sufficiently precise or definite, the remedy is not to deny class certification but to alter the class definition. See *Holling-Fry v. Coventry Health Care of Kansas*, 2010 U.S. Dist. LEXIS 94416 at * 18-19 (W.D.Mo. September 10, 2010) ("Although Plaintiff's proposed definition was somewhat overbroad in that it did not explicitly restrict the class to individuals who actually *paid* a copay in excess of what was permitted by the regulation, this is easily cured by amending the definition.")

problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Mace* v. *Van Ru Credit Corp.,* 109 F.3d 338, 344 (1997).

521 U.S. at 617 (underline added)

Several Seventh Circuit decisions expressly recognize these policy considerations. See *Parko v. Shell Oil Co.*, 2014 U.S. App. LEXIS 1018 at * 8 ("Also this doesn't appear to be one of those small-claims suits that as a practical matter can proceed only as a class action (e.g. overcharges of $5.50 for rental cars."); *Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30.... The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").

In *Hughes v. Kore of Ind. Enter.*, 731 F.3d 672 (7th Cir. 2013), the Seventh Circuit further noted the class action device serves the dual purposes of compensation and deterrence:

> A deeper question is whether a class action should be permitted when the stakes, both individual and aggregate, in a class action are so small—so likely to be swamped by the expense of litigation—as they are in this case. But we don't think smallness should be a bar. This is obvious when what is small is not the aggregate but the individual claim; indeed that's the type of case in which class action treatment is most needful. See, e.g., *Mace v. Van Ru Credit Corp., supra,* 109 F.3d at 344-45. But even when as in this case the aggregate claim—the sum of all the class members' claims—is meager, such treatment will often be appropriate. A class action, like litigation in general, has a deterrent as well as a compensatory objective. See, e.g., 1 Rubenstein, *et al., supra,* §§ 1:7-8. "[S]ociety may gain from the deterrent effect of financial awards. The practical alternative to class litigation is punitive damages, not a fusillade of small-stakes claims." *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006). The deterrent objective of the Electronic Funds Transfer Act is apparent in the provision of statutory damages, since if only actual damages could be awarded, the providers of ATM services such as Kore might have little incentive to comply with the law.[6]

---

[6] As discussed more fully, *infra*, some of the relevant states' consumer protection statutes have penalty provisions based upon a showing of defendant's willfulness.

731 F.3d at 677 (underline added).

    B.    Each of the Rule 23(a) Factors are Satisfied.

        1.    Numerosity

It is established that a Plaintiff "cannot rely on 'mere speculation' or 'conclusory allegations' as to the size of the putative class to prove that joinder is impractical for numerosity purposes." *Roe v. Town of Highland,* 909 F.2d 1097, 1100 n. 4 (7th Cir. 1990)). If plaintiffs are unable to provide an exact number, "a good faith effort is sufficient to establish the number of class members." *Jenkins v. Mercantile Mortg. Co.,* 231 F.Supp.2d 737, 744 (N.D.Ill. 2002)

Plaintiffs retained Candace Preston as their damages expert. Her Original and Supplemental Reports on class damages appear in the record at Doc. 101, as Exhibits "V" and "W." Relying upon data Plaintiffs subpoenaed from SymphonyIRI Group, Preston noted that there are tens of thousands of unit sales in each state during the class period.[7] During oral argument, Chief Judge Wood noted there are "lots of them. There's 700,000 of these things. You've got numerosity." Exhibit A at p. 25. Accordingly, this Rule 23 factor is easily satisfied.

        2.    The Seventh Circuit has Already Found Commonality is
             Satisfied by the Common Question of Whether the GSC's
             Packaging was Deceptive to a Reasonable Consumer

Rule 23(a) (2) sets forth the commonality requirement which ensures that the class is "reasonably homogeneous." *Culver v. City of Milwaukee,* 277 F.3d 908, 910 (7th Cir. 2002) As noted, *supra*, in the Conclusion of Law section, the Seventh Circuit has already found that commonality is satisfied in this matter. It explained:

---

[7] See Exhibit A to Preston's Supplemental Report breaking out dollar and unit sales for calendar years 2010, 2011, and 2012 up through October 19, 2012. (Doc. 101) Plaintiffs seek limited discovery from both the Defendants and SymphonyIRI Group to determine the full extent of sales. This discovery would confirm whether Plaintiffs' (b)(2) claim is moot and also provide a better approximation of the overall damages the eight subclasses suffered.

In this case, the evidence showed that the named representatives suffered the same injury as members of the proposed class. The plaintiffs proffered evidence to show the overwhelmingly negative response to the GSC product, the flood of complaints that followed the introduction of GSC, and numerous surveys that shed light on the preferences of Keurig users for premium (freshly brewed) coffee. 764 F.3d at 758.

The question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member. (Note that this is an objective question, not one that depends on each purchaser's subjective understanding of the package.) The district court abused its discretion in failing to recognize that this question satisfied the commonality requirement of Rule 23(a)(2).

764 F.3d at 758.

In sum, the Seventh Circuit has found commonality is satisfied and this finding is law of the case.

      3.      <u>There are Additional Common Questions as the Seventh Circuit Hinted at in its Opinion</u>

The Seventh Circuit has already found that "[t]here may be other common questions, such as those related to Sturm's *scienter*, but we leave determination of those issues under the proper standard to the district court on remand." 764 F.3d at 758. As shown below, there are additional common questions in this matter including, but not limited to, Defendants' scienter or willfulness.

Although Defendants acknowledge that *scienter* is not a required element of liability under any of the eight consumer protection statutes, the question of willfulness is still relevant under a few state's statutes for the imposition of damages. For example, under Alabama's Deceptive Trade Practices Act ("DTPA"), Ala. Code § 8-19-5 (1985) a court may award actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) up to three times any actual damages, in the court's discretion. In making its determination under this subsection, the court shall consider several factors, including to the extent to which the

unlawful acts or practices were committed intentionally. Likewise, the Tennessee Consumer Protection Act ("TCPA") gives the court discretion to award treble damages against a person who engages in an unfair or deceptive act that is a willful or knowing violation of the TCPA. *See* Tenn. Code Ann. § 47-18-109(a)(3).

Any violation of S.C. Code Ann. § 39-5-20 under the unfair trade practices law constitutes a violation of S.C. Code Ann. § 39-57-80, which directs the court to treble the damages awarded by a jury if the court finds a willful or knowing violation. *Tousley v. North American Van Lines, Inc.*, 752 F.2d 96, 1985 U.S. App. LEXIS 31374 (4th Cir. S.C. 1985). Treble damages are recoverable under S.C. Code Ann. § 39-5-140 where the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of S.C. Code Ann. § 39-5-20.

Other common questions include whether Defendants committed fraud by omission. The Seventh Circuit summarized the following facts which clearly support a fraud by omission claim:

> Sturm's consultants warned that `use of the word ''instant'' is a real no no` and should be avoided `if at all possible` in marketing the GSC product to the only people who would buy a KCup: Keurig machine owners. Sturm followed that advice. The GSC packaging stated in small font that it contained `naturally roasted soluble and microground Arabica coffee`; it never explained that soluble coffee is instant coffee. Nor did it mention that the GSC pods contained over 95% instant coffee with only a tiny bit of microground coffee mixed in. . . . The rest of the GSC packaging was mute about the true nature of the product, except insofar as it implied that these were genuine K-Cups like those Keurig users had come to expect.

764 F.3d at 753.

The Seventh Circuit further noted:

> In addition to following its consultants' warning against using the term `instant coffee,' Sturm conducted focus-group testing to determine whether participants would notice anything amiss about GSC. One test comparing reactions to GSC and licensed Keurig K-Cups containing ground coffee and filters concluded that the participants did not `notice[] any difference between the

15

single serve cups [*i.e.*, between the GSC product and licensed K-Cups] with respect to *weight* and none noticed [that] the [GSC] cup emitted a distinct *rattle* when shaken." (Emphasis added.) Even when these differences were pointed out, participants `did not equate [those differences] with quality.'

764 F.3d at 753.

Indeed, the Seventh Circuit even surmised that Defendants attempted to conceal their fraud by instructing consumers not to open the pod: "Interestingly, the package also included this warning: 'DO NOT REMOVE the foil seal as the cup will not work properly in the coffee maker and could result in hot water burns.' <u>Except as a measure designed to ensure that the user did not view the true contents of the pod, this makes no sense</u>: the presence or absence of a foil seal on top would have no effect on the risk of burns or the use of the cup." 764 F.3d at 754. (underline added)

Other evidence related to fraudulent concealment would include Defendants' responses to "[c]ustomers who complained, including named plaintiff Deborah DiBenedetto, [who] were told that GSC was `not instant coffee' but rather `a high quality coffee bean pulverized into a powder so fine that [it] will dissolve,' which was false except for the "microground" coffee that constituted less than 5% of GSC," as well as "Sturm['s] encourag[ing] employees to write fictitious favorable reviews online; the marketing department even offered to supply the language." 764 F.3d at 754

In sum, in addition to the overriding liability issue which the Seventh Circuit already determined satisfied the commonality requirement of Rule 23(a), there are several other common issues including Defendant's *scienter*, Plaintiffs' fraud by omission claim, whether Defendants engaged in fraudulent concealment, and whether the changing of the label from "soluble" to "instant" cured the deceptive nature of the packaging.

### 4.    Typicality is Satisfied

A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983). Moreover, typicality is determined with reference to the defendant's actions, not the defenses it may have against particular plaintiffs. *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721 724-725 (7th Cir. 2011) Here, all of the named Plaintiffs bring claims under their respective state's consumer protection laws and further bring a claim for unjust enrichment and seek injunctive relief. The claims all arise from the named Plaintiffs' purchase of the GSCs.

The Seventh Circuit's opinion essentially found the typicality requirement was satisfied, when it wrote:

> From the record amassed for the class certification decision, it is apparent that this is not a case where few, if any, of the putative class members share the named representative's grievance against the defendant. If it were, things would be different. A person whose claim is idiosyncratic or possibly unique is an unsuitable class representative. . . . In this case, the evidence showed that the named representatives suffered the same injury as members of the proposed class. The plaintiffs proffered evidence to show the overwhelmingly negative response to the GSC product, the flood of complaints that followed the introduction of GSC, and numerous surveys that shed light on the preferences of Keurig users for premium (freshly brewed) coffee.

765 F.3d at 758.

Moreover, in *Johnson v. General Mills, Inc.,* 275 F.R.D. 282 (C.D. Cal., 2011) the district court found that a plaintiff's claims under California's Unfair Competition Law ("UCL") and Consumers Legal Remedies Act ("CLRA"), challenging the deceptive nature of Defendant's packaging of its yogurt product, satisfied the typicality requirement. The court explained:

> Here, Mr. Johnson claims that he, like other reasonable consumers, purchased YoPlus in reliance on General Mills' representation that YoPlus promotes digestive health. He asserts that this representation was communicated by the packaging of YoPlus and by General Mills' marketing and advertising efforts including a television commercial that he saw. He further contends that

YoPlus did not live up to this representation and that he suffered damages as a result. These assertions combined with Mr. Johnson's supporting evidence recently withstood General Mills' motion for summary judgment. . . . General Mills conceded at the March 7, 2011 hearing on the motion for class certification that it does not genuinely dispute that Mr. Johnson's claims are typical. *See* Resp. to Pl.'s Proposed Class Certification Order Ex. 2, at 15:6-7 (transcript of March 7, 2011 hearing). The typicality requirement is also met here.

275 F.R.D at 287-288.

Similarly, each of the named Plaintiffs in these actions has survived Defendants' motion for summary judgment. In reversing the district court, the Seventh Circuit stated:

Our *de novo* review of the summary judgment record satisfies us that there are genuine questions of material fact in each of the individual cases whether the GSC packaging was likely to mislead a reasonable consumer. Sturm consciously avoided use of the term "instant" and designed the package to resemble Keurig products; several of the plaintiffs testified that they were misled; the packaging contained numerous statements that implied the product was premium fresh (*i.e.* unbrewed) coffee; and the package did not explain that it was little more than instant coffee. . . . A jury should have decided the question whether the packaging was likely to mislead reasonable consumers.

764 F.3d at 762.

In sum, it is evident that all of the named Plaintiffs' claims are typical of the other class members who purchased the GSCs.

> 5. Adequacy of Representation is Present for both the Named Plaintiffs and Class Counsel

The named Plaintiffs and their counsel satisfy the adequacy requirement. The adequacy inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Therefore, a determination of the adequacy of representation includes two inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."

> a. All of the Named Plaintiffs are Adequate Representatives

The adequacy requirement is satisfied where the named representative (1) has retained competent counsel, (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy, and (3) does not have interests antagonistic to those of the class. *In re VMS Ltd. Pshp. Sec. Lit.,* No. 90 C 2412, 1992 U.S. Dist. LEXIS 14445, at \*13 (N.D.Ill. Sept. 23, 1992).

In determining whether a class representative is adequate, the court should keep in mind the admonition of the Seventh Circuit in *Eggleston v. Chicago Journeyman Plumbers' Local Union No. 130* 657 f.2d 890, 895 (7th Cir. 1981), when it commented on a defendant's propensity for attacking the adequacy of a class representative. It noted:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

Moreover, as the court in *Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005) eloquently stated:

> Class representatives "should have a working knowledge of the case." *Buford v. H & R Block*, Inc., 168 F.R.D. 340, 353 (S.D. Ga. 1996, Moore, J.). However, requiring too much of class representatives "could well prevent the vindication of the legal rights of the absent class members under the guise of protecting those rights." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 at 728 (11th Cir. 1987). The "basic issue of adequate representation [is] whether there are significant antagonistic interests between the representatives and the class." *Schnorbach v. Fuqua*, 70 F.R.D. 424, 428 (S.D. Ga. 1975, Alaimo, J.). A lack of detailed factual knowledge about the case or a lack of understanding regarding the legal theories by the named plaintiffs does not preclude class certification in a complex case. *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327-28 (S.D. Fla. 1996); *Kirkpatrick* at 727-28.

229 F.R.D. at 258 (underline added).

Here, all of the named Plaintiffs have actively participated in this litigation and each

Plaintiff has survived summary judgment. Accordingly, all of the Plaintiffs are adequate representatives and there is absolutely nothing in the record to suggest otherwise.

b.    Class Counsel Is Adequate.

Adequacy of representation also requires a showing that the action will be vigorously prosecuted. Here, Plaintiffs' counsel has litigated these consolidated actions for three and a half years.[8] See *Newberg on Class Actions* § 3.24 at 3-133 n. 353 (3d ed. 1992) ("[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney;") *In Re: Diet Drugs (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) Products Liability Litig.*, MDL NO. 1203, 2000 U.S. Dist. LEXIS 12275 *158-159 (E.D. Pa August 28, 2000) ("In a massive class action, however, `it is counsel for the class who has the laboring oar. The class representatives furnish the factual basis to invoke jurisdiction of the court and provide the outline of the controversy, but the lawyers shape the claims . . . by the compilation of factual and expert testimony and the presentation of . . . evidence.'")

Pursuant to Rule 23(g), Plaintiffs would request that the Court enter an order appointing the law firms of Burke Harvey, LLC and Ward & Wilson as co-lead class counsel in the consolidated actions. Burke Harvey has taken the lead in prosecuting these consolidated actions and will continue to do so in its capacity as class counsel. At oral argument, the Seventh Circuit acknowledged that Plaintiffs "got good class lawyers. You know, adequacy of representation

---

[8] Prior to the final judgment in this action, Counsel reviewed in excess of 30,000 documents Defendants produced. Counsel took at least 12 depositions of Defendants' employees and further engaged in extensive third-party discovery through the use of subpoenas. Class counsel also hired a marketing and damages expert. Class counsel continued to vigorously pursue this action to the Seventh Circuit resulting in reversal of the district court on both class certification grounds and on summary judgment. Class counsel's dedication to the litigation is unassailable.

question." Exhibit A at p. 25.

6.     The Subclasses are Capable of Identification by Objective Criteria

Although not an express requirement[9] of Rule 23, district courts often apply an "ascertainability" requirement to the class definition in order to ensure that the class is capable of being identified. As summarized in the *Manual for Complex Litigation*, a class definition must "avoid subjective standards (e.g., a class member's state of mind) or terms that depend on resolution of the merits (e.g., 'persons who were discriminated against')." *Manual for Complex Litigation (Fourth)* § 21.222, at 270 (2004). A "class is sufficiently definite if its members can be ascertained by reference to objective criteria and may be defined by reference to defendant's conduct." *Hinman v. M and M Rental Center, Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008); *Saf-T-Gard Intern., Inc., v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D.Ill. 2008).

Here, Plaintiffs class definition satisfies the objective-criteria requirement.[10] See *Langendorf v. SkinnyGirl Cocktails*, et. al., 2014 U.S. Dist. LEXIS 154444 at * 4 ("Purchase of Skinnygirl Margarita, after March 1, 2009, and lack of association with defendants or the court provide objective descriptions of prospective class members;")[11] see also, *Mullins v. Direct*

---

[9] See *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) ("Although there is no explicit requirement concerning the class definition in *FRCP 23*, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed.")

[10] For the convenience of the Court, Plaintiffs have restated their class definition: "All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSQ") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSQ primarily for resale; (c) retailers or re-sellers of the GSQ; (d) governmental entities, including this Court."

[11] Obviously, Plaintiffs are aware that the district court in *Langendorf v. SkinnyGirl Cocktails* found the plaintiff in that action did not satisfy the second requirement of ascertainability, i.e., demonstrating that some method exists to identify the class members, but that finding occurred because the "plaintiff provide[d] no evidence that any records exist that

*Digital, LLC*, 2014 U.S. Dist. LEXIS 155 at * 5 (N.D.Ill.) (Sept. 30, 2014) ("Plaintiff's class is ascertainable because it is objectively contained to all individuals who purchased Instaflex for personal use during the class period and the class period is finite. The class period will close when notice of this action is disseminated to the class members and will include all individuals who purchased Instaflex within the relevant statute of limitations period allowed by the relevant consumer fraud statute of the state in which they reside.")

Similarly, in *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) the court discussed ascertainability, finding that a definition similar to what the Plaintiffs propose here satisfied the requirement:

> Indeed, <u>the proposed class definition simply identifies purchasers of Defendant's products that included the allegedly material misrepresentations. Because the alleged misrepresentations appeared on the actual packages of the products purchased, there is no concern that the class includes individuals who were not exposed to the misrepresentation.</u> Defendant's concern that the Court will have difficulty identifying members of the class is unavailing. Because Defendant does not have records of consumer purchases, and potential class members will likely lack proof of their purchases, Defendant argues that the Court will have no feasible mechanism for identifying class members and will have to pursue proof individual to each class member. However, "[t]here is no requirement that "the identity of the class members . . . be known at the time of certification." *Ries v. Ariz. Bevs. United States Llc, Hornell Brewing Co.,* 287 F.R.D. 523, 536 (N.D. Cal. 2012*); Wolph, 272 F.R.D. at 482.* <u>If class actions could be defeated because membership was difficult to ascertain at the class certification stage, "there would be no such thing as a consumer class action."</u> *Ries,* 287 F.R.D. at 536.

291 F.R.D. at 500 (underline added).

---

show who purchased the offending product, when, or where." 2014 U.S. Dist. LEXIS 154444 at *4. Here, by contrast, Plaintiffs have a complete record of sales from Symphony IRI Group, as well as detailed sales information from several of the retail outlets. When this detailed information is incorporated into Plaintiffs' Notice Plan, as discussed *infra*, it is evident Plaintiffs in this action have carried their burden of proof of identifying class members.

The "ascertainability" requirement[12] dovetails with Rule 23's notice provisions, which do not require individual notice in all cases but only "the best notice that is practicable under the circumstances[.]" Fed.R.Civ.P. 23(c)(2)(B). As a result, many courts have analyzed ascertainability in conjunction with the feasibility of notice. In doing so, a court confirms that membership in the class is sufficiently ascertainable, not for its own sake, but "to permit a court to 'decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment.'" *Donovan*, *Philip Morris USA, Inc.*, 2012 U.S. Dist. LEXIS 37974, at * 91–92 (D. Mass. Mar. 21, 2012). (quoting *Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000)).

Plaintiffs have attached as Exhibit "B" to the Evidentiary Submission a proposed Notice Plan for Court approval. As this case involves small dollar consumer claims with little to no direct sales from Defendants, notice will necessarily be accomplished through publication or "the best notice that is practicable under the circumstances."[13] Plaintiffs envision a notice campaign that relies heavily on digital media targeted to consumers of K-Cups in the relevant states.

---

[12] Three reasons are generally proffered for imposing an "ascertainability" requirement on the class definition. First, courts require classes to be defined in a clearly ascertainable manner to identify who must receive notice of class certification under Rule 23(c)(2). Second, the definition of an ascertainable class will identify who will be bound by any judgment, thus avoiding subsequent litigation over a judgment's preclusive effect. Third, the ascertainability requirement ensures it will be feasible to identify class members who may ultimately be entitled to damages or other relief.

[13] Notice by publication has been used in cases where potential class member names were confidential or impracticable to ascertain. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536-537 (3d Cir. 2004) (Where class members were consumers of a prescription drug, and names and addresses of these consumers were confidential and not available to parties, notice by publication combined with call center and website was sufficient notice to identify class members.); *Macarz v. Transworld Sys., Inc.*, 201 F.R.D. 54, 59 (D. Conn. 2001) (notice by publication used where circumstances "make it impracticable to gain the names and addresses of class members and notify them individually of the action's pendency"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (Internet notice of settlement was acceptable substitute for individual notice where Defendant had no record of part of a class of customers.).

Moreover, as Plaintiffs have obtained through third-party discovery from Wal-Mart and other retailers the amount of GSC product it sold in the relevant states, broken down by store number, Plaintiffs are able to target in digital media through the use of zip codes specific areas of each of the eight states where it is most likely the product was sold.[14]

Plaintiffs would employ digital notice by placing banner ads on a variety of websites which might include among others AOL.com, Facebook.com, AXIS digital media, and/or other local statewide online newspapers in the relevant eight states. These efforts would lead to tens of millions of net based impressions for the eight subclasses. The FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* considers 70-95% reach among class members reasonable. See p. 3. Plaintiffs' Notice Plan is designed to reach 75.5% of potential class members and therefore within an acceptable range.[15]

In addition, Plaintiffs would request that the actual locations of Wal-Mart and Stop & Shop which sold the GSCs post the Court approved Notice in their stores. In the same manner whereby a store places a coupon near the product for which it may be redeemed, Plaintiffs would seek to have Notice placed next to where the Keurig compatible coffees are shelved. This way, consumers who previously purchased the GSCs in those locations would be alerted of the class action. If Wal-Mart and Ahold and other retailers would not voluntarily cooperate with the

---

[14] The Notice Plan relied upon demographic data from GfK MediaMark Research & Intelligence, LLC (MRI), a nationally accredited research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media.

[15] The Court should keep in mind that Defendants themselves employed a digital strategy to combat the black eye reviews on the internet the GSC were receiving from angry consumers after they were launched. See Grove Square 0000664: "Grove Square digital campaign kicks off in January;" see also, Grove Square 0000574: "Grove Square Digital Ad Campaign will re-launch in Q4 '11." These documents are attached to Evidentiary Submission as Exhibit "E". As the Seventh Circuit observed:"To mitigate the negative reviews, Sturm encouraged employees to write fictitious favorable reviews online; the marketing department even offered to supply the language." 764 F.3d at 754.

placement of Notice, Plaintiffs would request the aid of the Court in seeking their cooperation.

Plaintiffs would further request that Keurig place notice on its Website to alert Keurig consumers of the class action. To the extent that Keurig maintains lists of its customers in the relevant states, Plaintiffs would seek its cooperation in disseminating the notice to its customers. Recognizing that Keurig may treat any such list as a trade secret or proprietary and confidential, Plaintiffs would enter into a confidentiality agreement to protect the information. Again, if Keurig would not voluntarily cooperate with Plaintiffs efforts, Plaintiffs would request the aid of the Court.

In sum, any requirement that the class be ascertainable is met in these consolidated actions.[16]

## RULE 23(b)(3)'s REQUIREMENTS: Predominance and Superiority

Plaintiffs seek certification under Rule 23(b)(3). Each of the factors under Rule 23(b)(3), taking into account the guidance from the Seventh Circuit's opinion, will be addressed below.

A.  Seventh Circuit Case Law Equates Predominance with Efficiency and Further Acknowledges the Viability of Consumer Class Actions

In several recent opinions, the Seventh Circuit has repeatedly explained that the predominance inquiry under Rule 23(b)(3) equates with a finding of efficiency. For example, in *Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012), a class action involving consumers from several states who had purchased defective washing machines, the Seventh Circuit granted a Rule 23(f)

---

[16] See *Lilly v. Jamba Juice Co.*, 2014 U.S. Dist. LEXIS 131997 (N.D. Cal., Sep. 18, 2014) ("Plaintiffs here have submitted a detailed plan for notice prepared by a commissioned media and notice expert, indicating that they will attempt to provide direct notice to many retail customers whose contact information may be on file with the retailer (such as those who purchased products from the retailer with store-specific membership cards), and that an extensive but targeted internet and print media campaign will be aimed at providing notice to other potential class members. . . . After reviewing the proposal, the Court sees no reason to conclude at this stage that the plan to identify class members will fail to comport with due process.")

petition in order to clarify the "predominance" requirement in class action litigation. Reversing

the district court's failure to certify a class of consumers who complained about a defect in the

washers that caused mold, Judge Posner explained the concept of predominance:

> Predominance is a question of efficiency. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615-16, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); Committee Notes to 1966 Amendment to Fed. R. Civ. P. 23; *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 n. 12 (11th Cir. 1997); William B. Rubenstein, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2012). Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials? A class action is the more efficient procedure for determining liability and damages in a case such as this involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary, a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine—there doesn't seem to be any claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

702 F.3d at 362.

Thereafter, in *Butler v. Sears* 727 F.3d 796 (7th Cir. 2013), the Seventh Circuit

reexamined its prior holding in light of the Supreme Court's decision in *Comcast Corp. v.*

*Behrend*, 133 S. Ct. 1426 (2013), and reinstated its prior opinion writing:

> The basic question presented by the mold claim—are the machines defective in permitting mold to accumulate and generate noxious odors?—is common to the entire mold class, although damages are likely to vary across class members (the owners of the washing machines). A class action is the efficient procedure for litigation of a case such as this, a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost to any one of them large enough to justify the expense of an individual suit. A determination of liability could be followed by individual hearings to determine the damages sustained by each class member. The parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-

contaminated washing machines. In that event the hearings would be brief; indeed the case would probably be quickly settled.

727 F.3d at 798. (underline added)

Specifically, as it relates to the question of efficiency, judge Posner rebuked Sears' contention that efficiency wasn't a proper basis for class certification, stating:

> Sears argues that *Comcast* rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." 702 F.3d at 362. But in support of its argument Sears cites only the statement in the *dissenting* opinion in *Comcast* that "economies of time and expense" favor class certification, 133 S. Ct. at 1437—a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority *must* disapprove of.

727 F.3d at 800.

Earlier, in *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010), the Seventh Circuit again in response to a Rule 23(f) petition upheld the trial court's granting of class certification to subclasses of consumers from six states who alleged that they bought defective windows. In a per curiam opinion, in which Judge Posner participated, the Seventh Circuit found:

> The district court held that the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3) are both satisfied because the central questions in the litigation are the same for all class members--whether the ProLine windows suffered from an inherent defect when they left the factory, whether and when Pella knew of this defect, the scope of Pella's warranty, and the nature of the ProLine Customer Enhancement Program and whether it amended the warranty.
>
> In contrast to *Thorogood* where there were no common issues of law or fact and the court questioned whether anyone besides the plaintiff shared the same concerns with the product, here there is an economy to class treatment of the question whether the ProLine windows suffer from a basic design defect, the resolution of which has the potential to eliminate the need for multiple, potentially expensive expert testimony and proof that would cost considerably more to litigate than the claims would be worth to the plaintiffs. *See Thorogood*, 547 F.3d at 748. According to class counsel, they already have been contacted by over 350 consumers who have experienced the same wood rot problems set forth in the complaint. Where there are common issues and the accuracy of the resolution of

27

those issues "is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *Mejdrech*, 319 F.3d at 911.

606 F.3d at 394. (underline added)

Like *Butler v. Sears*, *Pella* has been before the Seventh Circuit on more than one occasion. Ironically, when the Seventh Circuit heard oral argument in this case, it had just released its most recent opinion in *Pella* two days prior. During oral argument Chief Judge Wood stated that the "Court has never said that consumer fraud -- as a matter of fact, we said in *Pella*, we rejected the idea that consumer fraud claims are inappropriate for class treatment." Exhibit A at p. 39.[17] Judge Wood also inquired of Defense counsel, "[b]ut why not compare this to *Butler* . . . where everybody says I thought I was buying a washing machine that wasn't going to get my clothes moldy?" Id. at p. 34.

The Seventh Circuit's opinion in this matter also cited to *In re IKO Roofing Shingle Prods. Liab. Litig.,* No. 14-1532, 757 F.3d 599 (7th Cir. 2014), which is the Seventh Circuit's most recent pronouncement in response to a Rule 23(f) petition. In finding that the district court erred in its class certification analysis, Judge Easterbrook explained:

> The court read *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013), and *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), to require proof "that the plaintiffs will experience a common damage and that their claimed damages are not disparate." 2014 U.S. Dist. LEXIS 80243 at *9. Elsewhere the district court wrote that "commonality of damages" is essential. Id. at *13, 20, 23. If this is right, then class actions about consumer products are impossible, and our post-*Comcast* decision in *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796 (7th Cir. 2013), must be wrong. *Pella Corp. v.*

---

[17] See *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) ("The district judge certified two separate classes: one for customers who had already replaced or repaired their defective windows, the other for those who hadn't. The latter class sought only declaratory relief and so was nationwide, but the former sought damages and was limited to customers in six states, with a separate subclass for each state. We upheld the certifications over Pella's objections in *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) (per curiam).")

> *Saltzman,* 606 F.3d 391 (7th Cir. 2010), which approved class treatment of litigation asserting defects in casement windows, another product used in home construction or renovation, also would be wrongly decided under the district court's reading of *Comcast* and *Wal-Mart*. Indeed, we could not affirm the district court's decision in this case without overruling *Pella*, so close are the circumstances of the two home-product-defect suits.

757 F.3d at 602 (underline added)

In sum, in resolving the question of predominance the Court should equate this finding with efficiency, and further, recognize that the Seventh Circuit has continually reaffirmed the viability of consumer class actions in several recent opinions.

> B.    Plaintiffs Have a Methodology to Compute Class-wide Damages that Fits Their Theory of Liability

In addition to the question of efficiency which this Court must resolve, the Seventh Circuit also instructed this Court to determine if Plaintiffs' "damages are susceptible of measurement across the entire class." 764 F.3d at 760. It then answered its own question in the affirmative, explaining that "plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds). See Dkt. 29, Ex. V, Expert Report of Candace L. Preston (discussing two potential damages models: retail measure and wholesale measure)." Id.

In addition to Preston's original Expert Report, Preston submitted a Supplemental Report which further refined her retail damages estimate based upon new data and also set forth a methodology to compute unjust enrichment damages. See Document 101, Plaintiffs' Evidentiary Submission Filed Under Seal, at Exhibit W. Preston's damages were calculated using Defendants' own internal numbers relating to gross margins and cost of production, and easily allow for a calculation of damages for the subclasses.

The crux of Plaintiffs' damages, as evidenced by the numerous complaints the Defendants received from consumers, is that they paid more for a product than they should have, or otherwise purchased a product that they would not have bought at all.[18] The First Amended Complaint (Doc. 53) set forth numerous consumer complaints at ¶¶ 34-51 expressing these sentiments.[19] Judge Wood stated a similar notion during oral argument, when she opined: "I can't imagine why a Keurig user would want to buy instant coffee packaged inside a K-Cup for ten times the price that the instant coffee would cost." Exhibit A at p. 40. Likewise, Judge Rovner commented that because "these cups are made for a Keurig machine sort of speaks for itself because people who buy such a machine do it because they want freshly-brewed coffee. If they didn't, they would just buy instant." Id. at pp. 20-21.

To the extent Defendants argue consumers actually received a benefit from the "microground and soluble" coffees contained in the GSCs, Defendants' own internal documents quantify this "benefit" at 5 cents per pod. See Grove Square 0007025, a document dated May 9,

---

[18] *Nilon v. Natural-Immunogenics Corp.*, 2013 U.S. Dist. LEXIS 141728 at *2 N. 2 (S.D. Cal September 30, 2013) ("The spirit of this case, like most false advertising cases brought under the UCL and CLRA, is that plaintiffs paid for a product that, with more accurate information, they would have either paid less for or not bought at all.")

[19] Some of the more negative consumer feedback includes the following: "If I wanted instant coffee, I would have bought about 5 jars of what I paid for one box (18 servings) of your product." (GROVE SQUARE 0001968) Sturm received this complaint November 11, 2010: "How greedy can a company get? You guys must be proud of yourself by screwing consumers every day. The fake coffee you guys sell is nothing more than garbage!!trying to pass off instant coffee as gourmet coffee for the keurig.you are a joke! Our united states is in the condition it is, because of companies like you. If I wanted instant coffee, I wouldn't need a keurig, would i? Charging consumers $9.98 for a quarter cup of no brand instant coffee is simply outrageous and irresponsible! Greed must be your first priority. you suck!!" (GROVE SQUARE 0001969) "I have a Keurig coffee maker and came across your Grove Square product the other day at Wal-Mart. As it was next to the Green Mountain brand I usually buy, and it was $2 cheaper, I thought I would try it. Imagine my disbelief when I took the first cup out of the package. It felt different in weight and upon shaking it, sounded different. I am a coffee drinker. If I'd wanted instant, I would have bought a jar for considerably less money than I paid for 2 boxes of your crap." (GROVE SQUARE 0001971 and GROVE SQUARE 0001972) See Doc.141 at p.11 of 23, n.13.

2009, which commented on various formulations or prototypes of the GSC and noted: costed out to[o] high price goal now $0.05 per unit for ingredients." <u>See</u> <u>also</u>, Grove Square 0006940, a document dated June 1, 2009, which adds: "good but again too expensive aim for $0.05 per cup." Grove Square 0007026, a document dated June 22, 2009, which notes one prototype: "meets $0.05 price goal, too weak upfront. . ." and another prototype whose "$0.48 meets price, good flavor, send to costing." These documents are attached to Evidentiary Submission as Exhibit "F".

In *Mullins v. Direct Digital, LLC*, 2014 U.S. Dist. LEXIS 155 at * 8-9 (N.D.Ill.) (Sept. 30, 2014), the court certified a class of consumers from Illinois and other states that had purchased defendant's product explaining:

> Plaintiff's theory of damages—a full refund and statutory consumer fraud fines—matches his theory of liability—Instaflex does not perform as advertised. Whether the medical studies of Plaintiff's experts will show that "glucosamine, alone or in combination, is not effective in providing the represented joint health benefits" and Instaflex "was no more effective than [a] placebo" is a question of fact common to the members of the proposed class. PI. Compl. ¶ 21, 22. If the medical studies are true, Instaflex's label would be fraudulent on its face, and this question concerns every member of the class. "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010). Proceeding to trial as a class will produce a common answer to whether the advertisements on Instaflex's label are false.

Likewise, as shown *supra*, Plaintiffs in this action have also come forward with a theory of damages, consistent with the teaching of *In re IKO Roofing Shingle Products Liability Litigation,* that matches their theory of liability. 757 F.3d at 602. In addition to Preston's methodologies, and Defendants' own internal documents relating to product cost, Plaintiffs seek statutory damages under each of the state's consumer protection statutes. Accordingly,

predominance is readily satisfied in this action.[20]

C.    The Superiority Requirement is Satisfied

The Seventh Circuit further noted that if "damages can be estimated, the court next should examine the matters identified in Rule 23(b)(3);" these considerations deal with "the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. Thus, the court needs to assess the difficulty and complexity of the class-wide issues as compared with the individual issues." 764 F.3d at 760. Each of these items is addressed below.[21]

1.    Members of the class have no interest in individually controlling their claim

As the United States Supreme Court explained in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985):

> The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required by the Constitution. If, on the other hand, the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to "opt out."

Here, the claims of most consumers will be for approximately $10 to $15, except to the extent a state statute provides for a greater amount than actual damages, or if a state statute

---

[20] *Amchem Prods. v. Windsor*, 521 U.S. 591, 617, 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. See Adv. Comm. Notes, 28 U.S.C. App., p. 697"); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."); 7AA Wright, Miller, & Kane § 1781, at 235-237.")

[21] The superiority requirement is met when the plaintiff demonstrates that there is a standardized conduct by a defendant to the putative class members and a common nucleus of operative facts is present. See *Harris v. Circuit City Stores, Inc.*, 2008 WL 400862, at *8 (N.D. Ill. 2008).

allows damages to be trebled for intentional or willful conduct. Still, even that sum is too small on its own for a deceived consumer to bring his own individual lawsuit. Hence, class members have no interest in individually controlling their own claim. *Butler v. Sears*, 727 F.3d 796, 801 (7th Cir. 2013) ("The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile."); *Suchanek v. Sturm*, 764 F.3d at 760 ("few if any injured parties would bring suit to recover the paltry individual damages available in most consumer fraud cases". . . allowing "tortious harms of enormous aggregate magnitude" . . ."not to be remediable in individual suits.'")

Moreover, as the Seventh Circuit counseled, this Court should "assess the difficulty and complexity of the class-wide issues as compared with the individual issues," when it determines if an individual has an interest in controlling his or her own claim. 764 F3d at 760. The Seventh Circuit further observed that "class issues often will be the most complex and costly to prove, while the individual issues and the information needed to prove them will be simpler and more accessible to individual litigants." Id.

That is certainly the case in the instant action. In fact, the Seventh Circuit pointed out that in order to succeed on liability at trial, i.e., to prove the allegation that the GSC packaging was likely to mislead a reasonable consumer, Plaintiffs might have to rely upon "costly survey evidence and expert testimony, along the lines plaintiffs have proffered for certification purposes." 764 F3d at 760. Plaintiffs' marketing expert,[22] Bobby Calder, performed a detailed survey of random individuals that focused on the GSC packaging, which asked:

---

[22] Attached to the Evidentiary Submission as Exhibit "C" is the Declaration of Robert Klein. As noted in the Seventh Circuit decision, Klein performed his own studies on consumers' reaction to the GSC packaging by attempting to "recreate conditions of in-store buying by

participants to score the product on a scale of 1 to 10 on various measures based on its packaging, with "1" being least likely and "10" being most likely. When asked whether participants expected GSC to contain instant coffee, the mean answer was 1.61. Asked whether the GSC product filtered ground coffee just as other Keurig-compatible coffee products did, participants essentially said yes, recording an average score of 9.26. And even if consumers saw and understood that the term "soluble" meant "instant" in context, they had no way to know that GSC actually was more than 95% "soluble" (instant) coffee.

764 F3d at 754.

It's axiomatic that no individual litigant, or lawyer for that matter, could afford such an investment for an individual suit. Under these circumstances, no individual litigant has an interest in individually controlling the individual claim.

> ### 2. The extent and nature of any litigation concerning the controversy already begun by or against class members

All of the existing class cases have already been consolidated in this forum. Plaintiffs are not aware of any other actions involving the same misconduct. If these cases do not proceed on a class basis, they will simply not proceed at all. Hence, this factor weighs heavily in favor of certification.

> ### 3. It is Desirable to Control Litigation in this forum

As noted, *supra*, all of the existing class cases have already been consolidated in this forum. The litigation has proceeded in this forum for nearly three and a half years. Furthermore, the Seventh Circuit has recently provided significant guidance on several different class certification issues. It is evident that it is desirable for these proceedings to continue in this forum.

---

presenting participants first with a photograph of the GSC product on shelves near other Keurig-related products, and then presenting participants with images of the GSC box to look over for 30 seconds. Only 14% of participants in Klein's study identified GSC's product as containing instant coffee." 764 F.3d at 753. In his Declaration, Klein opines that the findings contained in his surveys, which he performed for Keurig, Inc. for use in its Lanham Act claim against Sturm, would provide evidence supporting Plaintiffs' claims in this action. See Exhibit C at ¶¶ 10-11.

Tellingly, the Seventh Circuit remarked: "Ultimately, th[is] [C]ourt must decide whether classwide resolution would substantially advance the case. See *Butler*, 727 F.3d at 801-02 (explaining that the class issue is "central to liability"). The named plaintiffs in our case allege that Sturm deceived consumers by telling them that the GSC pods contained freshly ground coffee, when at most 5% of the pod did so, and by concealing the fact that the product was overwhelmingly instant coffee." 764 F.3d at 761. The court in *Mullins v. Direct Digital, LLC*, *supra*, resolving a similar question, determined:

> Given the sheer size of this class, certifying the class will `achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' *Amchem Prods, v. Windsor*, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (internal quotation and citation omitted). Thus, class certification is superior to individual lawsuits.

2014 U.S. Dist. LEXIS 155 at * 9.

The same holds true here; class litigation is clearly superior to individual lawsuits.

> 4. <u>A Class Action Focusing on the Common Liability Issues of this Lawsuit Followed by Damages Proceedings Does not Present Insurmountable Management Difficulties</u>

Not only is it evident that a class action is superior to individual litigation but also it is clear that the Court will not face insurmountable management difficulties with this action. As noted, *supra*, there are several common issues which the Court can address during the liability phase of this lawsuit. Accordingly, proceeding to trial as a class will not only produce a common answer to the overriding question of "whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member. (Note that this is an objective question, not one that depends on each purchaser's subjective understanding of the package,") but also answer other common questions such as Defendants' *scienter* and whether Defendants engaged in fraud by omission. 764 F.3d at 758.

If Defendants are successful at the liability stage then the litigation would end. *Schleicher v. Wendt,* 618 F.3d 679, 686 (7th Cir. 2010) ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.") *Butler v. Sears*, 727 F.3d 796, 799 (7th Cir. 2013) ("But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears--a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment.")

If Plaintiffs are successful on the liability issues, however, they will then present evidence showing the aggregate damages for each of the subclasses. These damages will either be computed by the retail sales damages approach, by how much Defendants were unjustly enriched, by statutory penalty damages, and/or a combination of each of these methods. At this point, it would be a simple matter as Judge Posner explained, to have "individual hearings to determine the damages sustained by each class member. The parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. In that event the hearings would be brief; indeed the case would probably be quickly settled." 727 F.3d at 798.

One treatise, under the heading, "Issues of Liability and Damages Are Often Severed," states flatly that, "[i]n order to make class action litigation efficient, courts often bifurcate trials into liability and damages phases, severing common liability questions from individual damages issues." 5-23 Moore's Federal Practice – Civil § 23.45 (3d ed. 2011). Another leading treatise explains that it is necessary to consider liability prior to damages:

> Logically, the existence of liability must be resolved before damages are considered. . . . Moreover, the evidence pertinent to the two issues often is wholly unrelated and there is no efficiency in trying them together. Thus it is not surprising that a significant number of federal courts, in many different kinds of

civil litigation, have ordered the questions of liability and damages to be tried separately.

9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed. 2008).

Likewise, other authoritative texts approve of similar techniques. <u>See</u> 2 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 8:2 (8th ed. 2011) ("The most commonly employed bifurcation in class actions and other contexts is the trial of the issue of the defendant's liability in Phase I, followed by determinations of the amount of recovery by individual plaintiffs or class members in follow-on trials."); William B. Rubenstein, Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 9:47 (4th ed. 2002 & supp. 2012) ("Not infrequently, actions filed as class actions present predominating common issues of liability, while proof of damages may remain as individual issues for the several class members.").

Finally, as the court noted in *In re Potash Antitrust Litigation*, 159 F.R.D. 682 (D.C.Minn. 1995):

> "Moreover, various judicial methods are available to resolve individual damage issues without precluding class certification. Among the methods available to the Court are: (1) bifurcating liability and damage trials; (2) appointing special masters or magistrates to preside over individual damage proceedings; (3) decertifying the class after the liability trial, if liability and damages are separated; (4) establishing presumptions or inferences of reliance or causation which are predicates to damage entitlement; (5) using the defendants' transactional records to compute individual damages; and (6) creating subclasses. See 1 Herbert H. Newberg, Newberg on Class Actions, '4.26 at 4-91-97 (3d ed. 1992) (citing cases for each proposed method); see also *In re Bally Mfg. Securities Corp. Litig.,* (noting that risk "certification would expand the litigation beyond all reasonably controlling bounds . . . is better addressed further down the road, if necessary, by altering or amending the class, not by denying certification at the outset") (quotation omitted)."

159 F.R.D. at 697.

Indeed, if Plaintiffs are successful on their fraud by omission claim, this finding would

provide class members "presumptions or inferences of reliance and causation which are predicates to damage entitlement," as outlined in (4) above. As far as proof of reliance in cases of fraud by omission, individual reliance is not required or may be inferred from the purchase itself. See *Mass Mutual Life Ins. Co. v. Superior Court of San Diego County,* 97 Cal. App. 4th 1282, 1293, 119 Cal. Rptr. 2d 190, (Cal. App. 2002) (if plaintiffs succeed in proving allegations of a failure to disclose a material fact associated with the purchase of life insurance policies, "the purchases common to each class member would in turn be sufficient to give rise to the inference of common reliance on representations which were materially deficient."); *Astiana v. Kashi*, 291 F.R.D. 409, 501 (S.D.Cal. 2013) ("[U]nder the CLRA, `[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.")[23]

Most of the state's deceptive trade practices acts give consideration and weight to interpretations of the Federal Trade Commission ("FTC") and federal courts relating to § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). It is well settled that the deception required to state a violation of the FTC Act need not be made with intent to deceive; it is enough that the representations or practices were likely to mislead consumers acting reasonably. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). See *In the Matter of Cliffdale Assocs., Inc.* 103 F.T.C. 110, 165 (1984) (deception occurs under the FTC Act when there is an omission likely to mislead consumers acting reasonably under the circumstances, and

---

[23] *Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill. App. 3d 1139, 759 N.E.2d 66, 70, 259 Ill. Dec. 586 (Ill. App. 2001) ("it is not necessary . . . to show actual reliance in order to state a valid claim based on an omission or concealment under the Consumer Fraud Act."); *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J. 2007) ("[NJ CFA] essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss."); *Stutman v. Chemical Bank,* 731 N.E.2d 608, 612, 709 N.Y.S.2d 892 (N.Y. 2000)("reliance is not an element of a [statutory consumer protection] claim.")

the omitted information is material; see also, *FTC v. 120194 Canada, Ltd.*, 2007 U.S. Dist. LEXIS 12657, 10-11, (N.D.Ill. February 12, 2007) (materiality shown through consumer declarations and complaints)

Here, as the district court in *Langendorf v. SkinnyGirl Cocktails*, et. al., 2014 U.S. Dist. LEXIS 154444 (C.D.Ill) (October 30, 2014) correctly recognized, the concealed nature of the product would be material to the purchasing decision of the individual consumer:

> The *Suchanek* defendants marketed and sold single-cup coffee pods for use with the popular Keurig-brand coffee machines. But unlike Keurig-brand pods, the defendants' product contained almost exclusively instant coffee. 764 F.3d at 753. Recognizing that their target consumers disfavor instant coffee, the defendants intentionally concealed the nature of their product. *Id.* Further, they charged three-to-four times as much for their product as typical instant coffee, so "only a very price insensitive consumer, or one who was misled," would buy it. Id. at 754. Therefore, unlike Langendorf, the *Suchanek* plaintiff produced evidence tending to show the materiality of the misleading marketing. Because few (if any) informed purchasers would have bought the product, the court stated that "if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation. Indeed, if the class prevails, the case would probably be quickly settled." Id. at 760 (internal marks omitted).

2014 U.S. Dist. LEXIS 154444 at * 18. (underline added)

In sum, the foregoing demonstrates that there are no insurmountable management difficulties with these actions proceeding on a class basis.[24]

D.    Plaintiffs Have Gathered Evidentiary Proof to Prove their Class Allegations

Lastly, the Seventh Circuit instructed this Court to "assess whether the class allegations are `satisf[ied] through evidentiary proof.'" 764 F.3d at 761. That court further explained that

---

[24] Plaintiffs expect Defendants will argue against certification because they intend to vehemently contest each and every claim a class member submits, and therefore, these actions will by necessity devolve into a series of mini-trials. The Seventh Circuit once again repudiated this argument in *Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th cir. 2014) stating: "Saltzman appears to believe that the alternative of litigating the class action to judgment would be infeasible because the court would go crazy trying to determine the damages of each of several, maybe many, thousand class members. He neglects to mention that we rejected this argument when we approved class certification. *Pella Corp. v. Saltzman, supra*, 606 F.3d at 395-96."

such "proof might include, for example, survey or other evidence suggesting the relevant common traits of the class members, expert testimony supporting the classwide allegations, or analysis of the relative costs of prosecuting the class and individual issues in the case." Id. And in making this determination, the court should "evaluate the evidence pragmatically." Id.

As discussed in greater detail, *supra*, the class allegations will be proven by survey evidence, consumer complaints, and internal documents from the defendants that provide other anecdotal evidence showing the deceptive nature of the product. In addition, Plaintiffs will offer evidence and expert testimony showing the damages the different subclasses suffered. All of the testimony relating to liability and damages is similar for the class, and by certifying this action, the Court would "substantially advance the case" in one proceeding. *Butler*, 727 F.3d at 801-02. By contrast, the individual issues in this cases could be "readily determined" in individualized follow-on proceedings. Id at 800.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that the Court enter an order certifying the proposed subclasses.

Respectfully submitted,

By:   /s/Peter H. Burke
Peter H. Burke

OF COUNSEL:
Peter H. Burke, Esq.
J. Allen Schreiber, Esq.
W. Todd Harvey, Esq.
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Telephone:  (205) 930-9091
Facsimile:   (205) 930-9054
E-Mail:  pburke@burkeharvey.com

aschreiber@burkeharvey.com
tharvey@burkeharvey.com
*Attorneys for Plaintiffs Richard Mcmanus,*
*Edna Avakian, Charles Cardillo, Ben Capps,*
*Deborah Dibenedetto, and Carol J. Ritchie*

Patrick C. Cooper
James Ward
WARD & WILSON
2100A Southbridge Parkway, Suite 580
Birmingham, Al 35209
*Attorney for Plaintiff Edna Avakian*

Randy L. Gori
D. Todd Mathews
GORI, JULIAN AND ASSOC, P.C.
156 N. Main Street
Edwardsville, IL 62025
*Attorney for Plaintiff Linda Suchanek*

B. J. Wade
SKOUTERIS AND MAGEE, PLLC
Morgan Keegan Tower
50 N. Front Suite 920
Memphis, TN 38103
*Attorney for Plaintiff Carol Carr*

Michael H. Maizes
MAIZES & MAIZES LLP
2027 Williamsbridge Road, 2nd Floor
Bronz, NY 10461-1630
*Attorney for Plaintiff Paula Gladstone*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 16th day of December, 2014, I served the foregoing via the Court's CM/ECF which will send notification to the following:

Craig Fochler
Rebecca R. Hanson
Foley & Lardner LLP
321 North Clark St., Suite 2800
Chicago, IL 60654-5313
cfochler@foley.com
*Attorney for Sturm Foods, Inc. and*
*Treehouse Foods, Inc.*

                         /s/Peter H. Burke
                         Of Counsel