IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA SUCHANEK,                          )
RICHARD MCMANUS, CAROL CARR,  )
PAULA GLADSTONE,                     )
EDNA AVAKIAN,                            )
CHARLES CARDILLO, BEN CAPPS,  )
DEBORAH DEBENEDETTO, and      )
CAROL J. RITCHIE,                        )
                                                    )
               Plaintiffs,                      )
                                                    )
vs.                                                )     Case No. 11-CV-565-NJR-PMF
                                                    )
STURM FOODS, INC., and             )
TREEHOUSE FOODS, INC.,            )
                                                    )
               Defendants.                   )

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Defendants, Sturm Foods, Inc., and its parent company Treehouse Foods, Inc., manufactured single-serve coffee cups for use in Keurig machines and marketed them under the name Grove Square Coffee ("GSC"). The eight named Plaintiffs each purchased GSC, but were extremely unsatisfied with their purchase. They claim that Defendants packaged, marketed, distributed, and sold GSC as premium, ground coffee. In truth, GSC was actually more than 95% instant coffee. The named Plaintiffs claim they would not have purchased GSC, or would have paid less for it, had they known it was actually instant coffee. They brought suit against Defendants for violating the consumer protection statutes and unjust enrichment laws of Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee.

District Judge G. Patrick Murphy denied Plaintiffs' original motion for class certification and granted summary judgment for Defendants on each of the named Plaintiffs' individual claims. Plaintiffs appealed to the Seventh Circuit Court of Appeals; the Seventh Circuit reversed Judge Murphy's decisions and remanded the matter for further proceedings. Upon remand, the case was reassigned to the undersigned because Judge Murphy retired while the case was on appeal. Plaintiffs have renewed their motion for class certification, which is presently before the Court. Also before the Court are five related motions filed by the parties seeking to exclude expert reports and testimony and arguments deemed improper. The Court will first consider the motions to exclude, as these rulings may affect the analysis of the motion to certify the class.

## MOTIONS TO EXCLUDE

The Court has divided the motions to exclude into two categories: non-*Daubert* motions and *Daubert* motions. The non-*Daubert* motions challenge the admissibility of expert testimony based on purported procedural deficiencies, while the *Daubert* motions challenge the substance of the expert testimony as unreliable or irrelevant.

## I.   DAUBERT MOTIONS

District courts have a "gatekeeping" obligation to ensure that expert testimony is both relevant and reliable. FED. R. EVID. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (2993); *Lees v. Carthage College,* 714 F.3d 516, 521 (7th Cir. 2013). Essentially, the district court must ask three questions before admitting expert testimony: is the expert qualified, is the expert's methodology reliable, and will the expert's testimony

assist the trier of fact in understanding the evidence or determining a fact in issue. *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). In determining relevance and reliability, the party offering the expert testimony bears the burden of proof. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)).

The Court did not conduct a hearing on the *Daubert* motions because the record is adequate to decide the motions without one. Additionally, the parties did not indicate that a hearing was necessary or set forth what missing information a hearing would supply. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("[A] *Daubert* hearing is [not] always required**."**); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form"); *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998) ("[T]he Supreme Court did not suggest in either *Daubert* or *General Electric* that district courts would be required to conduct *in limine* hearings concerning every rejected proffer of expert testimony.").

### A.   Defendants' Motion re: Bobby Calder (Doc. 196)[1]

Bobby Calder is a professor at Northwestern University, and he teaches graduate and post-graduate level courses in consumer behavior and marketing strategies. He has published numerous articles in research journals and has been a consultant to a number of widely-recognizable companies, including Aetna, Coca-Cola, GE, GM, and Kraft. Calder was hired by Plaintiffs to address whether GSC's packaging was likely to

---

[1] Plaintiffs' response brief is at Doc. 206. Defendants' reply brief is at Doc. 216.

mislead reasonable consumers, which is the question common to all class members. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014). Plaintiffs submitted Calder's opinions to show that the issue of liability is capable of resolution on a class-wide basis and predominates over the class members' individual issues.

Defendants claim that Calder's report and testimony must be excluded (Doc. 197). Calder's report contains two sets of opinions (*See* Doc. 101-8). The first set of opinions is based on his review of GSC packaging, Sturm's marketing documents, and consumer complaints. Calder concluded, in short, that

> A reasonable consumer would have been led to falsely believe that [GSC] contained regular ground coffee for brewing in a Keurig machine. . . . Usage of the word "instant" on the package in a non-prominent way would not have been sufficient to prevent consumers being misled and deceived. . . . (and) Sturm's plan for marketing the [GSC] product was at its heart intended to distract consumers from realizing that the product quality or standard was instant coffee and not regular ground coffee for brewing.

(Doc. 101-8, pp. 4, 5, 7).

Defendants argue that these opinions must be excluded because they are not based on evidence of actual consumer perceptions, like a survey (Doc. 197, pp. 10–11). The Court disagrees. A consumer survey is not the only acceptable evidence of consumer deception. *See Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 628 (7th Cir. 2009) (explaining that the "best evidence" that a statement is misleading is "a responsible survey," but testimony from consumers can also suffice); *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 415 (7th Cir. 2005) (explaining that the need for evidence to show a collection letter is confusing "might be met through the use of a carefully

designed and conducted consumer survey. Also, we have suggested that an appropriate expert witness might suffice."); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (requiring plaintiff to present evidence of deception "in the form of consumer surveys, market research, expert testimony, or other evidence.")

Calder had plenty of other evidence regarding consumer deception. First, he had Defendants' own market research. This research showed Keurig users did not want instant coffee, so Defendants avoided using the word "instant" on the label. Defendants also conducted product testing to see if consumers noticed the physical differences between GSC cups and regular K-cups that signaled GSC was instant coffee (*see* Doc. 101-1, p. 4; Doc. 101-7; Doc. 219). Next, and most importantly, Calder had hundreds of consumer complaints. In those complaints, customers said they felt disappointed, dissatisfied, displeased, disgusted, swindled, robbed, cheated, ripped off, duped, and misled (Doc. 221).[2] Others said GSC was a hoax, deceptive, an absolute fraud, a rip off, a sad joke, a gross misrepresentation, a clearly substandard instant coffee disguised as a Keurig k-cup, and a waste of money (*Id.*). The Court simply does not see why Calder needed a survey to measure the perceptions of potential GSC purchasers when he had oodles of complaints explicitly stating what consumers thought. Thus, the fact that Calder's first set of opinions were not based on a consumer survey does not make them inadmissible.

Defendants also claim that Calder's opinions are based upon an erroneous understanding of the relevant facts and his irrelevant personal feelings. For example, he

---

[2] More customer complaints are located at Doc. 100-12, Doc. 101-2, and Doc. 101-9.

didn't know some "Keurig products" contain instant coffee (e.g., vanilla flavored mocha) and no filter (e.g., ciders, hot chocolate), and he ignores that some Plaintiffs knew what "soluble" meant. To the extent that Defendants want to quibble with Calder's understanding of the facts or the materials that he reviewed, those are matters for cross-examination because they go more to the weight and credibility of his opinions, rather than their admissibility.

Calder's second set of opinions is based on a consumer study that he designed and conducted. For his study, Professor Calder interviewed twenty-three randomly recruited individuals in Chicago who owned and used Keurig machines (Doc. 101-8). The results of his study were consistent with his first set of opinions (*Id.* at p. 23). The participants "overwhelmingly identity [sic] the single-serve brands with the quality of ground roasted coffees, not instant coffees." (Doc. 101-8, p. 9). Consistent with that idea, the participants expected GSC "to be a traditional ground coffee filtered from roasted beans that did not contain instant coffee (I*d.* at p. 15). After a product demonstration,[3] the participants "changed their minds dramatically," and said GSC was more similar to instant coffee than ground roasted coffee (*Id.* at pp. 18, 23). Qualitative results also showed the participants "for the most part realized that they had been misled." (*Id.* at pp. 18, 23).

Defendants argue that Calder's opinions based on his consumer study must be stricken because the study deviated from accepted scientific principles for a valid

---

[3] The GSC cup and a Green Mountain cup were opened, the insides of the cups were exposed, and the products were poured onto white paper (Doc. 101-8, p. 15).

consumer survey (Doc. 197). Defendants hired Gary Ford, Ph.D., a professor emeritus of marketing at American University, to critique Calder's methodology. Ford identified a number of purported deficiencies in Calder's study and discussed each one in a rebuttal report (Doc. 107-4). Based on Ford's report, Defendants argue that Calder used an improper universe, an unrepresentative sample from the universe, and ambiguous, imprecise, and biased questions (*Id.*). Defendants further argue that Calder failed to include a control group, failed to replicate the store environment, and failed to use a double-blind format (*Id.*).

It does not seem that Professor Calder's second set of opinions are *critical* to class certification. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("We hold that when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion.") It seems that the consumer complaints and Defendants' own internal documents, along with Professor Calder's first set of opinions, supply all the needed proof as to whether the common issue of liability is capable of resolution on a class-wide basis and predominates over the class members' individual issues. While Calder's study is not *critical*, it is nevertheless important. Thus, the Court will undertake the *Daubert* analysis to put this issue to bed.

Consumer survey evidence must comply with principles of professional survey research in order to be admissible. *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007). *See also* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 364 (3d

ed. 2011) (provided by Defendants at Doc. 107-2). "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare[.]" *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (citing *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993)). "Usually, objections based on flaws in the survey's methodology are properly addressed by the trier of fact." *PBM Products, LLC*, 639 F.3d at 123; *accord Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,* 383 F.3d 110, 121 (3d Cir. 2004); *Clicks Billiards, Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1262–63 (9th Cir. 2001); *AHP Subsidiary Holding Co.*, 1 F.3d at 618.

While Calder's survey may not be perfect, and Defendants undoubtedly would have done things differently, the survey is not so fundamentally flawed that it is inadmissible. Calder's universe—individuals who currently own and actively use a Keurig machine—is a sufficiently close approximation of the consumers who would potentially purchase GSC.[4] In other words, it is self-evident that the vast majority of people who were likely to buy GSC were those who owned and actively used a Keurig machine. To the extent Calder's chosen universe was deficient, it goes to the weight of the survey, not its admissibility.

Calder's use of a convenience sample of only twenty-three participants in the Chicago-area also does not doom his survey because convenience samples are

---

[4] A "universe" is "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (4th ed. 2003). "In survey research, the 'universe' for a survey often is referred to as the 'target population.'" E. Deborah Jay, *Ten Truths of False Advertising Surveys*, 103 TRADEMARK REP. 1116, 1121 (2013) (citing ROBERT M. GROVES, ET. AL, SURVEY METHODOLOGY 69 (2009)).

"routinely" relied on in surveys conducted by experts in marketing and in deceptive advertising cases. Diamond, *Reference Guide on Survey Research*, p. 361, 382 (available at Doc. 107-2). And those surveys "are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that 'results of these studies are used by major American companies in making decisions of considerable consequence.'" *Id.* (citations omitted). Case in point: Defendants' own market research was comprised of interviews with only seven consumers (*see* Doc. 219).

The Court also does not believe that Calder biased participants by displaying a GSC cup and a Green Mountain cup simultaneously at the beginning of the study. Contrary to Defendants' assertion, Calder did not ask participants whether the cups— "both the Green Mountain K-Cups and the Grove Square K-Cups"—were more similar to ground coffee or instant coffee (Doc. 197, p. 17). Instead, Calder asked the question about single-serve coffee cups *in general*.[5] Even if Defendants had accurately represented Calder's question, their argument is still insufficient because it does not make clear how the simple presence of the Green Mountain cup injected an impermissible bias into the study.

Furthermore, the form of Calder's questions is not so flawed that the study is inherently unreliable. To the extent Calder's questions elicited ambiguous responses, participants *immediately* explained their responses, which in the Court's opinion eliminated any ambiguities (*see* Doc. 101-8, p. 39). And while many of Calder's

---

[5] The Questionnaire indicates that Calder said "To get started, look at the products in front of you. On one side are brands of ground coffee from roasted beans used to make freshly brewed coffee. On the other side are brands of instant coffee. In the middle are brands of single serve coffee tubs. Thinking about the brands in the middle, which of the other two are they more similar to?" (Doc. 101-8, p. 39).

questions were close-ended, that does not automatically render a study inadmissible. *See* Diamond, *Reference Guide on Survey Research*, pp. 391–94. In fact, close-ended questions are particularly useful "for assessing choices between well-identified options or obtaining rating on a clear set of alternatives." *Id.* at p. 394. Additionally, the absence of a "no opinion" option does not significantly compromise the study because participants were still able to indicate neutrality.[6] The absence of a "don't know" option also does not doom the study because participants were encouraged to offer commentary during their interview. Despite the lack of a "don't know" option, participants commented on their uncertainty in a number of instances (*see* Doc. 101-8, pp. 54, 58, 68). Calder also told the participants that if they were unsure about a question, they should ask him for an explanation.

The lack of an external control group also does not make Calder's study inadmissible. His study was designed with a before and after format in which each participant served as his or her own control. The weaknesses of conducting a study in that format go to the weight of Calder's study, not its admissibility. Likewise, the failure to conduct a double-blind study does not make Calder's study wholly inadmissible; it simply limits the reliability of it.

Finally, the study is not inadmissible because Calder failed to replicate real-world conditions when he pointed out and read aloud six sections of the GSC package that Plaintiffs consider to be deceptive. Professor Calder explained that the entire

---

[6] For example, participants were asked to answer questions by circling the number that represented their expectations on a scale from 1—"not at all expected" to 10—"very much expected." (*See* Doc. 101-8, p. 45). In the Court's experience, circling five on a scale of one to ten indicates neutrality.

purpose of his study was to examine whether consumers were misled by information on the GSC package, so it was necessary to ensure that the participants saw that information (Doc. 107-1, pp. 37–38). That approach is certainly used by other experts in conducting consumer surveys. *See* Diamond, *Reference Guide on Survey Research*, p. 397 (available at Doc. 107-2) ("Some surveys attempt to reduce the impact of preexisting impressions on respondent's answers by . . . direct[ing] respondent's attention to the mark at issue (e.g., 'these stripes on the package'). Such efforts are likely to be only partially successful."); Mike Rappeport, *Response to Survey Methodology Articles*, 96 TRADEMARK REP. 769, 774–75 (2006) ("[F]or statements on packages . . . frequently it is proper to 'focus' the respondent on that aspect or aspects of the product packaging . . . the plaintiff thinks is offending. . . . [O]ne could reasonably argue that it is only fair to the defendant to make sure the respondent sees what the defendant said, because after all, if the defendant didn't think it would help the consumer to see it, why did they put it on the package?") Any deficiency in Calder's approach goes to the weight of the study, not its admissibility.

In sum, Defendants' arguments do not demonstrate that any of the alleged issues with Professor Calder's study are significant enough, even when considered in their totality, to warrant exclusion of the study. The issues identified by Defendants more appropriately go to the weight of the study than to its admissibility. For this reason, Defendants' motion to exclude the expert report and corresponding testimony of Professor Bobby Calder is denied.

## B.    Defendants' Motion re: Candace Preston (Doc. 194)[7]

Candace Preston is the damages expert hired by Plaintiffs. In her original report, she opined that there were two potential models for calculating damages in this case: Wholesale Damages and Retail Damages (Doc. 101-12). The "Wholesale Damages" model reflects the revenue Defendants earned selling GSC at wholesale prices to retailers (*Id.*). The "Retail Damages" model reflects the amount of money consumers spent purchasing GSC (*Id.*).

Defendants argue that Ms. Preston's opinions should be excluded because her calculations do not fit Plaintiffs' theory of liability or the facts of this case, and they are contrary to law (Doc. 194, pp. 13–14, 14–15). It seems to the Court that these arguments do not bear on the relevance and reliability of Ms. Preston's opinions, but rather go to the issue of predominance under Rule 23(b)(3). Therefore these arguments are not a good fit for a *Daubert* motion, and they are more appropriately considered with respect to the motion for class certification. They will be addressed later in this order.

Defendants also argue that Ms. Preston's opinions regarding the Wholesale and Retail Damages models should be stricken because they are based on an unreliable assumption that "if the product [GSC] had been marketed truthfully, consumers would not have purchased the product at all" (Doc. 195, pp. 16–17 (citing Doc. 101-12)). Ms. Preston claimed this assumption was supported by the analysis and conclusions reached by Bobby Calder and customer complaints (Doc. 101-12), which Defendants claim is not true (Doc. 195). Defendants contend that Professor Calder's report actually

---

[7] Plaintiffs' response brief is at Doc. 201. Defendants' reply brief is at Doc. 215.

contradicts Ms. Preston's assumption and cite to a cherry-picked passage from that report, which states "very few consumers would have purchased the product at its price point if it had disclosed that it was instant coffee." (Doc. 195, p. 16 (citing Doc. 101-8, p. 23)). But Defendants ignored another passage opining that consumers "did not believe that the product was instant coffee when they bought it and would not have bought it if they did," which utterly supports Ms. Preston's assumption (*see* Doc. 101-8, p. 7). Defendants also contend that Ms. Preston's assumption is contradicted by favorable consumer comments (Doc. 195, p. 17). This argument is laughable. Ten positive reviews do not somehow negate the hundreds, if not thousands, of bad (sometimes scathing) reviews, particularly when there is evidence that Defendants had their employees write fake, positive reviews (*see* Doc. 101-1, p. 28). In the Court's opinion, the overall and intended spirit of Professor Calder's report and the consumer complaints very clearly support Ms. Preston's assumptions. Defendants' overly-technical nitpicking is not sufficient to convince the Court that Preston's report is unreliable.

Defendants' Motion To Strike Expert Witness Reports of Candace Preston and to Exclude Her Expert Testimony (Doc. 195) is denied.

### C.    Plaintiffs' Motion re: Neal Roese (Doc. 203)[8]

Neal Roese is a professor at Northwestern University. He is a social psychologist with expertise on judgment and decision-making. Roese was hired by Defendants to address the psychology of purchasing decisions. Specifically, he determined that there

---

[8] Defendants' response brief is at Doc. 222. Plaintiffs did not file a reply brief.

was no uniform or typical consumer decision process across consumers who have purchased GSC; instead, there were significant variations (Doc. 116-1). Defendants used Roese's report in opposing class certification to show that factual distinctions between the claims of the named Plaintiffs meant there was a lack of typicality and that individual issues predominate.

Plaintiffs claim that Roese's report and testimony should be excluded because it is nothing more than a recitation of passages from the named Plaintiffs' depositions that were cherry-picked to reach a predetermined outcome (*Id.* at pp. 2–4). Plaintiffs further claim that the named Plaintiffs' deposition testimony regarding their individual purchase decisions is irrelevant to the objective inquiry of whether a reasonable consumer was likely to be misled (Doc. 203, p. 4). The Court disagrees.

Roese began his report by explaining the steps involved in the consumer buying process: attention, interpretation, and attitude (Doc. 116-1). He then used the named Plaintiffs' deposition testimony to illustrate the variability between them at each mental step, which ultimately meant they had different reasons for purchasing GSC (*Id.*). Plaintiffs seem to suggest that he should have interviewed prospective or actual GSC purchasers rather than relying on the named Plaintiffs' depositions (*see* Doc. 203, p. 2). The Court does not see what difference that makes. Regardless of what he read or who he talked to, Roese was going to reach the conclusion that there was a significant variation in consumers' decision-making process when it came to purchasing GSC. No two people are the same, so it is axiomatic that no two people would make a purchase decision in the same exact manner for the same exact reasons. While people may reach

the same ultimate decision to buy a product, the factors that went into making that decision are as varied as people themselves.

As far as the relevance of Roese's report, it is undoubtedly relevant to this case; it's just not particularly helpful for the purposes for which Defendants submitted it. Defendants believe that Roese's report tends to show a lack of typicality and that individual issues predominate. For the reasons explained later in this Order, based on the case law of this Circuit, the Court disagrees. In other words, Roese's report is not unreliable or irrelevant under *Daubert*, it just doesn't help Defendants' accomplish anything with respect to class certification. But that does not mean that his report must be excluded and stricken from the record. The Court simply chooses to afford it little to no weight on the matters relevant to class certification. Plaintiffs' motion to exclude the expert report and corresponding testimony of Professor Neal Roese is denied.

## II.   NON-DAUBERT MOTIONS

### A.   Defendants' Motion re: Robert Klein (Doc. 193)[9]

Robert Klein was hired by Keurig, Inc. as an expert witness in its lawsuit against Sturm Foods for violations of the Lanham Act. *Keurig, Inc. v. Sturm Foods, Inc.*, Case No. 10-cv-841-SLR (D. Del.). After conducting four market research surveys, Klein concluded, in pertinent part, that few potential purchasers of GSC understood that it contained instant coffee (Doc. 115-4). He further concluded that after learning GSC contained instant coffee, consumers' interest in purchasing GSC fell significantly, which demonstrated the materiality of this information to their purchase decision (*Id.*).

---

[9] Plaintiffs' response brief is at Doc. 202. Defendants did not file a reply brief.

In this matter, Plaintiffs had to identify all class certification experts by August 30, 2012, and all other experts by February 14, 2013. Plaintiffs did not identify Robert Klein as an expert witness or tender his report to Defendants before either of those dates. They made no mention of Klein until March 26, 2013, when they submitted his report in support of their brief opposing Defendants' original *Daubert* motion regarding Bobby Calder (*see* Docs. 115-4, 115-5). Plaintiffs referred to Klein's reports again in opposing Defendants' motions for summary judgment (*see* Doc. 141-12). Additionally, the Seventh Circuit explicitly referenced Klein's reports in their opinion. *See Suchanek v. Sturm Foods*, 764 F.3d 750, 753 (7th Cir, 2014). According to Plaintiffs, the Seventh Circuit's mention of Klein's reports is what prompted them to ask him "to opine on the relevance of his findings submitted in the other litigation to the claims asserted here" (Doc. 202, p. 3). Klein then prepared a declaration in which he asserts that his findings in the *Keurig* case are relevant to this matter (Doc. 187-2). Plaintiffs submitted that declaration in support of their amended motion for class certification.

Defendants argue that Klein's reports, his declaration, and any corresponding testimony should be excluded in connection with the motion for class certification and trial because Klein was not retained as an expert in this case, and his documents were submitted long after the deadline for expert disclosures (Doc. 193). The Court agrees.

Klein cannot serve as an expert witness because Plaintiffs did not disclose him as an expert before the deadlines had passed. Consequently, Plaintiffs are not allowed to use his expert report to supply evidence on for the motion for class certification unless the failure was substantially justified or is harmless. FED. R. CIV. P. 37(c)(1). But

Plaintiffs do not offer any reason for failing to disclose Klein as an expert (*see* Doc. 202). In fact, they continue to maintain that they have no desire to designate him as an expert (*Id.*). They claim that Klein's reports are simply "additional anecdotal evidence on the issue of consumer confusion" (*Id.* at p. 4). Plaintiffs do not, however, adequately explain or set forth any legal authority (such as a Federal Rule of Evidence or case law) demonstrating how Klein's findings can be treated as anything other than undisclosed expert opinions. As best the Court can tell, Plaintiffs seem to believe that because Klein's reports were previously submitted to the Court for other (presumably permissible) purposes, those reports are somehow now generally available for any and all purposes. That is not so. *See, e.g., Matter of James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992) ("The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion.").

Accordingly, Defendants' motion to strike the reports and declaration of Robert Klein (Doc. 193) is granted.

### B.   Defendants' Motion to Strike Improper Arguments and Evidence from Plaintiffs' Reply Brief (Doc. 210)[10]

Defendants ask the Court to strike various arguments from Plaintiffs' motion for class certification and their reply brief (Doc. 210). First, Defendants claim that any arguments related to the supplemental report of Candace Preston should be stricken (*Id.*). Again, Candace Preston is the damages expert hired by Plaintiffs. Magistrate

---

[10] Plaintiffs' response brief is at Doc. 223. Defendants' reply brief is at Doc. 224.

Judge Philip Frazier barred Plaintiffs from using Ms. Preston's supplemental report for purposes of their original class certification motion because it was submitted after the applicable deadline (Doc. 201 citing Doc. 103).[11] Consequently, Defendants argue that Plaintiffs should also be barred from using it for their amended motion for class certification (Doc. 210, p. 3). The Court disagrees.

After this case came back on remand, the parties chose to submit new briefs on the issue of class certification in order to align their arguments with the Seventh Circuit's opinion. The parties did not make any requests regarding evidentiary restrictions, and the Court imposed none. The Court sees no reason why it should not consider all of the available and properly submitted evidence in the record, including evidence that came into being after the deadlines applicable to the original motion for class certification.

Second, Defendants argue that Ms. Preston's declaration that was submitted as part of Plaintiffs' reply brief should be stricken (Doc. 210).[12] Defendants claim that Ms. Preston's declaration contains an opinion that GSC had zero value, which is a new and previously undisclosed opinion that is untimely and prejudicial to them (Doc. 210). This argument is a non-starter. Ms. Preston never explicitly stated in her declaration that she was of the opinion that GSC was worthless (*see* Doc. 201-2). To the extent that her declaration can be read to stand for that opinion, it is hardly new—it has been implicit

---

[11] All expert reports on the issue of class certification were due by August 30, 2012 (Doc. 210, p. 2). Candace Preston's original report was served on Defendants on August 29, 2012 (*Id.*). She was deposed on September 28, 2012, and her supplemental report was served on Defendants on November 16, 2012 (*Id.*).
[12] Candace Preston's declaration is at Doc. 201-2.

in her reports from the get-go. Ms. Preston explained that, for her original report, she was asked to assume that if GSC had been marketed truthfully, consumers would not have purchased it (Doc. 201-2, p. 3). Operating on that assumption, Ms. Preston opined that one potential measure of damages was the amount of money consumers spent purchasing GSC ("Retail Damages" model) (Doc. 101-12). In other words, class members would receive a full refund for their purchase of GSC. A full refund model is based on the notion that consumers received no benefit from the product and therefore the product was valueless. *See, e.g., Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524 (6th Cir. 2015); *In re Scotts EZ Seed*, 304 F.R.D. 397, 412 (S.D. N.Y. 2015).

Defendants next attack Ms. Preston's opinion that she can calculate the actual value of GSC from the cost of the ingredients in a GSC pod or the price of a cup of comparable instant coffee (Doc. 210). Again, Defendants claim this opinion was previously undisclosed and should be stricken because it is untimely and its admission would be prejudicial to them (*Id.*). In the Court's opinion, however, Ms. Preston's failure to present this opinion earlier is substantially justified.

As previously mentioned, the Retail Damages model in Ms. Preston's original report was based on the notion that a full refund was the proper measure of damages. During the first round of class certification briefing, Defendants did not file a *Daubert* motion or otherwise challenge Ms. Preston's report or the full-refund model. Things changed once the Seventh Circuit issued its opinion suggesting that the proper measure of damages is a partial refund. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) ("[F]or example, plaintiff's damages might be computed by taking the difference

between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the cups contained real coffee grounds).") Now, for the first time in the course of this litigation, Defendants take exception to the full-refund model of damages and argue that Ms. Preston's original and supplemental report do not provide any method for calculating a partial refund. As the Court sees it, if Defendants are going to mount a new challenge to Ms. Preston's original report years after it was submitted and supplemented, it is only fair to give her a chance to respond. What's good for the goose is good for the gander.

Defendants also argue that Ms. Preston's opinion that she can calculate the GSC's value from the cost of its ingredients or the price of a cup of comparable instant coffee is speculative and unreliable. The Court is doubtful that the value of the ingredients in an individual serving of GSC can be used as the measure of its actual value to consumers. And Plaintiffs do not cite to any case law or other legal authority showing that this is an acceptable way to calculate a product's actual value. Much like Neal Roese's report, however, the Court does not see why that means Ms. Preston's declaration, or a portion of it, must be excluded and stricken from the record. The Court simply chooses to reject that opinion for purposes of class certification.

On the other hand, using the cost of other instant coffees seems to the Court to be a perfectly acceptable method for determining the actual value of GSC. Defendants quibble that this fails to take into account any value associated with the k-cup brewing system or that the Starbucks VIA product was sold at a higher price than GSC (Doc. 210, p. 6). But the Court is unconvinced that either of these things make Ms. Preston's

opinion so unreliable that it must be excluded. As the Seventh Circuit noted during oral arguments, it simply makes no sense that a Keurig machine would be any more convenient for making instant coffee than, say, a microwave or a hot water spigot.[13] And if Starbucks VIA is truly a comparable product, then its price would be factored into Ms. Preston's computation of the cost of an equivalent instant coffee. Simply put, there is enough evidence in the record to satisfy the Court that consumers paid an inappropriately high premium for GSC. Ms. Preston will be given an opportunity to identify and isolate that premium. If, after further discovery, she is unable to do so, Plaintiffs will not be able to proceed on their theory that class members are entitled to a partial refund.

Finally, Defendants take issue with Plaintiffs' argument in their reply brief that individual issues relating to reliance do not predominate because reliance can be presumed on a class-wide basis (Doc. 210, p. 6). Defendants claim this argument is "new" and should be stricken (*Id.*). This portion of Plaintiffs' reply brief, however, was prompted by Defendants' argument in their response brief. Accordingly, it was appropriate for Plaintiffs to make this argument for the first time as a rebuttal argument in their reply brief. *See Cent. States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 640 n.2 (7th Cir. 2001); *Matter of Wildman*, 859 F.2d 553, 556 n.4 (7th Cir. 1988). Defendants also claim that Plaintiffs' argument regarding a presumption of reliance is wrong as a matter of law (Doc. 210, p. 6). This assertion goes to the merits of the

---

[13] One of the participants in Bobby Calder's study expressed the same sentiment (*see* Doc. 101-8, p. 82). She said "It's kind of like why bother to have a Keurig with Grove Square? Add the water and call it a day. You're paying for the separate tubs. I could just take a spoon and drop it in if that's all the Grove Square is." (*Id.*).

argument, and ultimately the merits of the motion for class certification. Therefore, it will be addressed later in this order with respect to the motion for class certification.

In sum, all of Defendants' arguments are meritless, and their Motion to Strike Improper Argument and Evidence from Plaintiffs' Reply (Doc. 210) is denied.

## MOTION FOR CLASS CERTIFICATION

### I. PROPOSED CLASS DEFINITION

Plaintiffs seek certification of a class, or subclasses by state, of:

> All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSC primarily for resale; (c) retailers or re-sellers of the GSC; (d) governmental entities, including this Court; and (e) any consumer that already received a refund from Defendants. The named Plaintiffs assert claims under their respective state's consumer protection laws and also assert claims for unjust enrichment and injunctive relief.

(Doc. 186, p. 18).

Since filing their motion for class certification, Plaintiffs have agreed that certain modifications to the class definition are necessary. Specifically, they agreed that class members are no longer seeking injunctive relief and that online purchasers of GSC should be excluded from the class. The analysis that follows is based on a proposed class definition incorporating those modifications.

The analysis that follows also considers only whether class certification is appropriate with respect to Plaintiffs' consumer fraud claims and does not consider

certification on the unjust enrichment claims. That is because Plaintiffs' motion for class certification focuses almost exclusively on the consumer fraud claims (*see* Doc. 186). In fact, they mention the words "unjust enrichment" only a handful of times. Plaintiffs do not address how any of the class certification requirements, such as commonality, typicality, and adequacy, are satisfied with respect to the unjust enrichment claim. Plaintiffs also do not set out the elements of unjust enrichment under the common law of each of the eight states at issue or comparatively analyze those laws to show that the laws are substantially similar and/or that the variances are manageable. Simply put, to the extent that Plaintiffs are seeking certification of an unjust enrichment claim, it is denied because the parties did not sufficiently address class treatment of that claim.

## II.   LEGAL STANDARD FOR CLASS CERTIFICATION

A plaintiff seeking to certify a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Harper v. Sheriff of Cook County,* 581 F.3d 511, 513 (7th Cir. 2009). In addition to meeting the threshold requirements of Rule 23(a), a plaintiff also must satisfy the requirements of at least one subsection of Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(3), and therefore they must show that "questions of law or fact common to the class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Finally, the Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must

be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Messner*, 669 F.3d at 811 (internal citation omitted). "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).

### III.   RULE 23(A) REQUIREMENTS

#### A.   Numerosity

The first requirement of Rule 23(a) is that the proposed class "be so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). It is undisputed that tens of thousands of units of GSC were sold during the class period and therefore numerosity is satisfied (*see* Doc. 192).

#### B.   Commonality

The second requirement of Rule 23(a) is that there is at least one question of law or fact common to the class. FED. R. CIV. P. 23(a)(2). The Seventh Circuit determined that commonality was satisfied: "The question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014).

Defendants argue that the Seventh Circuit got it wrong (Doc. 192). But that argument can be disregarded entirely because, even if Defendants are correct, it is not this Court's place to correct that error. *See Trinidad v. McCaughtry*, 17 Fed.Appx. 394, 396 (7th Cir. 2001) ("There is even an institution in the judicial hierarchy charged with the duty of correcting error by a United States Court of Appeals—but that institution is not the United States District Court . . . .") The mandate rule requires this Court to adhere to the rulings of the Seventh Circuit on remand. *Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) ("The lower court is bound, through the mandate rule, to the resolution of any points that the higher court has addressed." (citing *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001))); *see also Waid v. Merrill Area Pub. Sch.*, 130 F.3d 1268, 1272 (7th Cir. 1997) ("The most elementary application of [the law of the case doctrine] is that when a court of appeals has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court.") (citations omitted). Therefore, commonality is satisfied.

Plaintiffs argue that there are four additional common questions (Doc. 186, p.21–23). The first is whether Defendants' conduct was willful. By Plaintiffs' own admission, however, intent "is not a required element of liability under any of the eight consumer protection statutes" (Doc. 186, p. 21).[14] Instead, it is only relevant under the statutes of Alabama, South Carolina, and Tennessee and only with respect to the imposition of

---

[14] During the course of its own research, the Court discovered that intent is also relevant under the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), *see* 815 ILL. COMP. STAT. 505/2, *et seq.* That statute requires the plaintiff to show that the defendant intended consumers to rely on the concealment, suppressions, or omission of a material fact. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (citing *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 546 (2006)).

damages (those states provide that treble damages can be awarded if the defendant's conduct was willful or knowing) (Doc. 186, pp. 21, 22). Because intent is a relevant, but not necessary, component to the consumer fraud claims under the laws of three states, it is not an issue that is common across all class members, nor does it seem likely to "generate [an] answer apt to drive the resolution of the litigation." *Suchanek*, 764 F.3d at 756 (citing *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011)).

Two of the other common questions proposed by Plaintiffs include whether Defendants committed fraud by omission and whether Defendants engaged in fraudulent concealment. In the section of their brief addressing commonality, Plaintiffs do very little in the way of explaining how these questions are central to the validity of the claims of every single class member or how they would drive the resolution of the litigation (*see* Doc. 186, pp. 22–23). Instead, Plaintiffs simply repeat the relevant facts and make the unadorned assertion that these issues are common questions (*see* Doc. 186, pp. 22, 23). Elsewhere in their brief, however, Plaintiffs offer some clues as to why these questions matter (Doc. 186, pp. 44, 45). Plaintiffs believe that if Defendants are guilty of fraud by omission or concealment, then reliance/causation can be presumed on a class-wide basis, and individual proof from each class member is not needed (*Id.*). But Plaintiffs have not presented sufficient argument or authority to show that all eight states permit reliance/causation to be proven on a class-wide basis or that it would be appropriate in this particular case (*see* Doc. 186, p. 45). *See also* 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 5:55 (11th ed. 2014) (discussing that class-wide reliance can only be presumed in very limited circumstances). Therefore, the

Court cannot say that these questions are common across all class members or likely to "generate [an] answer apt to drive the resolution of the litigation."

Finally, Plaintiffs simply claim that another common question is "whether the changing of the label from 'soluble' to 'instant' cured the deceptive nature of the packaging" (Doc. 186, p. 23). Plaintiffs say nothing more. "[S]tating blankly what one's argument *is* and actually *arguing* a position are different things." *Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) (emphasis in original). "[I]t is not the obligation of this court to research and construct the legal arguments open to parties." *United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003). Without more, the Court cannot conclude that this question is common to every single member of the class.

In sum, commonality is satisfied because the question whether the GSC packaging was likely to mislead a reasonable consumer is common to the claims of every class member.

### C.   Typicality

The third requirement of Rule 23(a) is that the claims or defenses of the representative parties are typical of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). The typicality requirement is meant to ensure that there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). In other words, the named representative's claims must have "the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quoting *De La Fuente v. Stokely-*

*Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). It is well-established that typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory." *Oshana*, 472 F.3d at (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)); *De La Fuente*, 713 F.2d at 232.

On appeal, the Seventh Circuit did not explicitly take up the issue of typicality, but the opinion includes commentary that strongly suggests typicality is satisfied. Specifically, the Seventh Circuit stated that "the plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct by Sturm: the marketing and packaging of GSC." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). The Seventh Circuit further stated "[t]he same legal standards govern every class member's claim; [Defendant] admits in its brief that '[a]ll of the applicable state consumer protection laws require proof that a statement is either (1) literally false, or (2) likely to mislead (either through a statement or material omission) a reasonable consumer.'" *Id.*

Despite this commentary from the Court of Appeals and Defendants own concessions, Defendants nevertheless argue that typicality is not satisfied (Doc. 192). They urge the Court to focus on the injury and "how the named plaintiffs were injured [versus] how the other class members were injured" (Doc. 192, p. 32). Defendants argue that typicality is not satisfied because the class members "bought GSC for different reasons and formed their beliefs about it for different reasons" (*Id.*). For example, "[s]ome Plaintiffs bought GSC because a retailer placed it on a shelf near the Keurig k-

cups. Others bought GSC because they wanted to try something new. Still others bought GSC because of its low price." (Doc. 192, p. 32).

What Defendants are essentially saying is that typicality is not satisfied unless the class members all had the same perceptions and knowledge about GSC and the same preferences and reasons for purchasing GSC. This argument goes too far. The standard for typicality does not require the facts underlying every claim to be identical. *De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.") (citations omitted); 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 4:17 (11th ed. 2014) ("[M]inor factual differences between the claim of the putative representative and class members ordinarily will not defeat a finding of typicality, as the requirement does not require perfect overlap of circumstances."). In fact, when it comes to consumer fraud class actions, individual differences are to be expected. *See also* MCLAUGHLIN ON CLASS ACTIONS § 5:54 ("[I]n most contexts individuals choose consumer goods or services based on disparate knowledge and varied beliefs and reasons."); WILLIAM RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:36 (5th ed. 2013) ("In consumer fraud cases, the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct.")

Here, as previously mentioned, the class members were all exposed to the exact same course of conduct by Defendants: the marketing and packaging of GSC. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). *See also In re IKO RoofingShingle*

*Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014 ("In a suit alleging a defect common to all instances of a consumer product . . . the conduct does not differ."). Additionally, the claims of the named representative and the other class members have the same essence: they were duped into believing they were purchasing ground coffee, and they would not have purchased GSC (or paid as much as they did) had they known it was actually instant coffee. Variations among the named representatives in their perception of the GSC packaging or their motivation for ultimately purchasing GSC simply means their claims are not completely *identical*. It does not mean their claims are *atypical* of the class. *See also In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599, 601 (7th Cir. 2014) (reversing because district court mistakenly held class could not be certified because different plaintiffs had different experiences with sub-standard roofing tiles); *Butler v. Sears, Roebuck, and Co.*, 727 F.3d 796, 798, 800 (7th Cir. 2013) (affirming certification of single class of consumers who purchased washing machines that accumulated mold even though class members did not all own same exact model and "different models [were] differently defective."); *Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir. 2010) (affirming certification of class of consumers who purchased windows with a design defect even though consumers' experiences with defective windows may have been caused by many individual variances such as specific conditions and improper installation); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (finding typicality in an action by former students alleging two beauty schools had made fraudulent claims about the education they provided even though

the plaintiffs spent varying amounts of time at the school and some left "satisfied"). Typicality is satisfied.

### D. Adequacy

The fourth and final requirement of Rule 23(a) is that the named plaintiffs and proposed class counsel must fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). Defendants do not challenge the adequacy of class counsel (*see* Doc. 192), and the Court has no reason to believe they are not qualified. Therefore, the Court will only analyze whether the named Plaintiffs are adequate representatives.

Once again, the Seventh Circuit did not explicitly take up the issue of adequacy of representation, but the opinion includes commentary which strongly suggests adequacy is satisfied. The Court of Appeals stated, "[I]t is apparent that this is not a case where few, if any, of the putative class members share the named representative's grievance against the defendant. If it were, things would be different [because a] person whose claim is idiosyncratic or possibly unique is an unsuitable class representative." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (citations omitted).

Defendants nevertheless argue that the named Plaintiffs are not suitable class representatives (Doc. 192, p. 33). They point out that the named Plaintiffs ascribe different causes to their mistaken beliefs about GSC and had different reasons for purchasing GSC (*Id.*). "In other words, they do not agree on what would cause the packaging to create the impression GSC is all ground coffee. (*Id.*). Thus, according to Defendants, the named Plaintiffs are antagonistic to each other on causation, reliance, and the materiality of information on the packaging (*Id.*). The Court disagrees.

The adequacy requirement is satisfied when the named representatives have "a sufficient interest in the outcome of the case to ensure vigorous advocacy" and "[do] not have interests antagonistic to those of the class." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009) *aff'd,* 606 F.3d 391 (7th Cir. 2010). *See also Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 985 (7th Cir. 2002) ("A class may not satisfy the requirements of Rule 23(a)(4) if the class representative does not possess the same interest and suffer the same injury as the class members.") (internal quotation marks and citation omitted); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.").

The named Plaintiffs all claim that the overall GSC packaging was deceptive in that it created, and/or failed to correct, the misimpression that the product was premium, ground coffee. The named Plaintiffs also claim they would not have purchased the product (or paid as much as they did) had they known it was actually instant coffee. They are not alone in their claims. The evidence in the record illustrates that hundreds, if not thousands, of other consumers held the same mistaken belief and were equally disappointed upon learning the true nature of the product.

The Court fails to see how or why it makes a difference whether some of the named Plaintiffs were misled solely by affirmative misrepresentations in statements, images, and descriptions set forth on the packaging as opposed to a material omission or some combination of affirmative misrepresentations and omissions. They all have the same interest in proving the GSC packaging was unfair or deceptive because all of their

claims stand or fall on the issue of whether a reasonable consumer was likely to be misled by the overall packaging, not any one particular attribute or omission. Additionally, they all suffered the same injury—they paid an inflated price for instant coffee or paid for a product they would not have bought at all had they known it was instant coffee. Defendants provide little to no explanation as to how these differences could create misaligned incentives among class members and the class representatives. And the Court cannot think of a reason for anticipating antagonism based on these differences. *See* 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 4:30 (11th ed. 2014) ("Likely differences in the ways in which individual class members will prove causation and damages generally 'does not affect the alignment of their interests' so as to cause conflict."); 6A FED. PROC., L. ED. § 12:119 ("Where the central question common to all of the class members goes to the heart of the controversy, it outweighs other minor variations respecting individual interests in the class."). Adequacy is satisfied.[15]

## IV.    RULE 23(B)(3) REQUIREMENTS

Plaintiffs seek to certify a class under Rule 23(b)(3), and therefore must show that "questions of law or fact common to the class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "The

---

[15] Defendants also argue that Plaintiff Carol Carr is an inadequate class representative because she is subject to unique defenses not applicable to the proposed class. (Doc. 34, p. 192). At the hearing on the motion for class certification, Plaintiffs' counsel indicated that this argument is based on a misunderstanding about where Ms. Carr resides and purchased GSC. Therefore, the Court need not address this argument.

matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3).

In determining whether predominance and superiority are satisfied, the Court must first ask whether the plaintiff's "damages are susceptible of measurement across the entire class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (citing *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013)). If damages can be estimated, the Court will move on to examining the matters identified in Rule 23(b)(3), which "deal with the interests of individualized members of the class in controlling their own litigations and carrying them on as they see fit." *Suchanek*, 764 F.3d at 760 (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–16 (1997)) (internal quotation marks omitted); *see* FED. R. CIV. P. 23(b)(3). In particular, the court should assess "the difficulty and complexity of the class-wide issues as compared with the individual issues." *Suchanek*, 764 F.3d at 760. The court should also assess "whether the class allegations are satisfied through evidentiary proof." *Suchanek*, 764 F.3d at 760 (citation omitted).

### A.   Measurement of damages

"Damages are susceptible of measurement across the entire class" if there is "a single or common *method* that can be used to measure and quantify the damages of each class member." WILLIAM RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 12:4 (5th ed. 2013).

If damages are capable of measurement on a classwide basis, questions of individual damage calculations will not overwhelm questions common to the class. *Contra Comcast Corp.*, 133 S.Ct. at 1433.

Plaintiffs' theory of liability rests on the claim that because GSC was overwhelmingly instant coffee, GSC's actual value is either nothing or a figure substantially lower than the price consumers paid for it. If GSC's value is nothing, Plaintiffs would be entitled to receive all of their money back. If GSC is worth something less than what consumers paid, Plaintiffs would be entitled to receive a partial refund. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) ("[F]or example, plaintiff's damages might be computed by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the cups contained real coffee grounds).")

Candace Preston's "Retail Damages" model matches the full-refund theory (Doc. 101-12). Defendants contend, however, that the full-refund model is contrary to law (Doc. 192). They claim that "courts have universally rejected attempts to apply the theory that a defendant's product is worthless to food and beverage products, even if their value is minimal" (*Id.* at p. 36). Defendants vehemently insist that GSC is not completely worthless because it provided convenience, hydration, and caffeine (*Id.* at pp. 36–37).

Defendants' assertion that courts have "universally rejected" full refunds in cases involving the deceptive packaging of food or beverages is a gross exaggeration. Defendants cite to four cases from only three district courts. There are ninety-four

districts in the federal court system and over six hundred authorized district judgeships. So it goes without saying that the decisions of four judges in three districts hardly establish "universal" proposition of law. Furthermore, the cases cited by Defendants are of very little persuasive value given that two of them are unpublished,[16] Defendants cited to only a footnote from the third,[17] and the fourth case specifically noted that it was "quite different" from the instant case.[18] As such, the Court is not convinced that a full refund is never the proper measure of damages in a case involving deceptive packaging of food or beverages.

And if there was ever a case where this theory was appropriate, this may be it. There is plenty of evidence in the record suggesting that consumers would not have purchased GSC but for its deceptive labeling that created and/or failed to correct the misimpression that GSC was premium, ground coffee. Specifically, there is evidence that the only consumers who would potentially purchase GSC were those who owned a Keurig machine (or who were buying it for someone else who owned a Keurig machine) (Doc. 101-1, p. 253). And there is plenty of evidence showing that, when it came to coffee, Keurig machine owners wanted to brew only premium, fresh, ground coffee (Doc. 101-1, p. 4; Doc. 219; Doc. 101-7). There is also evidence that Defendants were fully aware of Keurig machine owners' preferences and went to great lengths to disguise the fact that GSC was not premium, fresh, ground coffee. And of course there

---

[16] *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014); *In re POM Wonderful LLC Mktg. & Sales Pratices Litig.*, No. MDL 2199, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012).
[17] *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 n.25 (C.D. Cal. 2014).
[18] *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 583 (N.D. Ill. 2014) ("The record before the *Suchanek* court was quite different than the record here.")

is evidence showing that hundreds of consumers misunderstood GSC to be ground coffee and purchased the product based on misunderstanding (*see* Doc. 221). Furthermore, Defendants have produced absolutely no evidence that some consumers may have still purchased GSC had they known GSC was instant coffee. There is also no evidence that some consumers did, in fact, know that GSC was instant coffee yet purchased it anyway. Accordingly, the Court thinks it is entirely possible that the finder of fact could conclude that GSC was worthless to consumers.

To the extent that a partial refund turns out to be the correct measure of damages, the Retail Damages model could simply be offset by subtracting the actual value of GSC. Ms. Preston explained she could calculate actual value of GSC from the consumer price per cup of an equivalent instant coffee (Doc. 201-2).

Ms. Preston also presented a third damages model, the "Wholesale Damages" model (Doc. 101-12). This model awards class members the revenue Defendants earned selling GSC at wholesale prices to retailers (*Id.*). This model does not match either of Plaintiffs' theories of liability, and thus this damages model is rejected.

Accordingly, Plaintiffs have met their burden of showing a proposed class-wide damages model that is consistent with their theory of liability. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (citation omitted). If a single class is certified for the purposes of establishing damages, each class member will receive a full refund or a partial refund. Alternatively, in the

event subclasses are created, class members in certain states will receive statutory damages.[19]

## B.    Complexity and class-wide proof

Because damages can be estimated, the Court will move on to examining "the difficulty and complexity of the class-wide issues as compared with the individual issues" and "whether the class allegations are satisfied through evidentiary proof." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (citation omitted).

As previously discussed, the common, class-wide issue in this case is liability, which turns on whether the GSC packaging was likely to deceive a reasonable consumer. This question is particularly appropriate for class-wide resolution. It is identical across every class member because all of the applicable consumer protection statutes require proof that Defendants' statement was likely to mislead a reasonable consumer. *Suchanek*, 764 F.3d at 756. And it is the most central aspect of every class member's consumer fraud claim; as noted by the Seventh Circuit, "the claims of every class member will rise or fall on the resolution of that question." *Suchanek*, 764 F.3d at 757. Additionally, the proof needed to resolve the question of liability—survey evidence and expert testimony—is common to all class members. It is also costly. For these reasons, it would be extraordinarily duplicative and wasteful of the time and resources of both the Court and the parties to litigate this question in individual cases. That is particularly true because Defendants make no argument, and the Court has no reason

---

[19] According to Defendants, statutory damages are available in Alabama, California, and New York (Doc. 192, p. 39 n.31).

to believe, that multiple, individual proceedings are necessary to ensure that the question of liability is accurately resolved. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 912 (7th Cir. 2003); *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 745 (7th Cir. 2008).

Individual litigation is not even a realistic alternative. The Court estimates that the value of each class member's claim is somewhere in the ballpark of $10. And "only a lunatic or a fanatic sues for [$10]." *Carnegie v. Household Int'l., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). But even if some of the class members were feeling especially fanatical, the survey evidence and expert testimony needed to prove the issue of liability would cost considerably more than their claim is worth, which almost certainly eviscerates any interest they may have in filing an individual suit.

Furthermore, contrary to Defendants' assertion (Doc. 192, p. 44), the fact that individualized proof from each class member may be required on the issues of proximate causation and reliance does not make the class format unmanageable or support the denial of class certification. *Suchanek*, 764 F.3d at 760; *Pella Corp.*, 606 F.3d at 394 ("Proximate cause, however, is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification.") Proximate causation and reliance are simpler issues than the issue of liability, and the information needed to prove them is more accessible to individual litigants than the information needed to prove liability. *Suchanek*, 764 F.3d at 760. That's because each class member can simply state for himself that, based on GSC's packaging, he mistakenly believed GSC was ground coffee, and he purchased it as a result of that mistaken belief. *See*

*Suchanek*, 764 F.3d at 760 ("At the back end, if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation."). The individualized assessments can be conducted after liability is determined and damages are being considered. *Suchanek*, 764 F.3d at 756 ("It is routine in class actions to have a final phase in which individualized proof must be submitted.")

Accordingly, the Court thinks "it makes good sense" to resolve the common issue of liability "in one fell swoop." *Pella Corp.*, 606 F.3d at 394 (citing *Mejdrech*, 319 F.3d at 911). *See also Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 444 (7th Cir. 2015) ("[W]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied." (quoting *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1436–37 (2013))); 7AA Charles Alan Wright, et al., Federal Practice & Procedure § 1778 (3d ed.) ("When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis.").

To conclude, because common issues of law and fact predominate, and trying these claims individually would result in a substantial amount of repetition and wasted resources, proceeding as a class action is the superior form of adjudication for this case.

V.     ISSUES WITH THE CLASS DEFINITION

    A.    Ascertainability

The Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Defendants do not dispute that the proposed class is defined by reference to objective criteria (Doc. 192, p. 24). The definition identifies a particular group of individuals (in-store purchasers of GSC) harmed in a particular way (defrauded by packaging) during a specific period (from September 2010 to the present) in particular states (Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee). Defendants' objection to the proposed class is that Plaintiffs have not pointed to any evidence that identifies the class members or proposed a reliable method for ascertaining their identities (Doc. 192, p. 24).

The Seventh Circuit recently ruled on this precise issue in *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015). The Court noted that some courts have recently imposed a "new" and "heightened" requirement to ascertainability by "requiring plaintiffs to prove at the certification stage that there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657. The Seventh Circuit declined to follow suit for two general reasons. First, the new, more "stringent" version of ascertainability "does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements." *Id.* at 662. And second, the costs of imposing the requirement are high

because it "erect[s] a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims," namely low-value consumer class actions like the instant case. *Id.* Accordingly, the Seventh Circuit opted to "stick with our settled law," which focuses on "the adequacy of the class definition itself," and not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id.* at 659. Under that standard, as previously indicated, Plaintiffs have satisfied the requirement of ascertainability.

## B.   Overbreadth

A class is defined too broadly if it includes "a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824, 825 (7th Cir. 2012). There is a difference between class members who *could not* have been harmed and those who *were not* harmed. *Id.* at 825. Class members who *could not* have been harmed are those who "could not bring a valid claim under the best of circumstances." *See, e.g., Id.* at 824–25 (antitrust plaintiff class could not be defined to include persons who purchased product before defendant possessed market power because those persons *could not* have been injured by defendant's alleged abuse of market power). On the other hand, class members who *were not* harmed are those who have valid claims that will ultimately fail on the merits for various, individual reasons. *See id.* A class should not be certified if it is apparent that it contains "a great many persons" who *could not* have been harmed at the hands of the defendant. *Id.* at 825, 826 n.15.

Defendants claim that the proposed class, which is defined as purchasers of "Grove Square Coffee products," is overly broad because it includes consumers who purchased the instant and microground coffee products as well as Grove Square's cappuccino products, which also contain instant coffee (Doc. 192, p. 28). The Court disagrees. Based on the images of the packaging submitted by Defendant (Doc. 192, p. 29), it seems rather obvious that the instant and microground coffee product, which is called "Grove Square Coffee," is something entirely different from the cappuccino product, which is called "Grove Square Cappuccino." In fact, the package of the cappuccino product does not appear to mention the word "coffee" at all. Thus, in the Court's opinion, defining the class as consumers "who purchased Defendants' Grove Square *Coffee* products" is sufficiently limiting. Furthermore, the risk that cappuccino purchasers will self-identify as members of the class seems slim as there is no evidence in the record that large numbers of cappuccino purchasers ever complained of being duped or were otherwise dissatisfied with their purchase.

Defendants also claim that the proposed class definition is overly broad and certification should be denied because the class is not limited to consumers who purchased the original package with the words "soluble and microground" (Doc. 192, p. 27). Instead, it also includes consumers who purchased the modified package with the words "instant and microground" (*Id.*). Defendants argue that none of the named Plaintiffs purchased, and therefore could not have been injured by, the modified package, and thus they cannot seek to represent consumers who purchased the modified packaging (*Id.*).

The Court is not persuaded that a class with both original-package-purchasers and modified-package-purchasers is so overly broad that certification must be denied. Defendants have not presented any evidence whatsoever as to how many purchasers of the modified packaging actually exist. Therefore the Court has no reason to believe that a "great many" of the putative class members are modified-package-purchasers and has no basis to deny certification. *See Messner*, 669 F.3d at 826. If anything, the Court should amend the class definition to correct for the overbreadth. *Id.* at 826 n.15. But not even that appears to be necessary at this time. Defendants do not argue or set forth any evidence that the consumers who purchased the modified package *could not* have been deceived by the packaging. On the other hand, Plaintiffs have put forth evidence that the modified package was not sufficient to prevent a customer from being misled and that consumers continued complaining about GSC after the modified packaging was rolled out (Doc. 101-8, p. 5; Doc. 100-12; Doc. 101-9). Therefore, it cannot be said that modified-package-purchasers *could not* have been harmed by Defendants' allegedly unlawful conduct in marketing and packaging GSC. Accordingly, including both original-package-purchasers and modified-package-purchasers in the class does not appear to implicate overbreadth concerns.

Instead, it seems to the Court that the question of whether the named Plaintiffs can present claims on behalf of others who purchased the same product in the slightly modified package actually implicates issues related to commonality, typicality, and adequacy of representation. 7AA CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed.) ("[T]he question whether [representative parties] may be

allowed to present claims on behalf of others who have similar, but not identical, interests depends . . . on an assessment of typicality and adequacy of representation."); *see also Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 530 (C.D. Cal. 2011). But Defendants did not make that argument. The Court nevertheless spent considerable time thinking about that issue and is convinced that the requirements of Rule 23(a) are still satisfied.

The Court was unable to locate photos in the record of the modified package, but throughout these proceedings, the Court was given the impression that the original package and the modified package were nearly identical. The only difference was the original package stated in small font that it contained "soluble and microground coffee" while the modified package said "instant and microground coffee." As best the Court can tell, the modified package still contained all the other misleading descriptions, images, and statements and still omitted what percentage of GSC was instant coffee. And regardless of the package, the problem—that GSC's package misrepresented and concealed the true nature of the product—remains the same. The Court does not believe that the single variation between the original and modified packages is so significant that it makes the packages sufficiently and meaningfully distinct and requires an independent review of each. As the litigation unfolds, if there are large and unmanageable differences in proving the deceptive nature of the original and modified packages, the Court may decide to exclude the modified-package-purchasers from the class or create a subclass. But, at this point, the Court does not see the different packages as an obstacle to certification of a single class.

In sum, neither of Defendants' arguments regarding overbreadth requires the denial of certification or even a modification of the proposed class definition.

### C.     Class Claims Under Alabama, Tennessee, and South Carolina Law

The consumer protection statutes of the states of Alabama, Tennessee, and South Carolina permit individual actions, but not class actions.[20] If this case were proceeding in state court, these statutes would undoubtedly preclude Plaintiffs from proceeding with a class action. But, obviously, this case is in federal court. The parties dispute whether those state statutes also bar class actions in federal court. The dispute centers on the Supreme Court's decision in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

In *Shady Grove*, the plaintiff brought a putative class action in federal court against an insurance carrier seeking to recover unpaid statutory interest on late benefit payments. The issue was whether the case could proceed as a class action. Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class

---

[20] The Alabama Deceptive Trade Practices Act provides: "A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class . . . ." ALA. CODE § 8-19-10(f).

The South Carolina Unfair Trade Practices Act provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 *may bring an action individually, but not in a representative capacity*, to recover actual damages." S.C. CODE ANN. § 39-5-140 (emphasis added).

The Tennessee Consumer Protection Act of 1977 provides: "Any person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . may bring an action *individually* to recover actual damages." TENN. CODE ANN. § 47-18-109(a)(1) (emphasis added). The TCPA further provides: "No class action lawsuit may be brought to recover damages for an unfair or deceptive act or practice declared to be unlawful by this part." TENN. CODE ANN. § 47-18-109(g).

action in federal court, "unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met." *Shady Grove*, 559 U.S. at 406. New York law, by contrast, prohibits class actions to recover penalties, such as the statutory interest sought by the plaintiff. Thus, the Supreme Court was tasked with deciding whether Rule 23 or the New York statute controlled.

A majority of the justices agreed that there was a direct conflict between Rule 23 and the New York law because they both address "whether a class action may proceed for a given suit." *Shady Grove*, 559 U.S. at 401. When a federal rule of procedure conflicts with state law, the Rules Enabling Act directs federal courts to apply the federal rule so long as its application does "abridge, enlarge, or modify any substantive right" under the state law. *Id.* at 407. A majority of the justices also agreed that Rule 23 would not alter the parties' substantive rights. In determining that Rule 23 was valid, however, the Court fractured 4-1-4. Four justices applied one test, while Justice John Paul Stevens applied another. Importantly, however, five justices concluded that Rule 23 controlled. *See Hahn v. Walsh*, 762 F.3d 617, 631 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1419 (2015) ("A plurality of the Court held that Rule 23 was valid under the Rules Enabling Act . . . and five Justices agreed that Rule 23, not the New York law at issue, should be applied in federal court.") (internal citation omitted).

Defendants believe that the fractured opinion in *Shady Grove* leaves room for debate as to whether this Court is required to apply Rule 23 or the laws of Alabama, South Carolina, and Tennessee that explicitly limit Plaintiffs' ability to bring a class

action. More specifically, the question for this Court is whether Rule 23 abridges, modifies, or enlarges a substantive right afforded by those three statutes.

In answering that question, Defendants insist that the Court should follow the analysis of Justice Stevens in *Shady Grove*, and they cite to two district court cases from other circuits in which Justice Stevens's concurrence opinion was deemed to be the controlling opinion. (Doc. 192, p. 47, n. 27). Defendants then mention four district court cases where the courts evaluated the Alabama, South Carolina, and Tennessee proscriptions on class actions in light of *Shady Grove* (*Id.* at pp. 47–48). Defendants assert those courts determined the proscriptions against class actions "are substantive restrictions on the state created rights, and declined to permit class action treatment under Rule 23" (*Id.*). Defendants then declare, without any further elaboration, that the three statutory prohibitions on class actions at issue are, in fact, "substantive definitions of the private right of action afforded under each statute, and not mere procedural rules" and therefore this Court "should follow the decisions cited above and refuse to permit class action treatment of those state law claims" (Doc. 192, p. 48).

Simply put, Defendants' argument is not good enough. It is really nothing more than an assertion. They did not even discuss the analysis of the other courts (let alone conduct their own independent analysis) regarding how the three statutes at issue are materially different from the New York law at issue in *Shady Grove* or how Rule 23 actually alters a substantive right under any of those three statutes. They also provide no explanation as to why the other courts decided to go the opposite way of the Supreme Court on the issue of whether Rule 23 displaced a state law prohibiting class

actions. This Court will not employ a sort of herd mentality and mindlessly follow the decisions of other district courts without reexamining the legal issues. This Court will also not do Defendants' job for them and comb through the cited cases to piece together the contours of their argument in order to determine whether those decisions are persuasive.

Additionally, one of the district court cases cited by Defendants was recently overturned by the Eleventh Circuit. *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335–37 (11th Cir. 2015). In *Lisk*, the Eleventh Circuit held that, under *Shady Grove*, Rule 23 controlled over the prohibition on private class actions in the Alabama Deceptive Trade Practices Act ("ADTPA"). *Id.* at 1336. In the view of the Eleventh Circuit, it didn't matter whether the plurality opinion or the concurring opinion in *Shady Grove* was controlling. *See id.* at 1335, 1336. That's because "all five justices agreed that applying Rule 23 to allow a class action for a statutory penalty created by New York law did not abridge, enlarge, or modify a substantive right," and "[t]here is no relevant, meaningful distinction" between the New York law in *Shady Grove* and the ADTPA. *Id.* at 1335. The Eleventh Circuit supported that conclusion by addressing the major points of the plurality's analysis as well as Justice Stevens's analysis (*e.g.,* the legislative history of the ADTPA; the placement of the prohibition on class actions within the code; the scope of the prohibition; and the rights and obligations of the parties under the ADPTA, the available remedies, and the rules of decision for enforcing either). *See id.* at 1336. Under either analysis, Rule 23 was valid. *See id.* at 1336, 1337. Thus the Court concluded "[t]he Alabama statute restricting class actions, like the

New York statute at issue in *Shady Grove,* does not apply in federal court. Rule 23 controls." *Id.* at 1336.

Defendants' anemic argument is no match for the thorough, well-reasoned opinion of the Eleventh Circuit. The rationale by which the Eleventh Circuit arrived at its decision in *Lisk* convinces this Court that Rule 23 controls over the Alabama proscription on class actions. The Court also believes that the decision in *Lisk* applies with equal force and logic to the South Carolina and Tennessee proscriptions on consumer fraud class actions. *See also* 7A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1758 (3d ed.) ("It now is clear that Rule 23 controls whether a class action may be maintained, regardless of a conflicting state law.") Defendants have not given the Court any reason to think otherwise, and once again, the Court will not dig through the cases cited by Defendants in an attempt to supply itself with those reasons.

Accordingly, the Court finds class treatment of the named Plaintiffs' claims arising under the consumer protection statutes of Alabama, South Carolina, and Tennessee is permitted.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Renewed Motion for Class Certification (Doc. 186) is **GRANTED in part and DENIED in part**. It is denied with respect to Plaintiffs' request to certify an unjust enrichment class. It is granted with respect to Plaintiffs' request to certify a statutory consumer fraud class under Rule 23(b)(3). The following class is certified on the issue of liability only:

All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee.

Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSC primarily for resale; (c) retailers or re-sellers of the GSC; (d) governmental entities, including this Court; (e) any consumer that already received a refund from Defendants; and (f) any consumer who purchased GSC online.

It is further ordered that:

1. The law firms of Burke Harvey, LLC and Ward & Wilson are hereby **APPOINTED** as co-lead class counsel.
2. Defendants' motion to exclude the expert report and corresponding testimony of Robert Klein (Doc. 193) is **GRANTED**.
3. Defendants' motion to exclude the expert report and corresponding testimony of Candace Preston (Doc. 194) is **DENIED**.
4. Defendants' motion to exclude the expert report and corresponding testimony of Professor Bobby Calder (Doc. 196) is **DENIED**.
5. Plaintiffs' motion to exclude the expert report and corresponding testimony of Professor Neal Roese (Doc. 203) is **DENIED**.
6. Defendants' Motion to Strike Improper Arguments and Evidence from Plaintiffs' Reply Brief (Doc. 210) is **DENIED.**
7. Plaintiffs are **GRANTED** leave to file a Second Amended Complaint as discussed at the hearing held on July 9, 2015, on the motion for class certification. The Second Amended Complaint **SHALL** be filed on or before November 17, 2015.
8. Finally, the parties **SHALL**, on or before **December 4, 2015**, advise the Court what, if any, additional discovery is needed (and explain how much time is needed for that discovery) and submit a proposed schedule for notice to the class and trial on the common issues of liability.

**IT IS SO ORDERED.**

**DATED:  November 3, 2015**

<u>s/ Nancy J. Rosenstengel</u>
**NANCY J. ROSENSTENGEL**
**United States District Judge**