IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LINDA SUCHANEK, | ) | |
| RICHARD MCMANUS, CAROL CARR, | ) | |
| PAULA GLADSTONE, | ) | |
| EDNA AVAKIAN, | ) | |
| CHARLES CARDILLO, BEN CAPPS, | ) | |
| DEBORAH DIBENEDETTO, and | ) | |
| CAROL RITCHIE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 11-CV-565-NJR-RJD |
| | ) | |
| STURM FOODS, INC. and | ) | |
| TREEHOUSE FOODS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is currently before the Court on (1) a motion filed by Defendants to exclude the expert testimony of Candace Preston regarding damages pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702 (Doc. 267); (2) a motion filed by Plaintiffs to exclude the expert testimony of Jeffrey Andrien pursuant to *Daubert* and Rule 702 (Doc. 274); and (3) a motion for decertification of the class filed by Defendants (Doc. 278).

For the reasons set forth below, these motions are denied.

## PROCEDURAL BACKGROUND

On November 3, 2015, the Court entered an Order granting in part Plaintiffs' renewed motion for class certification with respect to their claims under the consumer

protection statutes of eight states (Doc. 247). The Court found that the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—were satisfied (Doc. 247). The Court further determined that the predominance and superiority requirements of Rule 23(b)(3) were satisfied (Doc. 247). With respect to predominance, the Court found, in pertinent part, that damages were susceptible to measurement on a class-wide basis using the Retail Damages and Price Premium Damages models presented by Plaintiffs' expert Candace Preston (Doc. 247). This finding is now the subject of Defendants' motion to decertify (*see* Doc. 278).

Having concluded that Plaintiffs satisfied the requirements of Rule 23(a) and 23(b)(3), the Court certified a "liability" class comprised of all persons who purchased Grove Square Coffee ("GSC") "from September 2010 up through the date the case is certified and notice is disseminated" in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee (Doc. 247).[1]

Following the class certification Order, the parties were permitted to do additional discovery regarding damages (Doc. 254). Candace Preston submitted a second supplemental report in March 2016 explaining her Price Premium Damages model (Doc. 268-1). Defendants retained Jeffrey Andrien to rebut Ms. Preston's Price Premium Damages model as well as her Retail Damages model (*see* Doc. 268-2). While the parties were conducting the additional discovery, notice went out to the class (Doc. 254, 260).

Following the notice period and conclusion of discovery, Defendants filed their

---

[1] "Liability" refers only to the question of whether the GSC packaging was likely to deceive a reasonable consumer (*see* Doc. 247, 250). In order to be more clear from here on out, the Court will refer to that question as the issue of "deception," not "liability."

second *Daubert* motion seeking to exclude the expert testimony of Candace Preston (Doc. 267; *see also* Doc. 194). Plaintiffs then filed a *Daubert* motion seeking to exclude the testimony of Jeffrey Andrien (Doc. 274). Before either *Daubert* motion was ruled on, Defendants filed another motion seeking to decertify the class (Doc. 278). A hearing on these three motions was held on April 27, 2017 (Docs. 310, 311). Following the hearing, both parties filed responses to the arguments made at the hearing.

As an initial matter, the Court wishes to comment on the quality of the briefing and arguments advanced by both parties. The moving and opposing papers were voluminous, but poorly written and poorly researched, and have needlessly complicated the Court's task of deciding the motions. To begin with, Defendants' submissions are a kitchen-sink collection of arguments that are not clearly delineated, poorly organized—in fact, they are often split up between two sections of the briefs (the "background" section and the "argument" section), and are frequently undeveloped. Simply put, Defendants' arguments are exceedingly difficult to digest. At times, Defendants also misrepresented aspects of this case, ignored the Court's previous discussions, rehashed issues that were previously rejected, and squabbled over issues of no consequence.

Plaintiffs' submissions fare no better. They frequently rely on large block quotations from previous Orders or case law, but make little to no attempt to connect the quoted material back to issue at hand. Legal analysis is often absent; instead, they seem to simply announce their position but make no attempt to flesh out their argument or explain why their argument is of any significance. Perhaps most troubling is the

complete dearth of supporting legal authority in Plaintiffs' *Daubert* motion—none of

their arguments contain a single citation. Moreover, the parties frequently talk past one

another and fail to directly address one another's arguments. As a result, the Court has

spent an extensive amount of time—too much time, without a doubt—struggling to sort

out and analyze the issues presented. In the future, the Court will be much less tolerant

of poor quality writing and other behavior that it perceives to fall below the minimum

standards expected of an attorney, to waste the Court's time and resources, and to

needlessly protract the proceedings.

### *DAUBERT* MOTIONS

The admissibility of expert testimony is governed by Federal Rule of Evidence

702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that the *Daubert*

analysis applies to *all* expert testimony under Rule 702, not just scientific testimony).

Under Rule 702 and *Daubert*, district courts have a "gatekeeping" obligation to ensure

that expert testimony is both relevant and reliable. *Kumho Tire*, 526 U.S. at 147. This

requires the district court to ensure the following before admitting expert testimony:

> First, the expert must be qualified by knowledge, skill, experience,
> training, or education; second, the proposed expert testimony must assist
> the trier of fact in determining a relevant fact at issue in the case; third, the
> expert's testimony must be based on sufficient facts or data and reliable
> principles and methods; and fourth, the expert must have reliably applied
> the principles and methods to the facts of the case.

*Lees v. Carthage Coll.*, 714 F.3d 516, 521–22 (7th Cir. 2013) (citing FED. R. EVID. 702 and

*Smith v. Ford Motor Co.*, 215 F.3d 713, 717–19 (7th Cir. 2000)). The party offering the expert

testimony bears the burden of establishing that it meets these admissibility

requirements. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Here, neither party challenges the experts' qualifications or the relevance of the experts' opinions in their respective motions (*see* Docs. 268, 274). Instead, both parties focus on the reliability of the experts' opinions (*see* Docs. 268, 274). "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (quoting *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir. 2000)). In assessing the reliability of expert testimony, courts can consider the non-exhaustive list of guideposts set forth in *Daubert*: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert,* 509 U.S. at 593–94). The 2000 Advisory Committee's Notes to Rule 702 also lists additional factors for gauging expert reliability, including whether: (1) the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation; (2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) the expert has adequately accounted for obvious alternative explanations; (4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. *Am. Honda*, 600 F.3d at 817 (quoting

FED. R. EVID. 702, Advisory Committee's Notes (2000 Amend.)).

These factors do not, however, constitute a "definitive checklist or test." *Daubert,* 509 U.S. at 593. Rather, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and "the gatekeeping inquiry must be tied to the facts of a particular case," *Kumho Tire,* 526 U.S. at 150 (internal quotation marks omitted).

A. **OVERVIEW OF PRESTON AND ANDRIEN'S ANALYSES**

Candace Preston is the damages expert hired by Plaintiffs. In her original report submitted in August 2012, Preston provided, in relevant part, the Retail Damages model (Doc. 101-12).[2] This model would provide class members with a full refund of the purchase price, and it reflects Plaintiffs' theory of liability that GSC had no value to purchasers (*Id.*). Preston calculated that consumers spent a total of $6.273 million on GSC during the class period in the eight states at issue (Doc. 268-1, pp. 3, 8).

In her second supplemental report submitted in March 2016, Preston provided an alternative damages model: the Price Premium model (Doc. 268-1). This model would provide class members with a partial refund, and it reflects Plaintiffs' theory of liability that consumers paid an inflated price for GSC (*Id.*). Specifically, the class members would receive the difference between the inflated retail price they paid for GSC thinking it was ground coffee and the actual value of GSC had it been marketed truthfully. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014).

To determine the average retail price that class members paid for GSC, Candace Preston obtained data from Information Resources, Inc. ("IRI") for retail sales of GSC in

---

[2] The original report also contained the Wholesale Damages model, which reflects the revenue Defendants earned selling GSC at wholesale prices to retailers. This model was rejected by the Court because it did not match either of Plaintiffs' theories of liability (Doc. 247, p. 37).

the relevant eight states from 2010 through 2014 (Doc. 268-1, p. 3). From that data, Preston determined that the average retail price paid by consumers for GSC in the relevant states was approximately $0.45 per cup (Doc. 268-1, p. 5). Defendants have no objection to Preston's methodology for determining the average retail price of GSC or the $0.45 figure generated using that methodology (*see* Docs. 268, 278).

Preston then approximated the actual value of GSC by looking at the price per cup of comparable products on the market whose packaging did not contain the misrepresentations that were on the GSC packaging (Doc. 268-1, pp. 4, 5). Preston identified 23 instant coffee products as comparable products and determined that the average price per cup for those products was approximately $0.06 (*Id.* at pp. 6, 11). Thus, she determined that class members paid a price premium of approximately $0.38 per serving of GSC (*Id.* at pp. 7, 12). The price premium, multiplied by the number of units sold, amounts to a total of $5.415 million in damages (*Id.* at pp. 7, 13).

Defendants retained Jeffrey Andrien to rebut Ms. Preston's conclusions (*see* Doc. 268-2). Andrien opined that the price premium model is the appropriate method for quantifying damages, not the full refund model (Doc. 268-2). Andrien also believes, however, that Preston's application of the price premium methodology is fatally flawed (*Id.*) In pertinent part, Andrien believes Preston should have used instant and microground coffee products as comparables instead of instant-only products and that she should have accounted for the value of single-serve packaging (*Id.*). Andrien conducted his own analysis and determined that consumers are willing to pay more for single-serve packaging and for products that contain both instant and microground

coffee.

With respect to the single-serve packaging, Andrien determined that two of the products used by Preston as comparables—Nescafe and Folgers—cost approximately $0.10 more when it is packaged in single-serving packet than when it is packaged in jars in bulk (Doc. 268-2, pp. 51–52). Andrien further determined that ground coffee costs approximately $0.47 more on average when it is packaged in k-cups than when it is packaged in bulk, tea costs approximately $0.52 more on average, and other non-coffee products that do not require a filter to prepare (such as hot chocolate and cappuccino) cost $0.50 more on average (*Id.* at pp. 21–22, 53–54, 56, 57). Thus, the premiums associated with k-cup packaging are between $0.47 and $0.52, which is higher than the $0.45 average retail price of GSC as calculated by Preston. Based on that, Andrien extrapolated that the actual value of GSC is greater than what consumers paid for it ($0.45) (*Id.* at p. 23).

As for the value of a microground component, Andrien asserted that "instant and microground coffee is a distinct segment of the coffee market, and . . . [is] more expensive than . . . only instant coffee" (Doc. 268-2, p. 23). Andrien analyzed ten comparator products that all contained instant and microground coffee packaged in single-serving packets (*Id.* at p. 28). Eight of the ten products that Andrien used as comparables were Starbucks VIA products (*Id.* at pp. 24–28). According to Andrien, "Starbucks Via has one feature which alone makes it more comparable to GSC than any of the products selected by Ms. Preston as comparable. Specifically, its formulation is more similar to the GSC formulation than any of Ms. Preston's 23 selected products" (*Id.*

at p. 26). Additionally, like GSC, VIA products come in single-serve packages (although it is a packet, not a k-cup), and 21 of the 23 products selected by Preston do not (*Id.* at p. 26). Andrien also used two other instant and microground coffee products previously sold in single-serve packets in the United States: Archer Farms Donut Shop and Café Tastle Brucup Easy Brew (*Id.* at pp. 27, 28). Andrien calculated that the average price of these instant and microground coffee products was $0.77 per cup, which once again is higher than the $0.45 average retail price of GSC as calculated by Preston (*Id.* at p. 28). This calculation reinforced Andrien's previous assertion that the actual value of GSC is greater than the $0.45 price that consumers paid for it (*Id.*).

**B. DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF CANDACE PRESTON**

As previously indicated, Defendants challenge the reliability of Preston's Retail Damages Model and her Price Premium Model (Doc. 268). The Court analyzes the merits of Defendants' arguments as to each model in detail in the discussion that follows, but in short, the Court finds them each unconvincing. The Court has no doubt that Preston could have done more, and certain aspects of her methodology may be vulnerable on cross-examination, but Defendants have not given the Court any reason to believe that her damages models are so patently unreliable that they are inadmissible under Rule 702 and *Daubert*.

**1. Retail Damages**

The Retail Damages model, which provides consumers with a full refund of the purchase price of GSC, is based on the notion that the product was worthless to consumers and they would not have purchased GSC if not for the deceptive packaging (Doc. 247, pp. 19, 35). Defendants argue that the Retail Damages model is "legally and

factually insufficient" (Doc. 268, p. 23).

With respect to the legal validity of the damages model, Defendants once again suggest that a full refund is not an appropriate model of damages in a case where a food and beverage product is mislabeled (Doc. 268, pp. 12–13, 14, 23–24; *see also* Docs. 192, 247). In the class certification Order, however, the Court told Defendants that this argument "was not a good fit for a *Daubert* motion," and was more appropriately considered with respect to the issue of predominance under Rule 23(b)(3) (Doc. 247, p. 12). At any rate, the Court rejected the argument, finding that the four cases cited by Defendants in support of their argument were "of very little persuasive value" (Doc. 247, pp. 35–36; Doc. 268, p. 23).

Despite the Court's previous statements, Defendants once again advance this argument in a *Daubert* motion—but do not mention it in their motion for decertification. Even more unbelieveable, Defendants cite to the *same* four cases the Court previously found unpersuasive but do not offer any new analysis or explanation as to why the Court should revisit this issue (*see* Doc. 268). Therefore, this argument can be summarily denied as a basis for excluding Candace Preston's expert testimony under *Daubert*.

That being said, the Court believes it is important to once again explain why a full-refund model of damages may be appropriate in this matter. To begin, it is true that the full refund model of damages is often rejected in cases involving mislabeled food and beverages. A review of these cases demonstrates that they typically involve a product label that does not misrepresent the entire essence of the product but instead falsely claims the product possesses a particular premium quality. For example, in

*Khasin v. R. C. Bigelow, Inc.*, the green tea products at issue were, in fact, green tea, but they did not contain the "powerful" or "healthy" antioxidants that the label claimed. No. 12-CV-02204-WHO, 2016 WL 1213767 (N.D. Cal. Mar. 29, 2016). As another example, in *Werdebaugh v. Blue Diamond Growers*, the almond milk products at issue were, in fact, almond milk, but they were not "all natural" like the label claimed, because they contained synthetic ingredients. No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014). The usual story in these cases is that people purchased and consumed the product (often repeatedly) and were generally satisfied until they later realized that the product was missing the particular premium quality advertised on the label. Furthermore, the premium quality was often not the driving force behind every consumer's purchase. In other words, some consumers would have purchased the product for reasons unrelated to the promised premium quality, such as taste or brand loyalty. Consequently, courts have held that the full refund model is not appropriate in these cases, because the model fails to take into account that consumers still received some benefit when they consumed the product—even though it did not have the advertised premium quality—and it also fails to take into account that consumers may have still purchased the product had they known the truth about the product.[3]

---

[3] *See, e.g., Khasin*, 2016 WL 1213767, at *3 (in case where plaintiff alleged R.C. Bigelow green tea products misleadingly claimed to contain "powerful antioxidants" full refund was not appropriate because it was "too implausible to accept" that "consumers gain[ed] no benefit in the form of enjoyment, nutrition, caffeine intake, or hydration from consuming the teas," and the plaintiff himself admitted that he like the taste of Bigelow teas and preferred it to Lipton); *In re POM Wonderful*, Case No. ML 10-02199(RZx), 2014 WL 1225184, at *11 (C.D. Cal. Mar. 25, 2014) and 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012) (finding full refund model invalid in case where Pom juices misleadingly claimed to provide health benefits because, even though there was evidence this claim was the motivating factor behind consumers' purchase of the juice, plaintiffs could not "plausibly contend" that not a single consumer received a single benefit, be it hydration, flavor, energy, or anything else of value, from the juice); *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 192 & n.4 (D. Minn. 2009) (finding no factual support for full refund model because, even if the clothing at issue did not have the advertised odor-eliminating properties, "many class members may have

This case is different. GSC wasn't simply missing a particular premium quality advertised on the package. Instead, the package misrepresented the *very essence* of what was being purchased. The evidence also does not suggest that consumers were generally satisfied with GSC and continued purchasing it until they realized that it was instant coffee (*see* Doc. 247, p. 5 (citing Docs. 221, 100-12, 101-2, 101-9)). Rather, it suggests that consumers were immediately displeased with the product after they made their first cup of GSC, threw away the remainder of the product, and never purchased it again (*see* Doc. 221).[4] The evidence also suggests that GSC's deceptive packaging, which implied that GSC was ground coffee, was the driving force behind every consumer's purchase. While consumers may have ultimately chosen to buy GSC because they wanted to try

---

wanted this clothing for other reasons in addition to those pertaining to odor-elimination, such as warmth, appearance, and waterproofing" and therefore the clothing "would likely have value outside of its odor-eliminating capabilities"). *See also Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *2, 3 (S.D.N.Y. Aug. 5, 2010) (plaintiffs in putative class action alleging Snapple beverages misleadingly claimed to be "All Natural" admitted that the "All Natural" label "was not the deciding factor "in their purchasing decisions and they would have bought Snapple over other beverages even if it was not labeled "All-Natural").

[4] Complaints from consumers to the company include statements such as GSC "is the worse [sic] coffee I have ever tried to drink. (Both my wife and I poured it down the drain.) Total crap."; "[W]e are very disappointed, and now have 16 cups that we will not use."; "I have never been so disappointed in any other coffee like this one. It does not work well in the Keurig and tastes terrible. . . . I will warn everyone I know not to buy this brand."; "[I]t is the worst thing ever as far as coffee goes . . . I feel I've been swindled and can only throw it out."; "I recently purchased this coffee and wanted to tell you how disgusting it is."; "This coffee was AWFUL. How do you get by selling instant coffee under the guise of a K-cup????"; "All you did was package INSTANT COFFEE!!!!! How dare you??? With the economy the way it is, a cup of coffee from the Keurig is a treat. Generic instant coffee tastes better than this."'; "[T]he flavor is horrible. . . .Can you tell me how I can get a refund of this item because it is not usable."; "We have become accustomed to the excellent coffees for the Keurig, and yours was frankly awful. It tasted like a bad cup of cheap instant coffee."; "The coffee in the K-cup replica is nothing but instant coffee. . . . [It] was not much better than dirty water. . . . I wasted $8.00 of my good earned money and now have to go purchase a non replica of K-cup as I don't drink instant coffee."; "Instant coffee makes me sick, so I am going to have to throw it out."; "I'm sorry to say it's the worst coffee I've ever had in my entire life it tasted terrible. I cannot purchase this coffee again."; "To say that it is worse than any generic coffee or instant coffee I ever tasted would not be overstated. We regret purchasing this item and feel it was a waste of money."; "This is simply the worst tasting coffee I have experienced. . . . Be ashamed you cheated me out of $8.00." (Doc. 221).

something new or because of its cheaper price, the only reason they ever considered purchasing it in the first place was because they thought it was ground coffee. Had consumers known that it was overwhelmingly instant coffee, they never would have considered purchasing it.[5] Consequently, Plaintiffs have marshaled evidence sufficient to plausibly suggest that no one would have purchased GSC had they known it was instant coffee and that no consumers received any benefit from the product.[6] It is up to a jury, however, to ultimately interpret the evidence and determine whether Plaintiffs successfully made that showing.

As for the factual validity of the damages model, Defendants present an argument that is a slightly refashioned version of the one that was already rejected by this Court in the class certification Order. The first time around, Defendants argued that the Retail Damages models should be stricken because it was based on an unreliable

---

[5] As noted in the class certification Order, there is evidence that "the only consumers who would potentially purchase GSC were those who owned a Keurig machine (or who were buying it for someone else who owned a Keurig machine)" and that "when it came to coffee, Keurig machine owners wanted to brew only premium, fresh, ground coffee" so Defendants "went to great lengths to disguise the fact that GSC was not premium, fresh, ground coffee." (Doc. 247, p. 36). *See also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 753 (7th Cir. 2014) (finding that instant coffee "is not the kind of premium product that Keurig customers expected, as Sturm's marketing surveys confirmed. Indeed, Sturm's consultants warned that 'use of the word 'instant' is a real nono' and should be avoided 'if at all possible' in marketing the GSC product to the only people who would buy a KCup: Keurig machine owners.") Customers indicated in their complaints to the company that they felt disappointed, dissatisfied, displeased, disgusted, swindled, robbed, cheated, ripped off, duped, and misled (Doc. 247, p. 5). Others said GSC was a hoax, deceptive, an absolute fraud, a rip off, a sad joke, a gross misrepresentation, a clearly substandard instant coffee disguised as a Keurig k-cup, and a waste of money (*Id.*).

[6] *See Makaeff v. Trump Univ.*, 309 F.R.D. 631, 636–640 (S.D. Cal. Sept. 18, 2015) (providing extensive explanation on why full refund is appropriate in situations where consumers are deprived of the essence of what they were promised). *See also In re Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2017 WL 1191485, at *14 (S.D. Cal. Mar. 31, 2017) (approving full refund damages model where plaintiff alleged no class members would have purchased the bird food if they knew it contained pesticides that made it poisonous for birds even though defendants argued the product was not worthless and was safe for birds); *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *6 (N.D. Cal. Apr. 15, 2016) (accepting full refund damages model where plaintiff produced "some evidence" that no class members would have bought Joint Juice had they known it would not benefit their joints, even though defendants argued the juice had other benefits such as hydration, vitamins, antioxidants, taste, etc.).

assumption that "if the product [GSC] had been marketed truthfully, consumers would not have purchased the product at all" (Doc. 247, p. 12; Doc. 195, pp. 16–17). The Court rejected this argument, finding the assumption underlying the Retail Damages model was very clearly supported by the evidence (Doc. 247, pp. 12–13). This time around, Defendants once again attack the assumption that GSC had no value. They argue the Retail Damages models should be stricken because the assumption originated with Plaintiffs' attorneys, not Preston (Doc. 268, p. 23). Defendants further claim this assumption is erroneous because the fact that "someone would not have purchased a product if they were not misled does not mean they did not receive value" (*Id.*). Defendants also claim the assumption is erroneous because there is evidence that the ingredients in GSC and its packaging did, in fact, have value (*Id.* at p. 24).

The Court is wholly unconvinced by these arguments. First, the Court cannot discern any reason why it matters that Plaintiffs' counsel told Preston to assume that GSC had no value. It is not as though Preston blindly accepted some baseless or unfounded assumption. As discussed above, there is certainly evidence in the record that supports the assumption that GSC had no value. And, as discussed in the class certification Order, Candace Preston reviewed some of that evidence in preparing her Retail Damages model (Doc. 247, pp. 12–13). So to the extent Preston was fed the assumption that GSC had no value, it appears to the Court that she sufficiently verified that the assumption was based on evidence. Consequently, the Court concludes that, if anything, this criticism goes to the weight and credibility of Preston's opinion, not its admissibility. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir.

2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury . . . .") (citing *Tuf Racing Products v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact [.]").

Second, the Court does not believe that evidence regarding value of the ingredients and packaging of GSC has any bearing on the assumption that GSC had no value. Of course the ingredients and the packaging of GSC were worth *something*—the ingredients and packaging of any product always cost money and are never free. For example, even a probiotic that provides no digestive benefits, grass seed that doesn't grow grass, bird seed that is unfit for consumption because it contains pesticides, and a drinkable joint supplement that does not provide any joint health benefits, all contain ingredients that have some monetary value. But the courts nevertheless approved a full refund damages model in those cases.[7] That's because the full refund model does not focus on the "value" of the product from the company's perspective, such as the cost of

---

[7] *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 523 (6th Cir. 2015), *cert. denied,* 136 S. Ct. 1493 (2016) (approving full refund damages model where plaintiffs alleged probiotic was ineffective and did not promote digestive health benefits for anyone because "there is no reason to buy [the product] except for its purported digestive benefits"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412 (S.D.N.Y. 2015) (approving full refund damages model where consumers alleged that Scotts Turf Builder EZ Seed, an all-in-one-product containing premium grass seed, mulch, and fertilizer, was defective and did not grow grass); *In re Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2017 WL 1191485, at *14 (S.D. Cal. Mar. 31, 2017) (approving full refund damages model where plaintiff alleged no class members would have purchased the bird food if they knew it contained pesticides that made it poisonous for birds even though defendants argued the product was not worthless and was safe for birds); *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *6 (N.D. Cal. Apr. 15, 2016) (accepting full refund damages model where plaintiff produced "some evidence" that no class members would have bought Joint Juice had they known it would not benefit their joints, even though defendants argued the juice had other benefits such as hydration, vitamins, antioxidants, taste, etc.).

raw materials, of manufacturing, or of marketing the product. Instead, the focus is on the retail "value" of the product from the consumers' perspective, meaning whether anyone be willing to buy the product (or what price people would be willing to pay) if they knew they truth about the product. Contrary to Defendants' assertion, pertinent case law illustrates that the mere fact that the components or the packaging of a product have value does not cut the legs out from under the assumption that a product is valueless or the opinion that a full refund is an appropriate measure of damages.

For these reasons, the Court concludes that Defendants' criticisms regarding the factual basis of the Retail Damages model do not provide any grounds for finding Preston's opinion unreliable and inadmissible. The Court maintains its previous conclusion that Candace Preston's testimony regarding the Retail Damages should not be excluded under *Daubert* or Rule 702.

### 2. Price Premium

The Price Premium model, which provides consumers with a partial refund of the price they paid for GSC, is based on the notion that consumers paid an inflated price for GSC. In other words, Plaintiffs believe that instant coffee is worth less than ground coffee, and therefore the actual value of GSC is substantially less than what consumers paid for it. The price premium was computed by taking "the difference between the actual value of the package [consumers] purchased" and "the inflated price [consumers] paid" thinking the product was as advertised. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014). In order to determine the "actual value" of GSC, Preston identified comparable instant coffee products sold by competitors during the class period and

calculated the average price of a serving of instant coffee (*see* Doc. 268-1). As Defendants'

expert Jeffrey Andrien put it, "[t]he intuition underlying a comparables analysis is that

that [sic] the comparable products share features and attributes so closely aligned with

the subject product that the value of the comparables can be used as a proxy for the

value of the subject product" (Doc. 268-2, p. 16). Andrien admitted that the use of

comparables to assess the value of a product is "a well-established and commonly used

methodology" (Doc. 268-2, p. 14). Defendants believe that Preston's application of the

comparables methodology was highly flawed, however, and thus inadmissible under

*Daubert* for two reasons (*see* Doc. 268).

For their first argument, Defendants set the stage by noting that under *Comcast*

*Corp. v. Behrend,* 133 S. Ct. 1426 (2013), "class action plaintiffs must provide a damages

theory that measures only those damages attributable to the alleged misconduct and '[is]

consistent with [the plaintiff's] liability case'" (Doc. 268, p. 15). Defendants go on to

argue that the Price Premium model is inadmissible under *Daubert* because it does not

"calculate the price premium due solely to the allegedly misleading label statements or

omissions," and "it is not tied to the alleged wrongdoing" (Doc. 268, pp. 15, 16). For

instance, Defendants claim the model does not isolate the price premium associated with

the alleged misleading acts because Preston failed to distinguish between Plaintiffs' two

theories of liability, failed to control for differences between GSC and the comparable

products that may contribute to pricing, and failed to consider the supply-side of

valuation (Doc. 268, pp. 15–18).

Defendants' mention of *Comcast,* and their use of phrases and terminology

associated with the requirements of *Comcast*, suggests that the issues they identified bear on Rule 23(b)(3)'s predominance requirement and the propriety of class certification, not the reliability of Preston's methodology and the admissibility of the opinion under *Daubert* and Rule 702. This is reinforced by the three cases Defendants cited to: *In re POM Wonderful*, No. 10-cv-2199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014); *Lanovaz v. Twinings North America*, No. 12-cv-2646, 2014 WL 1652338 (C.D. Cal. July 24, 2014); and *Algarin v. Maybelline*, 300 F.R.D. 444 (S.D. Cal. 2014)). Each of these cases discussed the sufficiency of the damages model in the context of class certification and predominance under Rule 23(b)(3). Therefore, these cases do not suggest Preston's opinion is inadmissible under *Daubert*; instead, they suggest that the issues identified by Defendants should be evaluated under *Comcast* in the context of the motion for decertification.

Consequently, the Court finds that Defendants' first argument provides no basis for excluding Preston's Price Premium model under *Daubert* or Rule 702, and defers its discussion of this argument and its subparts until later in this Order when it addresses the motion for decertification. (Conveniently, Defendants repeat this same exact argument in their motion for decertification (*see* Doc. 278)). *See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 31, 2017) (declining to consider arguments based on the requirements of *Comcast* in the context of a *Daubert* motion); *Dzielak v. Whirlpool Corp.*, No. CV2120089KMJBC, 2017 WL 1034197, at *13 (D.N.J. Mar. 17, 2017) (same, and also discussing the difference between *Comcast* arguments and *Daubert* arguments); *In re*

*ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) (same).

As for their second argument, Defendants contend that Preston's application of the comparables methodology is "so highly flawed" that the Price Premium model must be excluded. Specifically, Defendants claim that Preston used inappropriate comparable products by including only "low cost" instant coffees and excluding other instant and microground coffees, particularly the Starbucks VIA products (*see* Doc. 268, pp. 11–12, 15, 18–20). Defendants argue that Preston's comparables methodology was further flawed because she failed to account for differences between GSC and the comparable products she chose that may provide value to consumers, namely the single-serve packaging and the inclusion of microground coffee (Doc. 268, pp. 11–12, 21–22).

For her part, Candace Preston explained that there is no product truly comparable to GSC because no other companies have ever attempted to sell instant coffee, or instant and microground coffee, in a k-cup (Doc. 268-1, p. 4; Doc. 272-3, p. 8). She chose to use instant-only products as comparables without regard to how they were packaged because she did not believe the microground component or the single-serve packaging added any value to GSC (Doc. 272-3, pp. 5, 7, 9). In particular, she said the microground coffee only made the product clumpy, which consumers complained about, and therefore it detracted from the value of GSC rather than adding to it (*Id.* at p. 5). As for the packaging, Preston said there is no added convenience with a k-cup of instant coffee over a jar of instant coffee or a single-serve packet because neither of those products requires the use of a special machine to prepare the product (*Id.* at pp. 5, 7, 9).

The Court finds that purported deficiencies in the Price Premium model

identified by Defendants go to the weight and credibility of Preston's opinion, not its admissibility. Preston had her reasons for conducting her Price Premium analysis in the manner that she did, and it is up to a jury, not the Court, to decide whether to credit those reasons. Defendants will have the opportunity to criticize Preston's choice of comparables and the variables she included in her methodology through "[v]igorous cross-examination . . . [and] presentation of contrary evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one best left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir. 2000))).

In sum, Defendants have failed to convince the Court that Candace Preston's Retail Damages analysis or her Price Premium Damages analysis are so unreliable that they are inadmissible under *Daubert* and Rule 702. Consequently, Defendants' motion to exclude Preston's testimony is denied.

## C. PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY ANDRIEN[8]

Although Plaintiffs ask the Court to strike Jeffrey Andrien's entire report (Doc. 274, p. 10), Plaintiffs' arguments actually pertain only to one portion of the report: Andrien's opinion that instant and microground products—particularly Starbucks Via, Archer Farms Donut Shop, and Café Tastle Brucup Easy Brew—were the appropriate

---

[8] Defendants ask the Court to summarily deny Plaintiffs' motion because it is untimely (Doc. 276). The Court rejected this argument at the hearing and indicated that it considered Plaintiffs' motion timely (Doc. 310).

comparables to use, his related analysis that these products cost an average of $0.77 per cup, and his conclusion that GSC was worth more than its actual cost of $0.45 per serving (*see* Doc. 274). Plaintiffs argue that Andrien's analysis is unreliable for the following five reasons: (1) it ignores that Defendants abandoned their project to develop a product to directly compete with VIA; (2) it is premised on the unsubstantiated belief that the VIA products were similar in composition to GSC; (3) Andrien did not read and was unaware of the legal rulings, factual findings, and evidentiary record in this case; (4) two of Andrien's comparator products were not available during the class period; and (5) it leads to absurd conclusions (Doc. 268). A couple of these arguments, if thoroughly developed and properly supported, potentially have merit. But in their current state, they are simply too cursory to justify striking any portion of Andrien's testimony.

### 1. Starbucks VIA as a Comparable Product

Plaintiffs' first two arguments relate to Andrien's opinion that Starbucks VIA is an appropriate comparable and that Candace Preston should have included it in her analysis (Doc. 268-2, pp. 23–28).

Plaintiffs first argue that this opinion is unreliable because Defendants abandoned their project to manufacture a microground and instant coffee product in single-serving packets to directly compete with VIA; Defendants instead concentrated solely on producing GSC in a Keurig-compatible format (Doc. 274, pp. 3–5). Plaintiffs also argue that Andrien's opinion is unreliable because Andrien has no direct knowledge of VIA's composition, meaning the amount of instant coffee versus the

amount of microground coffee in VIA products (Doc. 274, pp. 5–6).[9]

In response, Defendants assert that their decision not to make an instant and microground product in a single-serve packet in no way shows that the composition of GSC is dissimilar to the composition of VIA (Doc. 276, p. 7). They claim the coffee contained in GSC could still be compositionally similar to VIA—even though it was packaged in a k-cup instead of a single-serve packet (*see* Doc. 276, p. 7). As for Andrien's knowledge about the composition of VIA, Defendants assert that Andrien "relie[d] on the unrebutted testimony of one of the formulators of the GSC that it was developed to be similar in composition to VIA" (Doc. 279, p. 7). While Defendants repeatedly asserted that it was "undisputed" that VIA and GSC were compositionally similar, they never offered any actual proof regarding the formulation of VIA (*see, e.g.*, Doc. 268, p. 11; Doc. 276, pp. 6, 7)—that is until their briefing submitted after the hearing. In this brief, they once again claimed that "VIA's composition is undisputed: 97% soluble/instant and 3% microground," but this time they cited to a document at docket entry 300 (Doc. 312, p. 3). That document is an internal memo from Sturm Foods in which Samantha Peskie writes "Starbucks via is 3.3 grams of product which according to analysis is 0.1 grams of microground coffee and 3.2 grams of a highly concentrated spray dried" (Doc. 312, p. 3 (citing to Doc. 300)).[10]

---

[9] The Court notes that Plaintiffs' argument also appears to apply to Andrien's use of Archer Farms Donut Shop and Café Tastle Brucup Easy Brew as comparables. The Court knows of no evidence in the record regarding the composition of the Archer Farms product or the Café Tastle product. But given that neither party addresses this issue, the Court also declines to address it.

[10] The Court does not know what to make of the sudden appearance of this document, especially since Defendants say very little about it (*see* Doc. 312). They do not indicate why it was not provided sooner. They do not provide any context for the document or any explanation about the analysis that was purportedly conducted. They do not indicate whether Samantha Peskie provided any testimony regarding

Just like the Court concluded with respect to Candace Preston's choice of comparables, the Court believes that Plaintiffs' criticisms regarding Andrien's choice of comparables go to the weight and credibility of his opinion, not its admissibility. Plaintiffs are essentially arguing that Andrien ignored pertinent information, or did not have adequate information, prior to opining that Starbucks VIA is an appropriate comparable. These criticisms bear on "[t]he soundness of the factual underpinnings" and the correctness of his opinion regarding which products are appropriate comparables. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The Court cannot decide these factual matters on a *Daubert* motion. It is up to the jury to decide whether Defendants knew the composition of VIA and whether VIA is more comparable to GSC than instant-only products.

### 2. Archer Farms and Café Tastle as Comparable Products

Turning to Plaintiffs' fourth argument, they challenge Andrien's inclusion of Archer Farms Donut Shop and Café Tastle Brucup Easy Brew as comparable products because they were not sold during the class period (Doc. 274, pp. 8–9). Furthermore, the Café Tastle product was only available on the internet and not sold in retail establishments (Doc. 274, p. 9). While Plaintiffs fail to indicate what point they're trying to make (*see* Doc. 274), the Court believes they are questioning the extent to which the price of products sold in 2015 and 2016 is indicative of the price GSC could have been sold for between September 2010 and September 2014 if it had been marketed truthfully.

---

the document at her deposition. Defendants also do not make any attempt to reconcile this document with Ken Noble and Harry Overly's testimony that no one at Sturm ever determined what percentage of microground coffee was contained in the VIA products (Doc. 108-2, p. 12; Doc. 108-3, p. 12). Additionally, given the late submission of this document, Plaintiffs have not had an opportunity to provide their input on the meaning or significance of the document.

In response, Defendants provide little to nothing in the way of an explanation as to why it was appropriate for Andrien to include the Archer Farms and Café Tastle products in his analysis (*see* Doc. 276, p. 8). They state:

> At least one of these products, Archer Farms, was sold during at least one year, 2015, that GSC was sold. Mr. Andrien testified that whether the sales overlap was during the "class period" was irrelevant, and Ms. Preston testified she had no opinion of whether there would have been a price difference between Archer Farms and GSC. Plaintiffs do not even attempt to show how the absence of sales of a particular instant and microground product during the class period renders Andrien's conclusions unreliable or unsupported and Plaintiffs cite no case or other authority that an expert cannot rely on economic indicators outside of the class period.

(Doc. 276, p. 8).

The Court first notes that although Plaintiffs' argument is indeed undeveloped and unsupported, it is not their duty to establish that Andrien's testimony is unreliable—it is Defendants' duty to establish its reliability. In other words, the onus was on Defendants to establish that Andrien could rely on economic indicators outside of the class period; it was not on Plaintiffs to establish that he couldn't. The explanation provided by Defendants is hardly convincing. The simple fact that both GSC and Archer Farms were sold at some point in 2015 does not shed any light on how the price of the Archer Farms product in 2015 is a reliable and valid indicator of what GSC could have sold for one to four years earlier. And Andrien's testimony does not provide the needed connection. He simply repeated the same assertion (in a rather combative and obstinate fashion) that it is irrelevant to whether GSC, the Archer Farms product, and the Café Tastle product were sold during the same time period (*see* Doc. 320-1, pp. 22–23). The only explanation he gave was that the purpose of his analysis was to determine whether

consumers were willing to pay a premium for instant and microground coffee above instant bulk coffee (*Id.*). That's all well and good, but once again, it is not self-evident how the existence of such a premium in 2015 and 2016 establishes that the same (or similar) premium would have existed years earlier. Furthermore, the fact that Candace Preston did not investigate and had no opinion on whether the premium would have changed is illustrative of nothing. In other words, her lack of an opinion does not somehow establish that the premium remained the same (Doc. 268-4, p. 10).

Given the shoddiness of both parties' arguments, however, the Court is unable to say with any degree of certainty whether it would be legally proper or warranted under the circumstances to determine whether or not the Archer Farms and Café Tastle products are appropriate comparables. Consequently, the Court will stick to its position that the purported deficiencies in Andrien's choice of comparables is a problem of credibility, not admissibility. Plaintiffs will have the opportunity to criticize Andrien's choice of comparables on cross-examination, and the jury will ultimately have to decide whether instant-only or instant and microground products are the most appropriate comparables.

### 3. Unfamiliarity with Rulings and Evidence and Absurdity of Conclusions

In their third argument, Plaintiffs point out that Andrien never read the Seventh Circuit's opinion and was thus unaware of their "guidance on a methodology to compute a price premium" (Doc. 274, p. 7). Plaintiffs also claim that Andrien "seemed unaware of this Court's factual findings regarding the potential viability of a full refund method" (*Id.* at p. 8). Andrien was also unaware of the Seventh Circuit's "factual

findings" and the "voluminous record" regarding the public response to GSC, which Plaintiffs claim totally undermine Andrien's conclusion that GSC somehow provided value above the $0.45 cost per serving (*Id.* at pp. 7–8). Plaintiffs assert that because Andrien's "value" conclusions are directly refuted by the factual findings of both this Court and the Seventh Circuit, they should be excluded (*Id.* at p. 8). Relatedly, in their fifth argument, Plaintiffs assert that Andrien's analysis leads to the "absurd" conclusion that the actual value of GSC had it been marketed truthfully was greater than what it sold for, and therefore could not aid the jury as the trier of fact (Doc. 274, p. 10).

First, it certainly seems like it would have been helpful if Andrien was familiar with the Seventh Circuit's opinion or the class certification Order, but the Court does not see why it was necessary or why it would disqualify Andrien's testimony. And Plaintiffs don't cite to any legal authority indicating that it does, in fact, disqualify his testimony.

The Court thinks it's also worth noting that Plaintiffs seem to be reading a bit too much into some of the Orders and Opinions in this case. Yes, the Seventh Circuit indicated that damages could be computed in this case "for example . . . by taking the difference between the actual value of the package she purchased (instant coffee) and the inflated price she paid (thinking the pods contained real coffee grounds)." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014). But this language is by no means a binding instruction on how the price premium must be calculated in this case. It is merely an example, as the Seventh Circuit explicitly stated. Accordingly, the Court sees no reason why Andrien cannot opine that the price premium should be calculated using an alternate methodology, namely by taking the difference between the actual value of

the package consumers purchased (instant and microground coffee) and the inflated price they paid (thinking the pods contained real coffee grounds).

Also, this Court has indicated more than once that a full refund *may* be the proper measure of damages based on the evidence in the case (*see* Doc. 247; *see supra* section B(1)). But each time, the Court also has indicated that it is ultimately up to a jury to decide whether the evidence supports that measure of damages (*see* Doc. 247; *see supra* section B(1)). To that end, Defendants are certainly allowed to offer their interpretation of the evidence (*i.e.*, that some consumers intended to purchase instant coffee, liked GSC, and repeatedly purchased GSC, and those who didn't like it still received some benefit from it), and to argue that a full refund is not the appropriate measure of damages.

As for Andrien's unfamiliarity with the evidence regarding the public's response to GSC, the Court agrees that this is indeed problematic for him. But it's a problem of credibility, not admissibility. By opining that the actual value of GSC is greater than $0.45, Andrien is in essence saying that consumers would have been willing to pay more for instant coffee in a k-cup than they paid for ground coffee in a k-cup. This suggestion seems comically inconsistent with the evidence presented in this case so far and the realities of the coffee market in the United States.[11] But if that is the story that Defendants want to present to the jury, it is their gamble to make. Plaintiffs' counsel can

---

[11] *See, e.g., Instant Coffee Fights Back Against the Growing Challenge from Fresh*, EUROMONITOR INT'L (Aug. 20, 2016), http://blog.euromonitor.com/2016/08/instant-coffee-fights-back-growing-challenge-fresh.html (indicating that instant coffee sales in North America are "struggling" and "forecast to shrink"); Roberto Ferdman, *Almost Half of the World Actually Prefers Instant Coffee*, WASH. POST, July 14, 2014, https://www.washingtonpost.com/news/wonk/wp/2014/07/14/almost-half-of-the-world-actually-pr efers-instant-coffee/?utm_term=.a8818f299baf ("Americans have proved pretty exceptional in their utter disinterest in warming up to [instant coffee]. . . . [I]nstant coffee sales have barely budged since 2008, and even fell marginally last year to just over $960 million. While that might sound like a lot, it's actually a paltry fraction of the $30-plus billion U.S. coffee market.").

certainly press Andrien about his counterintuitive conclusion that GSC is worth more than its sale price on cross-examination. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

In sum, Plaintiffs have failed to convince the Court that Jeffrey Andrien's opinions and analysis are so unreliable that they are inadmissible under *Daubert* and Rule 702. Consequently, Plaintiffs' motion to exclude Andrien's testimony is denied.

## DEFENDANTS' MOTION TO DECERTIFY THE CLASS

An order regarding class certification is subject to alteration or amendment prior to final judgment. FED. R. CIV. P. 23(c)(1)(C). The decision whether to decertify a class action rests in the discretion of the district court. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir.1993) ("Under Federal Rule of Civil Procedure 23, a district court has broad discretion to determine whether certification of a class is appropriate."); *see also Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 549 (7th Cir. 2016) ("We review a district court's decision regarding class certification for abuse of discretion." (citing *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014)). In considering the appropriateness of decertification, the standard of review is the same as for a motion for class certification: whether the requirements of Rule 23 are met. *See Phillips*, 828 F.3d at 549.

In their motion to decertify the class, Defendants challenge only one aspect of class certification: the measurement of damages, which bears on Rule 23(b)(3)'s predominance requirement (*see* Doc. 278). The Court will begin by discussing the legal standard for predominance and its previous predominance determination from the class certification Order. The Court will then turn to the substance of Defendants' specific

arguments regarding predominance that are presented in the motion to decertify.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 136 S. Ct. at 1045. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quoting 2 W. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, pp. 196–197 (5th ed. 2012)). Predominance is satisfied when "the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045. *See also Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) ("Predominance is satisfied when 'common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication.'" (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012))), *cert. denied*, 137 S. Ct. 1582 (2017).

The predominance analysis begins with the elements of the underlying cause of action. *Messner*, 669 F.3d at 815 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). In the class certification Order, the Court looked at the three central

elements of all (or at least most) of the consumer fraud claims at issue: deception,[12] reliance/causation, and damages (*see* Doc. 247). The element of deception represents the question common to the entire class: whether the GSC packaging was likely to deceive a reasonable consumer (Doc. 247). The Court determined that this is the threshold question when it comes to determining Defendants' liability, and therefore it is the most significant element of each class member's claim (Doc. 247). This question can be resolved with common proof (Docs. 247, 250). As for damages, the Court determined that damages are capable of being measured on a class-wide basis using Candace Preston's Retail Damages model or her Price Premium Damages model (Doc. 247). Reliance/proximate causation is the only element that possibly necessitates individualized proof. But it is not a required element under the statutes of some states, and other states permit a presumption of reliance/causation, meaning it could be proven on a class-wide basis for those states, and individual inquiries would not be necessary (Docs. 247, 250). Furthermore, the issue of reliance/causation is simpler than the issues of deception and damages and does not require costly expert evidence to prove (Doc. 247). With these things in mind, the Court concluded that common issues of law and fact predominate, and proceeding as a class action was the superior form of adjudication for this case (*Id.*).

In their motion to decertify the class, Defendants argue that, based on the additional discovery developed by the parties, neither of Preston's damages models is

---

[12] As mentioned at the beginning of this Order, the Court previously referred to the element of deception—meaning whether the GSC packaging was likely to deceive a reasonable consumer—as the issue of "liability" (*see* Doc. 247, 250).

adequate for measuring damages on a class-wide basis because, for a number of reasons, neither model "provide[s] a measure of damages attributable only to the alleged misconduct and that can be calculated on a classwide basis" (Doc. 278, p. 13). The idea is that if Plaintiffs are left without a valid way to measure damages on a class-wide basis, then individualized proof will be necessary to determine each class member's damages. And the individualized damage calculations, combined with the individualized inquiries regarding reliance/causation, would mean that individual questions overwhelm questions common to the class and therefore decertification is required (*see* Doc. 278, p. 5).

An "essential component of the predominance inquiry" is whether there is a reliable method for measuring damages on a class-wide basis that matches Plaintiffs' theories of liability. 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 5:23 (13th ed.) (discussing the broad implication of *Comcast*, 133 S. Ct. 1426); *Suchanek*, 764 F.3d at 760 ("In determining whether to certify a consumer fraud class, the court should begin with a "rigorous analysis" into whether the plaintiffs' "damages are susceptible of measurement across the entire class." (quoting *Comcast*, 133 S. Ct. at 1433)). *See also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("[T]he method of determining damages must match the plaintiff's theory of liability and be sufficiently reliable." (citing *Comcast*, 133 S. Ct. at 1433)), *cert. denied*, 136 S. Ct. 1161 (2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 523 (6th Cir. 2015) (*Comcast* requires courts to a "conduct a 'rigorous analysis' to ensure at the class-certification stage that 'any model supporting a plaintiff's damages case [is] consistent with its liability case,' i.e., that the

model 'measure[s] only those damages attributable to that theory' of liability." (quoting *Comcast,* 133 S. Ct. at 1433)), *cert. denied*, 136 S. Ct. 1493 (2016).

As an initial matter, the Court notes that even if Defendants succeed in showing that neither of Candace Preston's damages models meets the requirements of *Comcast*, and Plaintiffs are left without a way to measure damages on a class-wide basis, decertification is still not required. It is well-established that the need for individual assessments regarding reliance/causation and damages does not preclude class certification entirely; the Court still has the discretion to certify the case on the issues that are common to the class, particularly the issue of deception. *See In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602, 603 (7th Cir. 2014); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800, 801 (7th Cir. 2013); *Pella Corp. v. Saltzman*, 606 F.3d 391, 393–94 (7th Cir. 2010).

## A. STATUTORY DAMAGES

Defendants argue that Plaintiffs' claims for statutory damages do not provide a basis for class certification without "an independent and non-speculative measure of damages" (Doc. 278, p. 20). In other words, Defendants seem to believe that before statutory damages are available, class members must offer evidence that they not only suffered actual harm, but they also must offer evidence that quantifies the amount of that harm (*see id.*; Doc. 280, p. 5).[13]

---

[13] The element of damages encompasses both the fact of damage (meaning proof of an actual injury) as well as the measurement of that damage (meaning quantifying the value of the injury). In the class certification Order, the Court spoke mainly in terms of measuring and quantifying the damage of each class member (Doc. 247). *See Suchanek*, 764 F.3d at 760 ("In determining whether to certify a consumer fraud class, the court should begin with a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013))). Candace Preston's testimony is necessary when it comes to measuring damages.

Two states provide for statutory damages: Alabama and New York. Alabama's Deceptive Trade Practices Act provides for the greater of $100 or actual damages. ALA. CODE § 8-19-10(a)(1). New York's Deceptive Act and Practices Law provides for the greater of $50 or actual damages while the False Advertising law provides for the greater of $500 or actual damages. N.Y. GEN. BUS. LAW §§ 349(h) and 350-e.

The Court agrees with Defendants that Plaintiffs must indeed prove an actual injury before they can recover statutory damages under either the Alabama or New York statutes. *See* ALA. CODE § 8-19-10(a) ("Any person who commits one of more of the acts or practices declared unlawful under this chapter and thereby *causes monetary damage to a consumer* . . . shall be liable to each consumer . . . . ") (emphasis added); *Lynn v. Fort McClellan Credit Union*, No. 1:11-CV-2904-VEH, 2013 WL 5707372, at *7 (N.D. Ala. Oct. 21, 2013) (finding the plaintiff had no claim under the ADTPA because he proved no monetary damages); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) ("[A] plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm.").

But the Court is not convinced that Plaintiffs must prove the exact monetary value of their injury. *Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142, 2017 WL 1155398, at *57 (E.D.N.Y. Mar. 27, 2017) ("New York law does not require that the injury must be proven with a specified degree of certitude; a plaintiff is only required to show 'that plaintiffs paid more than they would have for the good [because of] the deceptive practices of the defendants-sellers.'" (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015))). Regardless of the amount of damage—whether it is a full refund or a

partial refund—it will be, without question, less than $50. So it doesn't seem to matter what the exact amount of damage is when class members in Alabama and New York will not be collecting that amount—they will be collecting the statutory damages amount instead. *Kurtz*, 2017 WL 1155398, at *57 (holding that the "battle of experts" on the amount of price premium that consumers paid for "flushable toilet wipes" that allegedly were not actually flushable was "largely beside the point" because "[o]nce an injury is established . . . New York General Business Law § 349(h) provides for statutory damages of $50 to each class member"); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 70 (E.D.N.Y. 2015), *reconsideration denied*, 140 F. Supp. 3d 241 (E.D.N.Y. 2015) ("Once the injury is established, statutory damages can be calculated on a classwide basis. . . . Although not necessary, expert Weir may be able to determine an average price paid for the misrepresentation.")

Thus, it appears to the Court that class members from Alabama and New York only need to show the fact of damage. And when it comes to proving the fact of damage, the Court does not believe that Candace Preston's testimony is necessary. While it could certainly be used to show that consumers bought a worthless product or paid an inflated price, it seems like other evidence, such as consumer complaints, expert surveys, and Defendants' own internal documents, could just as easily show the same thing. If the Court is correct, Plaintiffs' ability to measure damages on a class-wide basis, or Defendants' criticisms of Candace Preston's damages models, would not have any bearing on the claims of class members from these states. In other words, these claims could proceed even if Candace Preston's damages models are thrown out.

In the upcoming section titled "Management of Trial," the Court invites the parties' input on the evidence needed to prove that fact of damage.

## B. RETAIL DAMAGES MODEL

As previously indicated, the Retail Damages model, which provides consumers with a full refund of the purchase price of GSC, is based on the notion that consumers would not have purchased GSC if not for the deceptive packaging and the product was worthless to them. Defendants argue that the Retail Damages model does not meet the requirements of *Comcast* and is not a viable method for determining class-wide damages because (1) it is contradicted by the evidence, (2) Preston did not develop the model herself and instead relied on an assumption from Plaintiffs' attorneys, and (3) it is inconsistent with Plaintiffs' omission theory of liability (Doc. 278, pp. 18–20). For the reasons explained below, the Court is unpersuaded by these arguments.

### 1. Evidence Regarding the Value of GSC

Defendants repeat the argument from their *Daubert* motion that the Retail Damages model is not a viable method for determining class-wide damages because evidence in the record demonstrates that GSC was not worthless and that some consumers received a benefit from GSC (Doc. 278, p. 18). Like they did in their *Daubert* motion, Defendants point to Preston's deposition testimony that the components of GSC—the instant coffee and the single-serve k-cup packaging—had value (*Id.*). For the reasons previously explained in this Order, the Court does not believe that the cost of GSC's ingredients and packaging has any bearing on whether a full refund is an appropriate measure of damages.

Defendants also point to a comment from one participant in Dr. Bobby Calder's

consumer study, who said "I would recommend this coffee as having a very nice medium rich flavor. It has nice color and body" (Doc. 278, pp. 18–19; Doc. 101-8, p. 82). And Defendants point to favorable consumer reviews that they received about GSC, which they claim show that some consumers liked GSC, appreciated it as a lower-cost alternative and repeatedly purchased the product (Doc. 278, p. 19; Doc. 108-8, p. 9).

A jury could, however, easily reject this evidence. First, the passage from the survey participant was cherry-picked, and Defendants ignore the rest of what the participant had to say, including that GSC "is instant coffee" (Doc. 101-8, p. 82). She also said

> [I]t's kind of like why even bother to have a Keurig with the Grove Square? Add the water and call it a day. You're paying for the separate tubs. I could just take a spoon and drop it in if that's all the Grove Square is. I'm kind of sad wasting money. I want to make sure I get what I paid for. What's the point of Grove Square?

(Doc. 101-8, p. 82). As for the consumer reviews, there is evidence that Defendants had their employees write fake, positive reviews (*see* Doc. 101-1, p. 28). Furthermore, the positive reviews are only a very small fraction of the consumer reviews received by Defendants. The overwhelming majority of the reviews involve consumers who were very dissatisfied with the product, wanted their money back, and vowed never to purchase it again.

Consequently, the evidence cited by Defendants does not make it indisputable, or even relatively clear, that some consumers received a benefit from GSC. Defendants' evidence simply shows that Plaintiffs ultimately may not be able to make the required showing that GSC was of no value to consumers. But it must be left for a jury to decide

whether Plaintiffs made that showing. *See, e.g., Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 521 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493 (2016) (emphasizing that establishing predominance requires plaintiffs to show only that "*they will be able* to prove injury through common evidence, not that they have in fact proved that common injury.")

### 2. Origination of the Model

Defendants repeat the argument from their *Daubert* motion that the Retail Damages model is "unsupported" because instead of determining the value of GSC, Preston adopted the assumption of Plaintiffs' attorneys that GSC had no value (Doc. 278, pp. 8, 19). According to Defendants, this is inappropriate because "determining the value of a consumer product requires expert analysis" (*Id.* at p. 19). The Court does not see how the case cited by Defendants stands for that proposition, however, nor is it clear how the analysis of that case would apply to the facts here.[14] Defendants also suggest that Plaintiffs arrived at their position that GSC had no value through some impermissible leap in logic (Doc. 278, p. 19). But as previously explained in this Order, there is plenty of evidence to support that position. Consequently, Defendants' argument provides no basis for concluding that the Retail Damages model is an invalid method for measuring damages across the entire class.

### 3. Applicability to Omission Theory of Liability

Defendants' final argument is that Preston's Retail Damages model is not a viable method for determining class-wide damages because it cannot apply to Plaintiffs' omission theory of liability (Doc. 278, p. 20). This argument is part of Defendants'

---

[14] Defendants cited to *Weiner v. Snapple Beverage Corp.*, Case No. 07 CV 8742(DLC), 2010 WL 3119452, *10 (S.D. N.Y. Aug. 5, 2010).

dogged attempt to convince the Court that Plaintiffs are proceeding on two separate, "mutually exclusive" theories of liability: (1) the GSC packaging was deceptive by virtue of affirmative misrepresentations set forth on the package, such as the use of the word "soluble" instead of "instant," and (2) the GSC packaging was deceptive by virtue of omissions, such as not disclosing the percentage of microground coffee versus instant coffee (*see* Doc. 268, pp. 9, 14-15, 16; Doc. 278, pp. 10, 13, 17).

Once again, however, the Court rejects Defendants' characterization of Plaintiffs' theories of liability (*see* Doc. 247, pp. 32–33, 35). Plaintiffs are, in fact, proceeding on two different theories of liability, just not the two advanced by Defendants. Plaintiffs' first theory of liability is that because GSC was overwhelmingly instant coffee, its value is nothing. That is, the deceptive packaging caused consumers to pay for a product they never would have purchased had they known it was not ground coffee. Plaintiffs' second theory of liability is that because GSC was overwhelmingly instant coffee, it is worth something substantially less than what consumers paid for it thinking it was ground coffee. In other words, the deceptive packaging caused consumers to pay an inflated price for instant coffee.

Neither of these theories of liability is tied to any one particular aspect of the GSC packaging. As the class certification Order previously highlighted, *the totality of the GSC package is at issue*. Specifically, the Court explained that "[t]he named Plaintiffs all claim that *the overall GSC packaging was deceptive* in that it created, and/or failed to correct, the misimpression that the product was premium, ground coffee." (Doc. 247, p. 32) (emphasis added). The use of the word "soluble" instead of "instant" and the omission

of the percentage of instant coffee were just two aspects of the package that contributed to the deception that GSC was ground coffee. As the Seventh Circuit pointed out, there were other aspects of the package that also contributed to the deception, such as "the image of K–Cups with fresh roasted coffee beans and the admonition that the GSC product was intended '[f]or use by owners of Keurig© coffee makers,'" the "quality promise" indicating the coffee was "made with some of the world's highest quality Arabica beans, roasted and ground to ensure peak flavor, then packaged to lock in optimum freshness," and the "Coffee Lover's Bill of Rights." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 753 (7th Cir. 2014)).

The Court further explained in the class certification Order that it "failed to see how or why it makes a difference whether some of the named Plaintiffs were misled solely by affirmative misrepresentations in statements, images, and descriptions set forth on the packaging as opposed to a material omission or some combination of affirmative misrepresentations and omissions" (Doc. 247, p. 32). Once again, Defendants have not provided any explanation, or cited to any authority, showing that this distinction actually matters, particularly with regard to calculating damages. The only thing Defendants say is that there is no indication of "how a full refund can be the proper measure of damages for consumers who understood that they were purchasing a product comprised of instant and microground coffee but thought they were getting a different ratio of instant and microground coffee" (Doc. 278, p. 20). Aside from being too perfunctory for the Court to analyze, this explanation also appears to be entirely divorced from the evidence in this case—the Court is unaware of any evidence in the

record showing that some purchasers knew they were purchasing instant and microground coffee.

In sum, neither this argument nor Defendants' other two arguments provide any basis for concluding that the Retail Damages model is an invalid method for measuring damages across the entire class.

## C. PRICE PREMIUM DAMAGES MODEL

The Price Premium Damages model reflects Plaintiffs' theory of liability that consumers paid an inflated price for GSC, and it would provide class members with a partial refund. This model assumes that the value of GSC would have been substantially less than what it sold for had it not been deceptively marketed as ground coffee. The price premium was computed by taking "the difference between the actual value of the package [consumers] purchased" and "the inflated price [consumers] paid" thinking the product was as advertised. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014).

Defendants claim that deficiencies in Preston's method for determining the "actual value" of GSC mean that the Price Premium model does not satisfy the requirements of *Comcast* and cannot be used to determine class-wide damages (Doc. 278, pp. 7–9, 14–17). Specifically, Defendants argue that the model does not isolate the price premium associated with the alleged misleading acts because Preston (1) failed to distinguish between Plaintiffs' two theories of liability, (2) failed to consider the supply-side of valuation, and (3) failed to control for differences between GSC and the comparable products that may contribute to pricing (Doc. 278, pp. 14–17). Before the Court gets to these arguments, none of which it finds persuasive, it will first address

Plaintiffs' argument regarding the level of scrutiny required by *Comcast*.

### 1. Level of Scrutiny Required by *Comcast*

Plaintiffs argue that Defendants are trying to impose a level of refinement for the damages models that is not required by Rule 23 or *Comcast* (Doc. 279). While this argument holds some intrigue, the Court declines to address it because neither party provided a worthwhile analysis. To begin with, Defendants simply assumed without any discussion that the Seventh Circuit interprets *Comcast* to require the level of specificity that the district courts in California do (*see* Doc. 268, pp. 14–17). Plaintiffs then called into question whether that was true, but their entire "argument" consists of a two-paragraph block quotation from a case that is eighty-five years old and predates Rule 23 (Doc. 279, pp. 14–15). Plaintiffs make absolutely no effort to discuss the requirements of Rule 23 as interpreted by the Seventh Circuit, let alone the impact *Comcast* had on Rule 23 (*see* Doc. 279). Defendants came back and simply accused Plaintiffs of failing to cite to any case law and failing to distinguish the California district court cases that Defendants cited to, but once again make no effort to substantiate their own argument in the first place (Doc. 280. p. 3). Quite simply, neither side did their job. The Court will not conduct the necessary research and analysis to construct each side's argument and then debate itself to determine which argument is correct.

### 2. Failure to Distinguish Between Theories of Liability

Defendants argue that Preston's Price Premium analysis "is not tied to the alleged wrongdoing because it does not distinguish between Plaintiffs' theories of liability" (Doc. 278, p. 17; *see also* Doc. 268, p. 16). Defendants believe Preston needed to conduct a separate analysis for consumers who were misled by affirmative misrepresentations and

consumers who were misled by omissions (Doc. 278, p. 17). This argument is summarily rejected for the same reasons stated above. *See supra* section (B)(3).

### 3. Failure to Control for Difference Between GSC and Comparable Products

This argument is Defendants' most substantial one, and it relates to Preston's method of calculating the price premium by taking the difference between the retail price of GSC and actual value of the package consumers purchased. Preston determined the "actual value" of GSC by looking at the retail price of comparable instant coffees. According to Defendants, simply taking the difference between the retail cost of GSC and the retail cost of instant coffee is a "price differential" calculation, not a "price premium" calculation (Doc. 268, pp. 16–17; Doc. 278, pp. 15–17). Defendants believe that a proper price premium calculation must adjust for differences between GSC and the comparable products, otherwise the model does not isolate the premium that is due solely to the alleged deception (Doc. 278, p. 14).

The Court first notes that calculating the price premium is indisputably an appropriate way to quantify damages on a class-wide basis (*see* Doc. 268-2, pp. 13– 14). *See also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014). Defendants simply dispute the precision of Preston's particular methodology of calculating the price premium. They essentially argue that she needed to include several more variables in order for her model to be an accurate measure of damages. Defendants have not, however, convinced the Court that this purported deficiency means her damages model is so deficient that it must be excluded and the class must be decertified.

Defendants refer the Court to four cases in which a "price differential" calculation

was purportedly rejected: *In re POM Wonderful*, No. 10-cv-2199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014); (2) *Lanovaz v. Twinings North America*, No. 12-cv-2646, 2014 WL 1652338 (C.D. Cal. July 24, 2014); (3) *Algarin v. Maybelline*, 300 F.R.D. 444 (S.D. Cal. 2014); and (4) *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) (Doc. at p. 15). Unfortunately, however, Defendants make absolutely no effort to apply the analysis of those cases to the facts of this case (*see* Doc. 268, pp. 16–17; Doc. 278, pp. 14–17). They simply make the conclusory statement that "Like the expert opinions rejected *In re POM Wonderful, Lanovaz*, and *Algarin*, Preston offers only a price differential that is not tied to the actual value of GSC and, therefore, to any alleged wrongdoing." (Doc. 278, p. 16). The Court will not review the cases and supply the legal analysis that Defendants neglected to provide.

The Court also notes that there is case law that seemingly refutes Defendants' suggestion that it is always legally unacceptable to use a "price differential" calculation as a measure of damages in a false advertising case. *See, e.g., Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 394 (S.D.N.Y. 2016) ("Calculating a price premium can be as simple as computing the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label)."); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571–72 (S.D.N.Y. 2014) (finding the price premium associated with the deceptive advertisement was the difference between the market price of 100% olive oil and the market price of the less expensive olive-pomace oil).

Furthermore, Candace Preston explained that she considered the differences

between GSC and the instant-only products that she chose as comparables—such as, branding, the microground component, and the k-cup packaging—and whether those differences contributed to the difference in price (*see* Doc. 272-3). She concluded, however, that those differences did not make the value of GSC higher than the value of her chosen comparable (*See* Doc. 272-3). The Court believes that Preston's explanations have to be evaluated by a jury. Determining whether Preston's model is accurate as it stands, or whether it needed to include more variables in order to be accurate, would require the Court to delve into the merits of the case and resolve issues of fact, which would invade the province of the jury.

### 4. Failure to Consider Supply-Side of Valuation

Defendants' final argument is that Preston's Price Premium analysis "failed to consider the supply-side of valuation, which also warrants decertification" (Doc. 278, p 17; *see also* Doc. 268, p. 18). This argument appears to have been thrown in as an afterthought because the entire argument is comprised of the following three sentences:

> A determination of the price premium arising from an alleged deception must consider whether manufacturer would even sell the product at the alleged actual value. The court *In re NJOY, Inc. Cons. Class Action Litig.,* No. 14-cv-428, 2016 WL 787415, at *7 (C.D. Cal. Feb. 2, 2016), excluded a price premium testimony that ignored this question, stating: "Dr. Harris . . . ignores the price at which NJOY, and other e-cigarette manufactures, would be willing to sell their products." Here too, Preston's bulk instant as "a comparable" theory ignores the price at which it would be feasible to sell GSC and, in effect, concludes Sturm should have sold GSC at a loss. (Dkt. 268-1, Preston 2d Supp. Rpt. Table 6 (2011 data); Dkt. 137-20 at Page ID # 2193-94).

This argument is simply too undeveloped for the Court to properly analyze it. Defendants do not provide any coherent explanation as to why an expert should

consider the price at which the manufacturer would sell the product when calculating a price premium. Instead, they simply rely on one sentence cherry-picked from the *In re NJOY* case. Furthermore, Defendants insinuate that they would have sold GSC at a loss if they charged only $0.06 per cup, but they do not provide any evidence to back this up. Absent that evidence, this insinuation is not particularly credible because, after all, a number of other manufacturers were willing to sell instant coffee at only $0.06 per cup (*see* Doc. 268-1, p. 11).

For these reasons, the Court is unconvinced that Preston's purported failure to consider the supply side of valuation means that her Price Premium model of damages fails the requirements of *Comcast*.

In sum, Defendants have failed to set forth an argument that justifies excluding the Price Premium damages model as an inappropriate measure of damages. The Court concludes the Retail Damages model and the Price Premium damages model are both acceptable methods for calculating damages across the entire class. Consequently, the Court stands by its previous determination that predominance is satisfied. Defendants' motion to decertify is denied.

## MANAGEMENT OF TRIAL

The class was certified as to liability only, and the Court envisioned a bifurcated trial (Doc. 247; *see also* Doc. 250). The first phase would address the deception, meaning the question of whether the GSC packaging was likely to mislead a reasonable consumer (Docs. 247, 250, 254). If that question was answered in the affirmative, a second phase would then address the issue of reliance/proximate causation with respect to each class

member and damages (Doc. 254).

The time has come to replace this simplistic plan with something much more clear and detailed. To that end, the Court notes that it always assumed, although it did not explicitly state, that additional issues would be certified for the whole class, or at least for certain subclasses, before trial arrived (*see, e.g.*, Doc. 247, pp. 37–38 ("If a single class is certified for the purposes of establishing damages, each class member will receive a full refund or a partial refund. Alternatively, in the event subclasses are created, class members in certain states will receive statutory damages."). Moreover, it has become clear to the Court that having the first jury answer only the question of deception would not be an effective use of the jury or an effective use of the time and resources of the parties and the Court. If the question of deception is answered in the affirmative, the jury should also address all other pertinent issues that can be resolved using common proof, as opposed to individualized proof. This will serve to minimize the overlap of evidence between the two phases. And, as Plaintiffs suggested at the hearing, it could also potentially resolve the claims of some class members, thereby paring down what must be addressed during the second phase.

The Court acknowledges that there has already been some discussion and legal analysis regarding additional common questions and proposals for managing trial. But that information is scattered throughout the submissions and Orders in this case, and the analysis is often deficient or devoid of input from one of the parties. The Court seeks to have the parties now consolidate that information and supplement it with a more thorough analysis than has been provided thus far. The Court aims to have this

accomplished in one joint submission so that it does not have to sift through multiple documents to identify and synthesize the parties' respective positions. Both parties should take particular care to adequately explain their position and provide sufficient citations to legal authority. Vague, conclusory, or unsupported statements will not be tolerated.

The Court would like Plaintiffs to begin by submitting a memorandum that not only identifies additional questions common to the entire class or common to sub-classes, but also contains something of a trial plan. More specifically, the Court would like Plaintiffs to separately discuss each of the statutes under which they have stated a claim. For each statute, Plaintiffs should identify:

1. the elements of a cause of action;

2. the elements that remain to be proven if the question of deception is answered in the affirmative, including the fact of damage, *see supra* n.13;

3. any additional issues that are not required elements of the claim, but are nonetheless pertinent;[15]

4. whether the remaining elements and issues can be established using common proof or whether individualized proof will be required, and what evidence Plaintiffs intend to use to prove each remaining elements/issues;

5. whether each remaining element or issue is relevant under any other statute—in other words, whether the issue is relevant to the entire class or a certain subclass; and

6. whether each remaining element or issue can be decided by the first jury.

---

[15] For example, the Court indicated in the class certification Order that Defendants' intent was a required element of any of the class members' claims, but it was a relevant issue under some of the statutes (Doc. 247, p. 25).

Plaintiffs also should address whether the class definition needs to be amended. The class was defined as "All persons or consumers that during the Class Period, from September of 2010, *up through the date the case is certified* and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee" (Doc. 247) (emphasis added). It has been determined, however, that sales of GSC were discontinued in September 2014 (Doc. 200), and Defendants indicated at the hearing that they believed the class period ended in September 2014 (Doc. 310, p. 27). Thus the class definition does not appear to accurately reflect the end of the class period.

For their response, Defendants should begin with Plaintiffs' submission and add their responses to that same document.[16] They should respond point by point, explicitly indicating whether they agree or disagree with Plaintiffs' position. Where Defendants disagree, they must provide a thorough explanation of their respective position and include citations to relevant legal authority.

Plaintiffs should then take Defendants' submission and add their own replies to that same document. For points where the parties are in agreement, no reply is necessary. For each point where there is a disagreement, however, Plaintiffs must provide a reply to Defendants' response.

---

[16] Plaintiffs should send Defendants their submission in a format that can be edited, such as a Microsoft Word document.

<u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Exclude the Expert Testimony of Candace Preston Regarding Damages (Doc. 267) is **DENIED.** Defendants' Motion to Decertify the Class (Doc. 278) is **DENIED.** Plaintiffs' Motion to Exclude the Expert Testimony of Jeffrey Andrien (Doc. 274) is **DENIED.**

The joint submission regarding trial procedures shall be filed with the Court on or before **October 30, 2017**.

**IT IS SO ORDERED.**

**DATED:** **August 28, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**